## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **DR. ROBERT LANCE WILSON, D.O.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **No. _____** |
| | ) |
| **ILLINOIS DEPARTMENT OF** | ) |
| **FINANCIAL AND PROFESSIONAL** | ) |
| **REGULATION; ANDREW** | ) |
| **GORCHYNSKY; THOMAS GLASGOW;** | ) |
| **LEONARD A. SHERMAN; JAY** | ) |
| **STEWART; OFFICE OF THE COOK** | ) |
| **COUNTY MEDICAL EXAMINER;** | ) |
| **MITRA B. KALELKAR; EDMUND** | ) |
| **R. DONOGHUE; THE STATE OF** | ) |
| **ILLINOIS; DOE DEFENDANTS** | ) |
| **1-5; DOE DEFENDANTS 6-10; DOE** | ) |
| **DEFENDANTS 11-20; and DOE** | ) |
| **DEFENDANTS 21-30,** | ) |
| | ) |
| **Defendants.** | ) |

### COMPLAINT AND JURY DEMAND

Plaintiff complains of Defendants as follows:

### Summary Of The Suit

1.      This case is about the Defendants' rush to judgment to strip Dr. Wilson of his medical license for the compassionate palliative care that he provided to a dying and suffering patient, Henry Taylor, who, at the time that Dr. Wilson arrived at his hospital bed, was already irretrievably cast within the process of suffocating to death. Without conducting an adequate investigation as to the circumstances surrounding Taylor's death, and without obtaining any information as to why Dr. Wilson chose the particular palliative care approach that he did, the Defendants branded Dr. Wilson a "murderer", and had his medical license "temporarily"

suspended on October 9, 1998 pursuant to an *ex parte* order issued by the Director of Defendant Illinois Department of Financial and Professional Regulation (the "Department"). At no time prior to this *ex parte* summary suspension of Dr. Wilson's medical license were any of the other doctors who were present at the time of Taylor's death interviewed, and Dr. Wilson was neither notified of, nor allowed to participate in, the Department's telephone conference call to the Director on the supposed emergency need to immediately suspend Dr. Wilson's medical license.

2.      Moreover, despite learning that Taylor had, in fact, died from natural causes; that the palliative care provided by Dr. Wilson was, in fact, in accordance with Rule 2.20 of the American Medical Association's Code of Medical Ethics; and that the Cook County State's Attorney, after conducting a thorough investigation and convening a grand jury, had decided not to prosecute charges against Dr. Wilson, the Defendants continued to label Dr. Wilson as a "murderer", and the Department refused to (a) remove the "temporary" summary suspension of Dr. Wilson's medical license, and (b) drop its baseless Complaint seeking to revoke Dr. Wilson's medical license. Unbeknownst to Dr. Wilson at the time, in the pending license revocation proceeding, Dr. Wilson was "blackballed from the start" and he couldn't win his case before the Department "no matter what [the evidence turned out to be]" because the Medical Disciplinary Board ("MDB") of the Department "had it out for [him]". Accordingly, it is not surprising that on June 26, 2000 the Department decided to revoke Dr. Wilson's medical license for five years, despite the fact that there was no evidence to support the charges that the Department had lodged against him.

3.      Finally, some 15 years and six months later, after numerous hearings before the Department and three separate appeals through the Illinois State Court judicial system, along with three separate reversals and remands to the Department, upon Dr. Wilson's fourth appeal, on

June 2, 2014 the Circuit Court of Cook County, Illinois (the Hon. LeRoy K. Martin, presiding), rendered a Final Judgment in Dr. Wilson's Fourth Complaint on Administrative Review (Px 1) reversing the Department's wrongful suspension and revocation of Dr. Wilson's medical license for lack of evidence, with a ruling that the Department's unconscionable delays constituted a violation of Dr. Wilson's due process rights. (Px 2 pp. 9-12) Someone with some common sense and a basic sense of fundamental justice finally convinced the Department not to appeal Judge Martin's May 2l, 2014 Order and June 2, 2014 Final Judgment reinstating Dr. Wilson's medical license.

4.    As a result of the Defendants' wrongful conduct, Dr. Wilson not only lost his medical license for over 15 years with all attendant public humiliation and loss of income, he lost his house, his car, and most of his personal possessions, but all the while maintained his pride, his self respect, and his wife, despite the fact that she and her family were subjected to a sudden and drastic change in their standard of living. As set forth in detail below, the Defendants' intentional and reckless conduct constituted violations of (a) Dr. Wilson's right to due process of law in connection with the suspension and revocation of his medical license and the right to practice medicine as protected by the Fifth Amendment of the United States Constitution and the due process clause of the Fourteenth Amendment; and (b) Dr. Wilson's right to be free from an unreasonable seizure of his property (his medical license) under the Fourth Amendment. Accordingly, Dr. Wilson hereby brings suit against the Defendants under 42 U.S.C. §1983, as well as pendant state law claims for malicious prosecution, a claim against the State of Illinois pursuant to 225 ILCS 60/46, and a declaratory judgment of indemnification against the State of Illinois for the wrongful conduct of the individual Defendants named herein who were state

actors acting within the course and scope of their duties as agents and employees of the State of Illinois.

5.     Through this suit, Dr. Wilson seeks to restore his good name, compensate his family for all the losses, suffering and embarrassment they were forced to endure, and finally bring his family's 15 ½ year nightmare to an end. In addition, Dr. Wilson seeks an appropriate award of punitive damages against the Defendants in any amount that the jury determines to be just, fair and reasonable, with the stipulation that each and every penny of the punitive damage award will be contributed to the General Research Fund of the American Heart Association.

## Jurisdiction And Venue

6.     This is a civil rights action brought pursuant to 42 U.S.C. §1983 to redress the Defendants' violations of Dr. Wilson's constitutional rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution. This Court has federal question jurisdiction under 28 U.S.C. §§1331 and 1343, with supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367(a).

7.     Venue is appropriate in this Court because the Plaintiff, as well as most of the Defendants, reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## Parties

8.     **Plaintiff** . Plaintiff Dr. Robert Lance Wilson, D.O. ("Dr. Wilson") is a Doctor of Osteopathy specializing in cardiology who was wrongfully stripped of his medical license and ability to practice medicine for over 15 ½ years from October 9, 1998 until June 2, 2014. Dr. Wilson is a citizen of the State of Illinois who resides in Cook County, Illinois.

9.     **Defendants.**

9.1.     Defendant Illinois Department Of Financial And Professional Regulation (the "Department") is an Illinois state regulatory agency, organized and existing under the laws

of the State of Illinois, and is charged, *inter alia*, with licensing and regulating the conduct of physicians within the State of Illinois. The Department is sued herein through its Director, Jay Stewart.

9.2.    Defendant Andrew Gorchynsky ("Gorchynsky") was the Chief Medical Coordinator of the Department who was a medical doctor. Gorchynsky is a citizen of the State of Illinois and a resident of Cook County, Illinois, and is sued herein solely in his individual capacity for actions that he engaged in as a state actor within the course and scope of his employment with the Department.

9.3.    Defendant Thomas Glasgow ("Glasgow") was the Chief of Medical Prosecutions of the Department. Glasgow is a citizen of the State of Illinois and a resident of Cook County, Illinois, and is sued herein solely in his individual capacity for actions that he engaged in as a state actor within the course and scope of his employment with the Department.

9.4.    Defendant Leonard A. Sherman ("Sherman") was the Director of the Department. On information and belief, Sherman is a citizen of the State of Illinois and a resident of Cook County, Illinois, and is sued herein solely in his individual capacity for actions that he engaged in as a state actor within the course and scope of his employment with the Department.

9.5.    Defendant Jay Stewart ("Stewart") is the Director of the Department. On information and belief, Stewart is a citizen of the State of Illinois and a resident of Cook County, Illinois, and is sued herein both in his individual capacity for actions that he engaged in as a state actor within the course and scope of his employment with the Department, and as a representative of the Department, but solely for the declaratory indemnification relief that Plaintiff seeks herein.

9.6.     Defendant Office Of The Cook County Medical Examiner ("CCME") is a Cook County, Illinois governmental agency, organized and existing under the laws of the County of Cook and the State of Illinois, and is charged, *inter alia*, with the responsibility of conducting thorough and complete autopsies in "suspicious" death cases, and reporting its findings to the appropriate governmental agencies. The CCME is sued herein through its Chief Medical Examiner, Stephen J. Cina, who is sued herein not individually, but in his representative capacity.

9.7.     Defendant Mitra B. Kalelkar ("Kalelkar") was the Deputy Chief Medical Examiner of the CCME who was a medical doctor. Kalelkar is a citizen of the State of Illinois and a resident of Cook County, Illinois, and is sued herein solely in her individual capacity for actions that she engaged in as a state actor within the course and scope of her employment with the Department.

9.8.     Defendant Edmund R. Donoghue ("Donoghue") was the Chief Medical Examiner of the CCME and a supervisor of Defendant Kalelkar. Donoghue is a citizen of the State of Georgia, but at all times relevant hereto was a citizen of the State of Illinois, and is sued herein solely in his individual capacity for actions that he engaged in as a state actor within the course and scope of his employment with the CCME.

9.9.     Defendant the State of Illinois is a State within the United States of America, and is sued herein through its Attorney General, the Hon. Lisa Madigan, Esq., who is sued herein not individually, but in her representative capacity.

9.10.    Doe Defendants 1-5 are sued herein under fictitious names since their true names and capacities are unknown to Plaintiff at this time, and Plaintiff will amend this Complaint to identify Doe Defendants 1-5 when this information becomes available through

discovery to be conducted in this case. Doe Defendants 1-5 are the employees of the Department and/or members of the MDB who participated in the decision to seek the summary suspension of Dr. Wilson's medical license without doing an adequate investigation as to the circumstances surrounding Taylor's death and why Dr. Wilson utilized the particular palliative care approach that he did. Doe Defendants 1-5 are sued herein in their individual capacities, and at all times relevant to this suit, acted within the course and scope of their duties as employees of the Department and/or as members of the MDB. On information and belief, Doe Defendants 1-5 are citizens of the State of Illinois and residents of Cook County, Illinois.

9.11.   Doe Defendants 6-10 are sued herein under fictitious names since their true names and capacities are unknown to Plaintiff at this time, and Plaintiff will amend this Complaint to identify Doe Defendants 6-10 when this information becomes available through discovery to be conducted in this case. Doe Defendants 6-10 are the employees of the Department and/members of the MDB who participated in the decision to continue the summary suspension of Dr. Wilson's medical license and continue the prosecution of the Department's baseless claims against Dr. Wilson, from and after the time these Defendants learned, or should have learned, that (a) Taylor died from natural causes, and the particular palliative care approach that Dr. Wilson utilized toward Taylor did not, in fact, cause Taylor's death; and/or (b) the particular palliative care approach utilized by Dr. Wilson toward Taylor was in compliance with Rule 2.20 of the American Medical Association's Code of Medical Ethics. Doe Defendants 6-10 are sued herein in their individual capacities, and at all times relevant to this suit, acted within the course and scope of their duties as employees of the Department and/or as members of the MDB. On information and belief, Doe Defendants 6-10 are citizens of the State of Illinois and residents of Cook County, Illinois.

9.12.    Doe Defendants 11-20 are sued herein under fictitious names since their true names and capacities are unknown to Plaintiff at this time, and Plaintiff will amend this Complaint to identify Doe Defendants 11-20 when this information becomes available through discovery to be conducted in this case. Doe Defendants 11-20 are the employees of the Department and/or members of the MDB who knew, must have known, or should have known that the Department's prosecution of its claims against Dr. Wilson from and after the first remand to the Department on October 15, 2014 was not proceeding in an expeditious manner, and thus knew, must have known, or should have known that the delay in prosecuting the Department's claims against Dr. Wilson constituted a violation of Dr. Wilson's due process rights. Doe Defendants 11-20 are sued herein in there individual capacities, and at all times relevant to the suit, acted within the course and scope of their duties as employees of the Department and/or as members of the MDB. On information and belief, Doe Defendants 11-20 are citizens of the State of Illinois and residents of Cook County, Illinois.

9.13.    Doe Defendants 21-30 are sued herein under fictitious names since their true names and capacities are unknown to Plaintiff at this time, and Plaintiff will amend this Complaint to identify Doe Defendants 21-30 when this information becomes available through discovery to be conducted in this case. Doe Defendants 21-30 are the supervisors of the other individual Defendants named herein who knew, must have known, or should have known of the violations of Dr. Wilson's constitutional rights as set forth herein, but failed to take appropriate measures to prevent or limit the continued violations of Dr. Wilson's constitutional rights. Doe Defendants 21-30 are sued herein in their individual capacities, and at all times relevant to the suit, acted within the course and scope of their duties as employees of the Department and/or as

members of the MDB. On information and belief, Doe Defendants 21-30 are citizens of the State of Illinois and residents of Cook County, Illinois.

9.14.    Defendants Gorchynsky, Glasgow, Sherman, Stewart, Doe Defendants 1-5, Doe Defendants 6-10, Doe Defendants 11-20, and Doe Defendants 21-30 (the "Department Defendants") and Defendants Kalelkar and Donoghue (the "CCME Defendants") acted individually and jointly under color of state law to deprive Dr. Wilson of his federal constitutional rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution. None of the conduct for which these individual Defendants is charged herein involves conduct of a judicial or prosecutorial nature, but rather involves conduct of an investigatory, management or administrative nature. Because the Department Defendants and the CCME Defendants acted knowingly and/or with reckless disregard to the constitutional rights of Dr. Wilson, with no objectively reasonable basis for their actions, they do not have qualified immunity from the damage claims set forth herein under the clearly established federal constitutional standards established by the United States Supreme Court, the Seventh Circuit Court of Appeals, and this Court.

## Facts

### A.    Background

10.    Dr. Wilson was first licensed to practice medicine in the State of Illinois on May 25, 1988, and, prior to October 9, 1998, never had any disciplinary problems with the Department. By September 30, 1998, Dr. Wilson was an experienced, well-respected and trusted cardiologist, with staff privileges at Olympia Fields Hospital in Olympia Fields, Illinois.

11.    By September of 1998 Henry Taylor ("Taylor") was 69 years old and was very ill with end-stage renal (kidney) disease. On September 18, 1998 Taylor developed edema

(swelling) in his right arm, so Taylor's doctor, Don L. Hollandsworth, D.O., had Taylor admitted to Olympia Fields Hospital.

**B.   Taylor Suffers From End-Stage Superior Vena Cava
Syndrome And Would Eventually Suffocate To Death**

12.     It was subsequently determined that Taylor suffered from superior vena cava ("SVC") syndrome, a potentially terminal condition whereby the return flow of blood from the upper part of the body to the heart is blocked, thus causing swelling of the soft tissue in the arms, head and neck. SVC syndrome eventually leads to swelling of the soft tissue in the neck, which results in compression of the trachea. This squeezing of the windpipe then results in difficulty in breathing (referred to as "air hunger") and eventual closure of the windpipe (referred to as "airway collapse"), and then "terminal apnoea/suffocation": cardiac arrest (heart stoppage) and, eventually, death from suffocation.

**C.   Taylor Requests No Artificial Ventilation To Prolong His Life
And Signs Two DNR Orders**

13.     Dr. Hollandsworth advised Taylor that he could suffocate to death because of SVC syndrome if he did not allow resuscitative measures or other interventions. Thereafter, however, Taylor, with the approval of Dr. Hollandsworth, signed two DNR (do not resuscitate) orders requesting no artificial ventilation to prolong his life.

14.     By the morning of September 30th, the swelling in Taylor's neck had progressed to the point where it was starting to affect Taylor's ability to breathe. At that stage of Taylor's SVC syndrome, there was no medication that would shrink the swelling or relieve the pressure. With Taylor's overall condition and advanced stage SVC syndrome, and with the two DNR orders in place, it was just a matter of time before Taylor suffocated to death.

**D.     By 7:30 a.m. On September 30, 1998, Taylor Complains Of
Difficulty In Breathing, But Again Refuses Intubation**

15.     At approximately 7:30 a.m., Taylor started to have worsening edema of his shoulder and neck, and then started to complain of difficulty in breathing. By 8:00 a.m., Taylor was drooling and flailing about trying to breathe. The resident doctor caring for Taylor, Dr. Teresa Muns, asked Taylor if he wanted to be intubated (a breathing tube placed down the trachea), but Taylor declined intubation.

16.     According to Dr. Muns, Taylor was suffocating and was probably going to die within minutes. At that point, Dr. Muns paged Dr. Wilson, and then gave Taylor a 2 mg shot of morphine to try to relieve Taylor's distress. Because of Taylor's advanced stage SVC syndrome, and with the DNR orders in place, by 8:00 a.m. on September 30, 1998, the irretrievable process of suffocating to death had begun, and for Taylor, death was now a certainty.

**E.     Dr. Wilson Arrived To Find A Critically Ill Patient Suffering
From Airway Collapse, Terminal Suffocation, And
Consciousness Of Suffocation And Impending Death**

17.     Dr. Wilson was first called to assist Taylor at approximately 8:10 a.m. on September 30, 1998. Dr. Wilson was a cardiologist with his practice in cardiovascular and critical care medicine, who had previously been called in as a consultant by Taylor's attending physician, Dr. Hollandsworth, because of the cardiology aspects of Taylor's SVC syndrome.

18.     When Dr. Wilson arrived at Taylor's bedside, he found a patient who was suffocating to death with air hunger. As admitted by the Department, Dr. Wilson "was called to Taylor's bedside and witnessed him <u>suffocating to death as his trachea collapsed</u> due to [SVC] syndrome." Dr. Wilson explained to Taylor that he was going to die without the insertion of a breathing tube, and then asked Taylor if he could put a tube down Taylor's throat to help him breathe. Taylor, however, refused Dr. Wilson's repeated requests for intubation.

19.     Then at 8:16 a.m. -- some six or seven minutes after Dr. Wilson arrived -- Taylor's airway collapsed, thus cutting off all oxygen. Taylor had deteriorated from "air hunger" to "airway collapse", and Dr. Wilson was now faced with a condition of terminal apnoea/suffocation. Thus, with the two DNR orders in place, Dr. Wilson had to care for a patient who was not only irretrievably spiraling down the path of suffocating to death, but also a patient who was uncontrollably gasping for air and experiencing the conscious suffering of awareness of his impending death from suffocation. Further, because Taylor's attending physician, Dr. Hollandsworth, had already approved Taylor's two DNR orders, it is undisputed that <u>there was nothing Dr. Wilson could do to save Taylor's life</u>.

20.     Dr. Wilson then administered another shot of morphine, this time 10 mgs.  But the additional morphine did nothing to relieve Taylor's gasping respirations and suffering through his consciousness of the fact that he was irretrievably cast within the process of suffocating to death.

### F.     Dr. Wilson Had A Duty To Not Only Relieve Taylor's Pain, But Also To Relieve Taylor's Suffering During The Process Of Death

21.     Unfortunately, death for Taylor was not a merciful split-second event; rather, it was a horrific process.  The easy thing would have been for Dr. Wilson to just turn his back and walk away, and let this 69 year old terminally ill man continue to gasp uncontrollably and flail about and suffer as he gradually spiraled down the terrifying process of suffocating to death. Dr. Wilson, however, believed he was morally and professionally obligated under American Medical Association Code of Medical Ethics Rule 2.20 (Px 3 p. 37) ("Rule 2.20") to do everything within his power to relieve Taylor's conscious suffering as Taylor slowly went through the agonizing process of suffocating to death. It is undisputed that Dr. Wilson believed administering

potassium chloride was proper palliative care because it would render his patient, Taylor, unconscious.

22.     "Palliative care" is the medical care rendered to a terminally ill patient to relieve that patient's pain and suffering during the process of death. Pursuant to AMA Rule 2.20,

> [p]hysicians have an <u>obligation</u> <u>to</u> <u>relieve</u> <u>pain</u> <u>and</u> <u>suffering</u> and to promote the dignity and autonomy of dying patients in their care. This includes providing effective palliative treatment <u>even</u> <u>though</u> <u>it</u> <u>may</u> <u>foreseeably</u> <u>hasten</u> <u>death</u>.

(Px A p. 37 (emphasis added)) Accordingly, under AMA Rule 2.20, a physician has a duty to not only relieve the patient's pain, but to also relieve the patient's <u>suffering</u> during the process of death. While the increasing doses of morphine may have been effective in relieving Taylor's pain, the morphine injections did nothing to relieve the suffering from Taylor's gasping respirations, and the suffering from Taylor's consciousness of his impending death through asphyxiation. Moreover, the gasping respirations that Taylor experienced as he slowly suffocated to death may not be influenced by analgesics (pain medicine) and sedatives (such as morphine) routinely used in end of life care.

23.     As Taylor continued to flail about and suffer from gasping respirations and through consciousness of the process of death, Dr. Wilson had to make a quick decision on how, under AMA Rule 2.20, to best relieve Taylor's suffering.  The *New England Journal of Medicine* provides guidance to a doctor in just such a circumstance. (Px 4) While analgesics such as morphine are appropriate palliative care to relieve a dying patient's pain, in certain circumstances it is appropriate to use a potentially lethal agent (such as potassium chloride) to induce the unconsciousness of the patient, and thus relieve the patient's conscious suffering during the process of death. (*Id*. pp. 1679-80; Rule 2.20 p. 37)

24.     Because of Taylor's advanced stage SVC syndrome, and with the two DNR orders in place, by 8:16 a.m. on September 30, 1998 Taylor's fate was either (a) conscious suffering, and then death; or (b) unconsciousness with no suffering, and then death. According to the *New England Journal of Medicine*, when (1) the dying patient has signed a DNR order (as was the situation with Taylor), and (2) the patient is suffering during the final stages of death (as was also the situation with Taylor), it is acceptable for a doctor to use a potentially lethal medication (such as potassium chloride) "to produce unconsciousness . . . as a means of relieving nonphysical suffering . . .." (Px 4 pp. 1679-80)  As confirmed by the *Journal of Medical Ethics* (Px 5), it is ethically acceptable to render a dying and suffering patient unconscious as the patient passes through the final stages of death, even if the medication used to render the patient unconscious may foreseeably hasten death. (*Id.* at pp. 164 & 166-67)

25.     Indeed, the *Journal of Medical Ethics* provides specific guidance to doctors on ethical palliative care when dealing with a dying and suffering patient (such as Taylor):

> Gasping respiration in the dying patient is the last respiratory pattern prior to terminal apnoea [death by suffocation]. . . . Gasping respiration . . . in the dying patient who has elected to not be resuscitated, will always result in terminal apnoea. . . . Therefore, gasping respiration at the end of life should be treated.

(Px 5 p. 164)  Moreover,

> [o]nce gasping respirations have begun, . . . there is no plausible possibility that the patient can survive; cardiac arrest will occur, usually within minutes.  In such a case of certain death, utilisation of any medication to insure comfort cannot be seen as precluding the possibility of survival.

(*Id.* p. 167)  For providing palliative care to a patient such as Taylor who was within the process of suffocating to death, the *Journal of Medical Ethics* concluded by stating:

> [G]asping respirations are absolutely futile and possibly burdensome to the patient.  Whenever, on the balance of

-14-

probabilities, they are judged to be a cause of suffering, gasping respirations at the end of life should be treated <u>even if</u> as a result the dying process is shortened.

(*Id*. p. 168 (emphasis added))

26.     As an experienced cardiologist, Dr. Wilson was familiar with the drug potassium chloride (KCL), and was familiar with the "double effect" of potassium chloride to render a patient unconscious through the mechanism of "heart block". Here Dr. Wilson faced a patient who was subject to two DNR orders put in place through Dr. Hollandworth, and a patient who'd recently received two shots of morphine, but was still suffering through suffocation and consciousness of the fact that he was irretrievably cast within the process of suffocating to death. According to the *New England Journal of Medicine*, it is appropriate palliative care to attempt to render a patient unconscious through the "double effect" of a potentially lethal drug (such as potassium chloride) when "the impending event is so psychologically distressing to the patient that mere pain control is not enough." (Px 4 p. 1680) And that is the situation that Taylor was in, and that is the situation that Dr. Wilson faced, at just before 8:25 a.m. on September 30, 1998.

**G.      As Dr. Wilson Attempted To Relief Taylor's Suffering By Rendering Him Unconscious, Taylor's Heart Stopped From <u>Natural Causes, And Taylor Was Officially Pronounced Dead</u>**

27.     The increasing doses of morphine had done nothing to relieve Taylor's gasping respirations and anxiety and suffering over consciousness of his impending death. With his patient continuing to suffer, Dr. Wilson, as an experienced cardiologist, used the only immediately available palliative care drug that would render Taylor unconscious, and thus relieve Taylor's conscious suffering during the process of his certain death. At or just a few seconds before 8:25 a.m., Dr. Wilson injected Taylor with 40 milleequivalents (m/eq) of

potassium chloride for the purpose of rendering Taylor unconscious as Taylor spiraled through the terrifying process of suffocating to death.

28.     As an experienced cardiologist, Dr. Wilson knew that 40 m/eq of potassium chloride would have the "double effect" of rendering Taylor unconscious during the continuation of Taylor's process of death. This was an appropriate dose to render Taylor unconscious in light of the fact that (a) 30 m/eq of potassium chloride was the standard dose used by cardiologists to correct irregular heart rhythms in a study of 100 patients, with some of those patients experiencing heart block, but none experiencing heart stoppage or death; and (b) the tolerance that Taylor had developed for potassium through his years as a kidney dialysis patient. Under these emergency circumstances, Dr. Wilson -- who regularly used potassium chloride in his cardiology practice -- believed that 40 m/eq of potassium chloride (1/6th the lethal dose) was an appropriate dose to render Taylor unconscious during the final stages of Taylor's process of death.

29.     As Dr. Wilson began the injection, however, Taylor's heart stopped from lack of oxygen due to the natural progression of his underlying disease, SVC; his heart monitor "flatlined"; and Taylor died due to natural causes from prolonged suffocation associated with his underlying medical condition. Taylor was formally pronounced dead at 8:25 a.m. on September 30, 1998.

> **H.     After The Emotionally Draining Death Of Taylor, Dr. Wilson Takes A Voluntary Leave Of Absence, And Contacts The <u>CCME About The Death Of Taylor</u>**

30.     It is an emotionally draining experience for most people to witness the death of a fellow human being, and the death of Taylor was no exception for Dr. Wilson. In fact, Dr. Wilson openly wept as Taylor flailed about and eventually, mercifully, died.  Not only was Dr.

Wilson emotionally drained, he wanted to give the Department, and all other investigating authorities, an adequate amount of time to conduct a thorough investigation without jumping to an erroneous conclusion as to the cause of Taylor's death. Dr. Wilson knew that most investigators -- and, in fact, most doctors without specific knowledge on the subject -- would assume that because Taylor died as the potassium chloride injection was being administered, the potassium chloride injection was what caused Taylor to die. To avoid a rush to judgment by uninformed decision makers, on September 30, 1998 Dr. Wilson took a voluntary leave of absence (Px 6) so that the Department and the Cook County State's Attorney could do a thorough investigation as to the death of Taylor without jumping to an erroneous (and uninformed) conclusion as to the cause of Taylor's death. While Dr. Wilson did not send a copy of his September 30, 1998 leave of absence letter (Px 6) to the Department, a newspaper story on that date (Px 7) covered Dr. Wilson's voluntary leave of absence, which was contained within the Department's investigatory file.

31.    Further, Dr. Wilson believed it was best not to have a pathologist from Olympia Fields Hospital conduct an autopsy on Taylor, so Dr. Wilson contacted the CCME about the circumstances surrounding Taylor's death, and requested that the CCME perform an autopsy on the body of Taylor. At approximately 3:55 p.m. on September 30, 1998, Dr. Wilson called the CCME's office and spoke with Investigator Ortiz. Dr. Wilson informed the investigator that Taylor was suffocating to death from SVC syndrome, and would have expired in "3 to 4 minutes", so, in order to relieve Taylor's pain and suffering, Dr. Wilson administered 40 m/eq of potassium chloride in an effort to render Taylor unconscious during the process of death. Dr. Wilson further informed Investigator Ortiz that Taylor died within one minute of the injection, and offered to have Taylor's corpse shipped to the CCME office for the autopsy.

I. **The Undisputed Medical Evidence Showed That Taylor Died From Natural Causes Due To Advanced Stages Of SVC Syndrome**

32.     As a result of complications associated with advanced stages of SVC syndrome, at approximately 8:00 a.m. on September 30, 1998, Taylor was suffocating to death with gasping respirations. Further, for someone in Taylor's condition, "[g]asping respiration . . . in the dying patient who has elected to not be resuscitated, will <u>always</u> <u>result</u> <u>in</u> <u>terminal</u> <u>apnoea</u> [<u>death</u> <u>by</u> <u>suffocation</u>]." (Px 5 p. 164) In addition, suffocation eventually results in death through "cardiac arrest" -- the heart stops beating (*id.* p. 167), which usually occurs "within minutes". (*Id.*) Indeed, it is a well-known and undisputed medical fact that asphyxia (suffocation) through airway obstruction usually results in circulatory arrest (the heart stops beating) in 5 to 12 minutes after commencement of airway obstruction. (Px 7 p. 178) Thus, by approximately 8:00 a.m. on September 30, 1998, death for Taylor was a certainty, and that "within minutes" of being cut off from all oxygen, Taylor's heart would stop beating, and Taylor would die from suffocation and "cardiac arrest" associated with advanced stages of SVC syndrome. (Px 5 p. 167)

33.     In particular, the medical chart notes showed that between 7:30 a.m. and 8:00 a.m., Taylor was "having a difficult time breathing [and] was in visible respiratory distress", and was "drooling and . . . flailing trying to breathe" as he "gurgle[d]": "I can't breathe." (Px 8 p. 1) Shortly thereafter, Taylor was "gasping for air, drooling [and] flailing extremities" (Px 9. p. 1), and, as noted by the medical resident, Dr. Muns, in her progress notes, "[p]atient was <u>suffocating</u> and <u>was</u> <u>probably</u> <u>going</u> <u>to</u> <u>die</u> <u>within</u> <u>minutes</u>." (*Id.* p. 2) This evidence was in the medical chart notes of the other doctors who were present at the time of Taylor's death, and was undisputed.

34.     Further, when Dr. Wilson first arrived at Taylor's bedside at 8:10 a.m., "[Taylor] was choking to death with air hunger." Then, at 8:16 a.m. -- some six or seven minutes after Dr. Wilson arrived -- Taylor's airway collapsed, which meant that <u>all</u> <u>oxygen</u> <u>was</u> <u>cut</u> <u>off</u> <u>and</u> <u>Taylor</u>

"was not getting oxygen anymore." As admitted by the Department, Dr. Wilson "was called to Taylor's bedside and witnessed him suffocating to death as his trachea collapsed due to [SVC] syndrome." Accordingly, "within minutes" after 8:16 a.m., Taylor's heart would stop beating (cardiac arrest) as a result of terminal suffocation associated with advanced stages of SVC syndrome.

35.     And then at 8:25 a.m. -- some nine minutes after Taylor's airway collapsed and all oxygen was cut off to Taylor's heart -- Taylor's heart stopped from lack of oxygen, his EKG flatlined, and Taylor was pronounced dead.

36.     Thus, by the time of Taylor's death at 8:25 a.m., Taylor had already suffered through an extended period of decreased oxygen supply (at least 25 minutes), and had also suffered through at least nine minutes of absolutely no oxygen by the time his heart finally stopped beating at 8:25 a.m. Accordingly, the evidence was undisputed that Taylor died from "[SVC] syndrome with compression of trachea and kinking of trachea, now occluding the trachea, preventing oxygenation", such that Taylor "suffocate[d] to death as a result of his underlying medical condition . . .."

**J.     The CCME And The Department Do Not Conduct An Adequate Investigation Before They Hastily Charge Dr. Wilson With Administering The Potassium Chloride Injection For The Purpose Of Causing Taylor's Death**

37.     At the request of Dr. Wilson, the body of Taylor was transported to the CCME for an autopsy, which was conducted by Kalelkar, the Deputy Chief Medical Examiner of the CCME. After Kalelkar concluded the autopsy -- the medical testing on Taylor's body -- she could not determine the cause of Taylor's death, whether from potassium chloride intoxication, SVC syndrome or otherwise. Accordingly, on October 1, 1998 Kalelkar initially "pended the autopsy" -- she listed the cause of Taylor's death as uncertain "pending" the return of the

lab/toxicology results on Taylor's blood. (Px 11) Indeed, the lab results on the actual potassium level in Taylor's blood would be a determinative factor on whether Taylor died from potassium chloride intoxication.

38.     The lab results on Taylor's blood were not completed until the following day, October 2, 1998. (Px 12) Later in the afternoon on October 1, 1998, however, after initially "pending" the autopsy "pending toxicology" (Px 11), but before getting those results on Taylor's blood back from the lab, Kalelkar decided to list the cause of Taylor's death as a "homicide" by "Potassium Chloride Intoxication" (Px 13) based not on any scientific or medical testing on the body of Taylor, but rather simply on the "story" that Kalelkar heard from a third party. In Kalelkar's rush to judgment, she jumped to a conclusion of "Potassium Chloride Intoxication" without waiting for the very scientific evidence that would prove that Taylor had not, in fact, died from potassium chloride intoxication -- the actual potassium level of Taylor's blood at the time of his death. Although not analyzed by Kalelkar, those blood results confirmed that Taylor had a normal potassium level at the time of his death, which meant that the potassium chloride injection had not reached Taylor's heart by the time of Taylor's death. (Px 14 ¶¶2-3)

39.     After jumping to her false conclusion, Kalelkar then notified Detective Marshall at the Olympia Fields Police Department that Taylor had died from "Potassium Chloride Intoxication", with the manner of death as a "HOMICIDE". (Px 15) Further, Kalelkar conferred with Gorchynsky and Glasgow about her conclusion that Taylor had died from potassium chloride intoxication and that the manner of death was a homicide by Dr. Wilson.

40.     Thereafter, although Kalelkar and Donoghue knew that there would be a homicide investigation by the Cook County State's Attorney as to Dr. Wilson's role in the death of Taylor, on October 6, 1998 Kalelkar and Donoghue released the body of Taylor for cremation (Px 16),

without notification to Dr. Wilson or allowing Dr. Wilson the opportunity to have an independent autopsy conducted on the body of Taylor. This was a violation of Dr. Wilson's due process rights, and constituted wrongful conduct on the part of the CCME after making a ruling of homicide. (Px 14 ¶4)

41.     On October 7, 1998 Gorchynsky and Glasgow met with Kalelkar and Donoghue at the CCME's office in Chicago. At that time, Kalelkar informed Gorchynsky and Glasgow that, after conducting the medical testing on the body of Taylor, she could not determine the cause of death or manner of death, and therefore "pended" the autopsy (Px 11), but after hearing the "story" from third parties about Dr. Wilson's injection of potassium chloride, she changed the autopsy conclusion to "Potassium Chloride Intoxication", with the manner of death as a homicide by Dr. Wilson. At this meeting, Kalelkar informed Gorchynsky and Glasgow that her conclusion as to the cause of death (potassium chloride intoxication) and the manner of death (homicide) was not based on any scientific or medical testing on the body of Taylor, or the analysis of any lab results on Taylor's blood

42.     Based solely on the meeting that Gorchynsky and Glasgow had with Kalelkar and Donoghue on October 7, 1998, Gorchynsky and Glasgow came to the conclusion that Dr. Wilson injected Taylor with potassium chloride for the purpose of causing Taylor's death, and that the injection did in fact cause Taylor's death. Gorchynsky and Glasgow came to this conclusion without interviewing any witnesses; without review of any medical treatises on the subject involved; and without conferring with a cardiologist or other medial experts pertaining to the issues involved in Taylor's death. Indeed, Kalelkar and Donoghue, and Glasgow and Gorchynsky, did not conduct an adequate investigation before they hastily charged Dr. Wilson with administering the potassium chloride injection for the purpose of causing Taylor's death.

43. Pursuant to Cook County Ordinance §38.119, it is the duty and obligation of a medical examiner/coroner at the CCME to conduct an investigation, including an autopsy if necessary,

> sufficient to establish manner and cause of death, and the Medical Examiner shall recover and retain any and all evidence for use in the investigation. The Medical Examiner shall obtain specimens necessary to determine the cause and manner of death and retain them in accordance with nationally established practice guidelines for forensic pathology.

Moreover, in accordance with national practice guidelines for forensic pathology, the conclusion in an autopsy as to cause of death is supposed to be based on scientific and medical testing on the body of the decedent, and not simply on a story that the coroner/medical examiner heard from a third party. By early October of 1998, however, Donoghue, as the Chief Medical Examiner of the CCME, had fostered an environment within the CCME wherein questionable autopsy tactics, including reliance on unfounded third party hearsay as opposed to scientific and medical testing and analysis of the body of the decedent, became the custom, policy and practice of CCME, and such deficient autopsies were routinely used to secure prosecutions.

44. The findings and conclusions by Kalelkar and Donoghue, and Gorchynsky and Glasgow, that Dr. Wilson injected Taylor with potassium chloride for the purpose of causing Taylor's death, with the injection in fact causing Taylor's death, were recklessly false and without any independent scientific basis in forensic science:

44.1. While Kalelkar and Gorchynsky claimed that the 40 m/eq of potassium chloride administered by Dr. Wilson to Taylor was a "fatal" dose, neither Kalelkar nor Gorchynsky knew, or did any research on, what would constitute a fatal dose of potassium chloride for a kidney dialysis patient such as Taylor. Indeed, the lethal dose of potassium chloride for executions is 240 m/eq. Although on September 30, 1998 Dr. Wilson readily had

available to him far more than 240 m/eq. of potassium chloride, the amount that he administered to Taylor on that date -- 40 m/eq. -- was one-sixth of a lethal dose. This non-lethal dose was not administered for the purpose of killing Taylor (indeed, it was not a fatal dose), but rather was administered for the purpose of rendering Taylor unconscious through the mechanism of "heart block", whereby the lower dose of potassium chloride would cause unconsciousness through the temporary interruption of Taylor's heartbeat. If Dr. Wilson intended to kill Taylor, he readily had available to him, and would have administered, 240 m/eq. of potassium chloride. Kalelkar and Donoghue, and Gorchynsky and Glasgow, were severely reckless in claiming that 40 m/eq. of potassium chloride was a fatal dose for a kidney dialysis patient such as Taylor.

44.2.    Kalelkar and Gorchynsky were of the belief that potassium chloride, upon injection, would immediately cause Taylor's heart to stop. This assumption is naive and indisputably false, and neither Kalelkar and Donoghue nor Gorchynsky and Glasgow did any research on the subject prior to the time that they accused Dr. Wilson of murdering Taylor. As any experienced cardiologist would know, it would take much longer than one minute for a potassium chloride injection to reach and have any adverse effect on Taylor's heart. Indeed, the studies conducted on executions (Px 17) showed that the actual amount of time between the potassium chloride injection and the stoppage of the heart was from two to nine minutes after the potassium chloride administration. (*Id*. pp. 649-650) Kalelkar and Donoghue, and Gorchynsky and Glasgow, were severely reckless in their conclusion that the potassium chloride injection would immediately stop Taylor's heart, and that therefore the potassium chloride injection administered by Dr. Wilson stopped Taylor's heart. While admittedly it looks incriminating to the uninformed that Taylor died "within one minute" of the potassium chloride injection, as would have been confirmed by a competent and experienced cardiologist, it takes far longer than

-23-

one minute for a potassium chloride injection to reach and affect the heart of a kidney dialysis patient such as Taylor.

44.3. In reaching their false conclusion as to Dr. Wilson's intent to murder his patient, Taylor, neither Kalelkar and Donoghue, nor Gochynsky and Glasgow, bothered to review the medical records from the two other doctors who were present at the time of Taylor's death, or even take the time to interview those doctors. Had Kalelkar and Donoghue, or Gorchynsky and Glasgow, bothered to review the chart notes of Dr. Spitzmiller (Px 8) or Dr. Muns (Px 9), both of whom were present at the time Dr. Wilson administered the potassium chloride injection to Taylor, they would have learned that "as the [potassium chloride injection] was being given, the patient went into asystole" (Px 8 p. 2), and that "Dr. Wilson pushed [the potassium chloride injection] as monitor was asystole." (Px 9 pp. 2-3) Not only were these notes readily available to Kalelkar and Donoghue, and Gorchynsky and Glasgow, before they accused Dr. Wilson of killing Taylor, both Dr. Spitzmiller and Dr. Muns were in the Chicagoland area and readily available to be interviewed by Kalelkar and Donoghue, as well as Gorchynsky and Glasgow. It was severely reckless for Kalelkar and Donoghue, and Gorchynsky and Glasgow, to not interview the other doctors who were present at the time of the injection, Drs. Spitzmiller and Muns, prior to the time that they accused Dr. Wilson of killing his patient, Taylor.

44.4. On October 2, 1998 the laboratory testing on Taylor's blood was completed, with the results forwarded to the Department on that date. (Px 12) At no time, however, did anyone at the CCME or the Department personally analyze, or seek expert assistance in the analysis of, those blood results. Had Kalelkar or Donoghue, or Gorchynsky or Glasgow, bothered to do so, they would have learned that Taylor's potassium level was normal at the time of his death. (Px 14 ¶¶2-3) It was severely reckless for Kalelkar and Donoghue, and

Gorchynsky and Glasgow, to not have the potassium level in Taylor's blood at the time of his death analyzed prior to the publication of their charges that Dr. Wilson murdered his patient, Taylor.

44.5.    There was a pre-mortem x-ray taken of Taylor's trachea just prior to the time of his death. Neither Kalelkar or Donoghue, nor Gorchynsky or Glasgow, had that x-ray analyzed by a competent radiologist to determine whether, in fact, Taylor's trachea had kinked and completely collapsed prior to the time of his death. Had Kalelkar and Donoghue, and Gorchynsky and Glasgow, properly reviewed and analyzed that pre-mortem x-ray, they would have learned that, in fact, Taylor's airway had kinked and collapsed, thus cutting off Taylor's ability to breath. It was severely reckless for Kalelkar and Donoghue, and Gorchynsky and Glasgow, to not have that pre-mortem x-ray examined by a competent radiologist prior to the time that they accused Dr. Wilson of murdering his patient, Taylor.

45.    On October 7, 1998 an article in the Daily Southtown pertaining to the death of Taylor stated that Dr. Wilson "has voluntarily taken a leave of absence from Olympia Fields Osteopathic Medical Center." Further, that article quoted a representative of the CCME (Donoghue) as stating "we're [the CCME] just calling it [the death of Taylor] a homicide", and the amount of the potassium chloride injection that Taylor received "is always fatal". (Px 7 p. 2) This article also pointed out that:

> Another doctor not involved in the case, however, said that wouldn't necessarily be true. The key, this doctor said, is whether Taylor's potassium level already was high before the shot was given.
>
> . . . Taylor was given 40 [m/eq.] of potassium chloride. Kidney disease patients are limited to a dose of 50 [m/eq.] of potassium a day, the doctor said.

(Px 7 p. 2) On that same date, a representative of the CCME (Donoghue) was quoted as stating "an injection of potassium chloride would only hasten the patient's death", and that the potassium chloride injection that Dr. Wilson administered to Taylor was "given to euthanize. That's exactly what happened." (Px 18)

46.     On the following day, Donoghue took to the press again, stating to the Chicago Tribune that Dr. Wilson "essentially euthanized the patient." (Px 19 p. 2) That same article noted that the Department "is also investigating Taylor's death. The investigators met Wednesday with officials of the medical examiner's office." (*Id*. p. 2) On October 8, 1998, Donoghue went to the press again to further punish and humiliate Dr. Wilson. On that date, a representative of the CCME (Donoghue) stated that "undiluted potassium chloride delivered at that level [40 m/eq.] is always fatal." Further, Donoghue stated that while Taylor suffered from SVC syndrome, "there is no certainty that he would have died shortly or even failed to recover. . . . The blockage could have caused suffocation and lead to Taylor's death, but it was not a certainty." Obviously, Donoghue had not bothered to read the chart notes of Dr. Spitzmiller (Px 8) or Dr. Muns (Px 9), who were also at Taylor's bedside at the time that Taylor died from natural causes. Donoghue concluded his insults lodged at Dr. Wilson by stating that the potassium chloride injection "was a killing, and that's why we ruled it a homicide." (Px 23)

**K.      Based On Their Inadequate Investigation, Gorchynsky And Glasgow Recommend That The Department File A Complaint To Revoke Dr. Wilson's Medical License, And Obtain A Summary Suspension Of Dr. Wilson's Medical License Because Of His Supposed Intent To Kill His Patient, Taylor**

47.     By October 8, 1998 Gorchynsky and Glasgow had concluded their investigation of the circumstances surrounding Taylor's death by simply meeting with Kalelkar and Donoghue, and reviewing some of the medical records pertaining to Taylor's death, but not interviewing any

of the other doctors who were present at the time of Taylor's death, or conducting any investigation as to a fatal dose of potassium chloride for a kidney dialysis patient such as Taylor, or the amount of time it would take for a potassium chloride injection to reach and affect Taylor's heart. Further, at not time during the investigation conducted by Gorchynsky and Glasgow did they consult with a cardiologist or any other medical experts on the circumstances surrounding Taylor's death.

48.     However, pursuant to the limited and inadequate investigation conducted by Gorchynsky and Glasgow, they were of the firm (but erroneous) belief that Dr. Wilson injected Taylor with the potassium chloride injection for the purpose of causing Taylor's death, and that the potassium chloride injection did, in fact, cause Taylor's death. Accordingly, Gorchynsky and Glasgow decided that the Department should file a complaint against Dr. Wilson seeking the revocation of Dr. Wilson's medical license for his alleged intent to kill his patient, Taylor. In arriving at this conclusion, Gorchynsky knew that the autopsy conducted by Kalelkar had no real probative value on showing that Taylor died from potassium chloride intoxication, or that Dr. Wilson intended to kill his patient, Taylor.

49.     Although Dr. Wilson had taken a voluntary leave of absence pending the investigation by the Department, and did not pose any threat to the safety and welfare of the public, Gorchynsky and Glasgow decided to seek an *ex parte* summary suspension of Dr. Wilson's medical license, without any notice to Dr. Wilson, and without any opportunity for Dr. Wilson to participate in the telephone conference call with the Director to explain the circumstances surrounding the particular palliative care approach that he was forced to utilize in connection with his patient's horrific death. Pursuant to their plan, on October 9, 1998 the

Department filed a Complaint against Dr. Wilson seeking the revocation of his medical license, with the allegation that:

> 4. During the course of Henry Taylor's care, Respondent [Dr. Wilson] administered an injection of a combination of morphine and potassium chloride for the purpose of causing Henry Taylor's death and which did in fact result in Henry Taylor's death.

(Px 20 p. 1 ¶4) On that same date, Gorchynsky and Glasgow presented a Petition for Temporary Suspension of Dr. Wilson's medical license (Px 21), which had attached to it an affidavit from Gorchynsky dated October 8, 1998 (the day before the Complaint and Petition for Summary Suspension were filed), representing that:

> 3. In the course of my duties I've reviewed medical records and other documents regarding the treatment of patient Henry Taylor at Columbia-Olympia Fields Osteopathic Hospital and Medical Center.
>
> 4. The above records document that on September 30, 1998 Dr. Robert Wilson . . . injected Henry Taylor with Potassium Chloride for the purpose of causing Henry Taylor's death and did in fact cause Henry Taylor's death.

(Px 21 p. 2) Despite Gorchynsky's false representations, the medical records do not document that Dr. Wilson "injected Henry Taylor with potassium chloride for the purpose of causing Taylor's death", and do not document that the potassium chloride injection "did in fact cause Henry Taylor's death."

50.    Based on their inadequate investigation as to the circumstances surrounding Taylor's death, Gorchynsky and Glasgow made recklessly false representations to the Director, Nikki Zollar, to induce the Director to enter an Order on October 9, 1998 summarily suspending Dr. Wilson's medical license, with the finding that

> the Director, having examined the Petition and attached Affidavit, finds that the public interest, safety and welfare imperatively require emergency action to prevent the continued practice of

medicine by Respondent [Dr. Wilson], and that Respondent's actions constitute an immediate danger to the public.

(Px 22)

51.     Thus, Kalelkar and Donoghue, as well as Gorchynsky and Glasgow, through their severely reckless conduct, set in motion a series of events which they knew or should have known would cause others to deprive Dr. Wilson of his property interest in his medical license, and his liberty interest in continuing his chosen profession as a cardiologist in the State of Illinois, without due process of law. Indeed, Gorchynsky and Glasgow knew, must have known, or should have known, that Dr. Wilson had taken a voluntary leave of absence. Further, the simple courtesy of a call to Dr. Wilson would have revealed that not only had he taken a voluntary leave of absence while the Department conducted a thorough review of the circumstances surrounding Taylor's death, but Dr. Wilson was also willing to stipulate that while he would continue in his practice as a cardiologist (for which there had been no complaints to the Department), he would voluntarily refrain from participating in any situations involving palliative care until such time as the Department made an informed decision, after a thorough investigation, on the appropriateness of Dr. Wilson's palliative care under the unique circumstances that Taylor was experiencing just prior to this death. In other words, there was no real emergency facing the Department, and Dr. Wilson posed no realistic threat to the safety and well-being of the public.

L.   **After The Department Wrongfully Suspends Dr. Wilson's Medical License Pursuant To The Summary Suspension Order, The Department Learns That It Was Mistaken In Its Charges Against Dr. Wilson, And Engages In A Cover-Up To Avoid A Damage Claim By Dr. Wilson Against The Department Defendants**

52.   On October 10, 1998 a spokesman for the Department stated to the Chicago Tribune that:

> It is rare for a physician to be suspended without first receiving a hearing and a recommendation to the Director from the Medical Disciplinary Board. . . . This is the most serious action the Department can take, because it eliminates the due process usually provided to a professional. But when we feel there is clear and convincing evidence of wrongdoing, we can take this action.

(Px 24 pp. 1-2) While the above is a correct statement as to the procedures available to the Department when there is a clear threat to the health or safety of the public, here there was no evidence, let alone clear and convincing evidence, of wrongdoing by Dr. Wilson.

53.   It is a fundamental principle of the American criminal justice system that "the government always wins when justice is done." Here, shortly after the filing of the Complaint against Dr. Wilson and the *ex parte* summary suspension of Dr. Wilson's medical license, certain members of the Department discovered that the Department's charges against Dr. Wilson that he administered the potassium chloride injection "for the purpose of causing Henry Taylor's death[,] and which did in fact result in Henry Taylor's death" (Px 20 ¶4) were totally without merit. Rather than admit its mistake, the Department did not withdraw the summary suspension order or dismiss its Complaint for revocation of Dr. Wilson's medical license, but rather engaged in a cover-up for the purpose of shielding the Department Defendants from damage claims by Dr. Wilson.

54.     Indeed, the Department was specifically told by one of its prosecutors that it couldn't prove the charges against Dr. Wilson. Further, the Department was specifically informed by this prosecutor that the Department was informed that Taylor didn't have a chance to live, and that it would take at least 60 or 90 seconds for the potassium chloride injection to have an affect on Taylor's heart. The Department, however, continued to prosecute Dr. Wilson because he was "blackballed from the start", and couldn't win his case before the Department "no matter what" because "[t]he Board had it out for you [Dr. Wilson]".

55.     The Department did, however, amend its Complaint against Dr. Wilson on November 17, 1998, changing the charge that Dr. Wilson administered the potassium chloride injection "for the purpose of causing Henry Taylor's death" (Px 20 p. 1 ¶4) to a charge that Dr. Wilson "administered an injection of a combination of morphine and potassium chloride directly in the Henry Taylor which resulted in Henry Taylor's death." (Px 25 p. 1 ¶4) Despite all the prior clammering about Dr. Wilson's supposed intent to murder his patient, Taylor, no such intent was alleged in the First Amended Complaint. But what about the *ex parte* emergency summary suspension order (Px 22) based on the representation by Gorchynsky in his Affidavit that Dr. Wilson "injected Henry Taylor with potassium chloride for the purpose of causing Henry Taylor's death" (Px 21 p. 2 ¶4), which was the express basis for the summary suspension order? (Px 22) Indeed, with the removal of the intent to kill issue, clearly Dr. Wilson's conduct was clearly within the provisions of AMA Rule 2.20 that, in treating a dying and suffering patient such as Taylor, Dr. Wilson was authorized to use "effective palliative treatment even though it [the palliative treatment chosen] may foreseeably hasten death." (Px 3 p. 37) Despite removing this intent to kill element, and despite the fact that Dr. Wilson clearly was no threat to the safety

and welfare of the public, the Department repeatedly refused Dr. Wilson's repeated requests to vacate and dissolve the Temporary Summary Suspension Order.

56.     Shortly after the issuance of the Summary Suspension Order, Gorchynsky, Glasgow and Doe Defendants 1-5 knew, must have known, or should have known, that there was no basis to summarily suspend Dr. Wilson's medical license without a contested evidentiary hearing and due notice to Dr. Wilson, and that, under the circumstances, Dr. Wilson did not really pose any threat to the health or welfare of the public. Indeed, Gorchynsky and Glasgow knew that the results of the autopsy conducted by Kalelkar (Px 13) was not reliable on the issue of cause of death (potassium chloride intoxication) or on the issue of manner of death (homicide). Gorchynsky and Glasgow, however, continued to use the findings of Kalelkar's autopsy to justify the continued prosecution of the Department's claims against Dr. Wilson.

57.     On April 7, 1999 Dr. Wilson and his attorneys (Edward H. Nielsen, Esq. and Denise M. Nalley, Esq.) met with Glasgow and Assistant Prosecutor William McLaughlin to discuss the progress of the license revocation proceedings before the Department. During that meeting,

> Mr. Glasgow told Dr. Wilson that he did not care about Dr. Wilson's 5th Amendment rights, that [the Department] would revoke his license to practice medicine, and . . . that if he were the prosecuting States Attorney he would have Dr. Wilson locked up and tried for murder because Dr. Wilson murdered Mr. Taylor.

(Px 26 ¶7) Further,

> [a]t one point Dr. Wilson stated that he gave the injection of potassium chloride to Mr. Taylor in order to relieve his pain and suffering. Thomas Glasgow loudly responded, "So you admit you murdered him." [Dr. Wilson's attorney] objected and stated that that was not what Dr. Wilson had said. Thomas Glasgow stated that he did not care what Dr. Wilson had to say and that if he were in charge of the homicide investigation he would make sure that Dr. Wilson was charged and arrested. Dr. Wilson asked "What

about my 5th amendment rights?" and Thomas Glasgow replied "I
don't care about your 5th amendment rights."

At the end of the meeting Thomas Glasgow stated that he would
not consider lifting the suspension on Dr. Wilson's license because
Dr. Wilson is a danger to society.

(Px 27 ¶¶12-13)

58.     Despite Glasgow's trampling upon Dr. Wilson's constitutional rights, on

September 28, 1999 the Cook County State's Attorney's Office announced that the evidence did

not support any criminal charges against Dr. Wilson:

> After a thorough investigation into the death of Henry Taylor, 69,
> at the Olympia Fields Osteopathic Hospital, the Cook County
> States' Attorney's Office announced today that the evidence does
> not support charges against cardiologist Robert L. Wilson.
>
> * * *
>
> Taylor died on September 30, 1998. A full and complete
> investigation by the Cook County State's Attorney's Office ensued.
> Numerous interviews were conducted, including two with Dr.
> Wilson. Grand jury testimony was taken from the deputy Cook
> County medical examiner who conducted the autopsy and Olympia
> Fields hospital personnel present when Taylor died. Expert
> medical opinions were considered.
>
> On September 30, 1998, Henry Taylor was near death and in
> extreme pain, suffocating from the effects of superior vena cava
> syndrome. Dr. Wilson administered potassium chloride to the
> patient while the patient was dying, which he said was to render
> the patient unconscious during his last moments of suffering.

(Px 28) The Department, however, because of its vendetta against Dr. Wilson, refused to listen to

the same logic and reason.

59.     By early October of 1999 there had not yet been an evidentiary hearing on the

Department's efforts to revoke Dr. Wilson's medical license. At that time, however, Sherman, the

Director of the Department, gave a television interview where he explained that, despite the fact

that there had not yet been any evidence against Dr. Wilson, he had the burden to prove that he was no longer a threat to the safety and welfare of the public: "I think he [Dr. Wilson] is always within his rights to come in and say that the danger to the public no longer exists and make his argument." Not only was there no evidence as to Dr. Wilson's supposed threat to the public, and no longer any complaint alleging that Dr. Wilson intended to kill his patient, Sherman expressed his belief that Dr. Wilson was, in fact, a threat to the public, and unconstitutionally reversed the burden of proof by requiring Dr. Wilson to show that he was no longer a threat to the public.

**M.     Dr. Wilson Files A 42 U.S.C. §1983 Civil Rights Suit In This Court**

60.     Based on Dr. Wilson's belief that he would not be able to obtain a fair hearing before the Department, on October 7, 1999 Dr. Wilson filed a 42 U.S.C. §1983 violation of civil rights suit in this Court against Kalelkar, Donoghue, the CCME, the Director of the Department, Gorchynsky, Glasgow and the Department, *Wilson v. Kalelkar, et al*., No. 99 C 6590 (Judge Lindberg) (the "Prior Civil Rights Suit"). In the Prior Civil Rights Suit, Dr. Wilson not only sought damages from the Defendants for their violations of Dr. Wilson's constitutional rights in connection with the ongoing prosecution of the Department's proceeding to revoke Dr. Wilson's medical license, Dr. Wilson also sought to enjoin the further prosecution of the Department's proceedings against Dr. Wilson.

61.     Subsequent discussions between Dr. Wilson's attorney, Thomas A. Zimmerman, Jr., Esq. and Glasgow centered on the fact that the Department was essentially backed into a corner, and that it essentially had no choice but to proceed because if it agreed that it was mistaken on the summary suspension of Dr. Wilson's medical license, the Department would open itself up to damage claims by Dr. Wilson. Thus, the Department was forced to proceed with its complaint for the revocation of Dr. Wilson's medical license. In those discussions between

Glasgow and Mr. Zimmerman, Glasgow informed Mr. Zimmerman that unless Dr. Wilson admitted his wrongdoing by use of potassium chloride and further agreed to a sentence of discipline (including probation of his license and continuing medical education), the "MDB will find against Dr. Wilson" at the formal hearing scheduled for Tuesday, November 16, 1999. Gorchynsky then said that Dr. Wilson was going to lose at the hearing. and that the Administrative Law Judge would write the order in such a way that it would involve credibility of witnesses. According to Glasgow, the ALJ would find against Dr. Wilson, and that it would be very difficult to overturn that ruling on administrative review. According to Glasgow, that was the reason why Dr. Wilson should enter into the Department's proposed stipulation of guilt. Indeed, Glasgow made it clear to Dr. Wilson's attorney, Mr. Zimmerman, that regardless as to what the facts or evidence turned out to be, Dr. Wilson would lose before the MDB.

62.     In response to Dr. Wilson's request for a temporary restraining order, the Prior Civil Rights Suit was transferred to Judge Ruben Castillo for hearing on November 15, 1999. In denying Dr. Wilson's request for a temporary restraining order, Judge Castillo ruled:

> I certainly conclude that if the doctor is correct in his allegations as to what's about to occur [before the Department]; that is, a kangaroo-type proceeding, I think the monetary damages that will be available under Section 1983 will be more than sufficient, both in compensatory and punitive damages, to take care of this particular type of allegation.
>
> * * *
>
> We need to allow those regulatory proceedings to take their due course and then come into to the fray and take up any constitutional issues that might exist. That's my conclusion, and so this case will be returned to the calendar of Judge Lindberg.

(Px 29 p. 22)

63.     After the defendants' in the Prior Civil Rights Suit filed motions to dismiss, Dr. Wilson's request for preliminary injunction was heard by Judge Lindberg on November 23, 1999. At that time, Judge Lindberg dismissed Dr. Wilson's Prior Civil Rights Suit, without prejudice, under the *Younger* abstention doctrine (*Younger v. Harris*, 401 U.S. 37 (1971)), ruling that:

> [T]he Court finds all three *Younger* criteria are present in the case at bar, and the Court must abstain under that doctrine.
>
> ORDERED: This Court abstains from hearing this case under the *Younger* doctrine. This case is dismissed without prejudice.

(Px 30 pp. 11-12)

**N.     On June 26, 2000 The Director Entered A Final Order Revoking Dr. Wilson's Medical License For A Minimum Of Five Years, Which Was Reversed By The Circuit Court Upon Dr. Wilson's First Complaint For Administrative Review**

64.     Upon conclusion of the subsequent formal hearing, on March 2, 2000 ALJ Phillip S. Howe recommended that Dr. Wilson's medical license be suspended for a minimum of five years, which was thereafter approved by the MDB. On June 26, 2000 the Department's Director adopted the MDB's findings. With the Department's "temporary" October 9, 1998 summary suspension order, the five-year period of suspension of Dr. Wilson's medical license would have expired on October 9, 2003.

65.     After the sham hearing and the decision by the Director to revoke Dr. Wilson's medical license, William J. McLaughlin, the Department's Assistant Prosecutor for the Department's case against Dr. Wilson, had a chance meeting with Dr. Wilson at Ryan's Tavern & Grill on Route 30 and 82nd Avenue in Frankfort, Illinois. Mr. McLaughlin approached Dr. Wilson, and with a sense of guilt and remorse, informed Dr. Wilson that:

(a)     The Department had "blackballed" Dr. Wilson from the start."

    (b)      Dr. Wilson couldn't win his case before the Department "no matter what [the evidence turned out to be]" because "the Board [MDB] had it out for him [Dr. Wilson]."

    (c)      The ALJ who presided over the evidentiary hearing had "his strings . . . pulled [from above]."

    (d)      Mr. McLaughlin had informed the Department "that they couldn't prove there charges against [Dr. Wilson]."

    (e)      The Department knew it would take 60-90 seconds for the potassium chloride injection to have any adverse impact on Taylor's heart.

    (f)      "It came from above . . . to get him [Dr. Wilson]."

    (g)      If a doctor didn't cut a deal with the Department, "they [the accused doctors] don't have a chance."

    (h)      The Chief of Medical Prosecutions, Glasgow, "had it out for you [Dr. Wilson] because you got in his face talking back to him."

Mr. McLaughlin's disclosures to Dr. Wilson confirmed his belief about the sham nature of the proceedings before the Department, and simply stiffened his resolve to seek relief in a real Court before a real Judge, where real justice is served.

    66.    After hearing Dr. Wilson's First Complaint for Administrative Review, Judge Bernetta Bush reversed the Department's decision on two grounds: (1) the Department violated Dr. Wilson's due process rights by refusing to grant Dr. Wilson a continuance so Dr. Wilson could put on additional evidence from his expert witness; and (2) the Department violated Dr. Wilson's due process rights by not granting Dr. Wilson's motion in limine to bar any evidence from the results of the *ex parte* autopsy since Taylor's body was cremated before Dr. Wilson had the opportunity to conduct an independent autopsy. (Px 31)

    67.    Upon appeal, the Court of Appeals affirmed Judge Bush on the expert witness issue, but reversed on the autopsy issue on procedural grounds because Dr. Wilson had not

challenged the results of the autopsy during the <u>initial</u> evidentiary hearing. (Px 32) On October 4, 2004 the United States Supreme Court denied further appellate review, with the Department's administrative proceeding against Dr. Wilson then sent back down to the Department shortly thereafter for continuation of the evidentiary hearing.

**O.     The Unconscionable Delays In The Department's Further Prosecution Of Its Claims Against Dr. Wilson Constitute A <u>Violation Of Dr. Wilson's Due Process Rights</u>**

68.     Dr. Wilson has both a property interest and a liberty interest in his ability to continue in his chosen profession as a medical doctor, which are entitled to constitutional protections. Without notice to Dr. Wilson, and without an opportunity to contest the charges that were made against him, on October 9, 1998 the Director summarily suspended Dr. Wilson's medical license pending further proceedings before the Department. Dr. Wilson was then subject to that "temporary" summary suspension order for almost 15 years, from October 9, 1998 to April 26, 2013, when the Director finally signed the Final Order for the five-year revocation of Dr. Wilson's medical license.

69.     When a doctor's license to practice medicine is subject to summary suspension entered without notice to the doctor and on an *ex parte* basis (as was the situation here), the doctor has a due process right to a prompt hearing and a prompt final decision by the Department. With the Department's summary suspension order kept in effect at all times, the failure of the Department to act in a prompt manner in entering a final decision on its charges against Dr. Wilson constituted a violation of Dr. Wilson's due process rights.

70.     On October 15, 2014 the Department's erroneous revocation of Dr. Wilson's medical license was remanded to the Department. With the proceedings thus reopened, Dr. Wilson sought to substitute his expert witness for purposes of rebuttal testimony. ALJ James

Jeffrey Canavan, however, refused to allow Dr. Wilson to substitute his rebuttal expert witness. Thereafter, on November 1, 2006 the MDB issued its Findings to the Director. And then, with no notice and no motion for entry of a final decision, on July 17, 2007 the Director affirmed the June 26, 2000 Order suspending Dr. Wilson's medical license.

71.     Accordingly, it took over 10 ½  months for ALJ Canavan to rule on Dr. Wilson's Motion for Substitution of Expert Witness.  While the MDB promptly adopted ALJ Canavan's Recommendation on November 1, 2006, it took an additional 8 1/2 months before the Director entered a final order.  In other words, from the time Dr. Wilson filed his Motion for Substitution of Expert Witness, it took the Director 20 months to enter a final decision on Dr. Wilson's motion and a final order on the Department's case against Dr. Wilson. This unconscionable delay constituted a violation of Dr. Wilson's due process rights.

72.     Dr. Wilson then filed his second Complaint for Administrative Review. On May 9, 2008 the Circuit Court (Palmer, J.) entered its second reversal, which reversed ALJ's Canavan's denial of Dr. Wilson's motion to put on rebuttal expert testimony, and remanded the matter back to the Department for further proceedings consistent with the Court's ruling. (Px 33)

73.     The evidentiary hearing on the Department's Amended Complaint then resumed before ALJ Lagattuta on October 29, 2008 with the testimony of Dr. Wilson's pathology expert, Dr. Bryant. On March 11, 2009 ALJ Lagattuta issued his Report and Recommendation, which (a) struck the prior expert witness testimony of Dr. Wilson's cardiology expert, Dr. Waller; (b) ruled that the two DNR orders signed by Taylor were not relevant; and (c) adopted the prior recommendation of ALJ Howe that Dr. Wilson's medical license should be suspended for a minimum of five years. ALJ Lagattuta's Report and Recommendations were accepted by the MDB on April 15, 2009, which were then adopted by the Director on July 21, 2009. The second

remand to the Department occurred On May 9, 2008. The 14-month delay in entering a final decision in connection with the second remand constituted a violation of Dr. Wilson's due process rights.

74.     On July 25, 2011 the Circuit Court reversed, for the third time, the Department's decision to revoke Dr. Wilson's medical license, and remanded the case back to the Department for further proceedings. (Px 34) Because ALJ Lagattuta (1) improperly excluded Dr. Waller's expert testimony and (2) erroneously ruled that the two DNR orders signed by Taylor were not applicable to the facts of this case, the Circuit Court reversed the Department's latest attempt to strip Dr. Wilson of his medical license, ruling that "when there are [DNR] orders, it affects the standard of care that a physician is to give [and,] in light of the fact that we're talking about standard of care here, . . . one would have to consider the [DNR] orders." (Id.)

75.     The third remand from the Circuit Court to the Department occurred on October 7, 2011. Thereafter, on November 23, 2011 Dr. Wilson filed another Motion for Judgment of Acquittal, which was ignored by ALJ Lagattuta. ALJ Lagattuta then waited some 199 days until April 25, 2012 to issue his Report and Recommendation, which not only failed to address Dr. Wilson's Motion for Judgment of Acquittal, but also failed to address Dr. Wilson's claims that the Department failed to prove (1) the charges that it made against Dr. Wilson as expressly alleged in the Amended Complaint, and (2) the applicable standard of care that Dr. Wilson, as a cardiologist, supposedly violated.

76.     Thereafter, on May 16, 2012 the MDB issued its initial Findings of Fact, Conclusions of Law and Recommendation to the Director, which adopted ALJ Lagattuta's April 25, 2012 Report and Recommendation. On June 18, 2012 the Department mailed its "20-Day Notice" to Dr. Wilson, and, on the same date, faxed a copy to Dr. Wilson's counsel. In violation

of 225 ILCS 60/37, however, the Director failed to issue, "without appreciable delay", a Final Order on the MDB's May 16, 2012 Findings. And then, in a bizarre and contrived maneuver, on March 6, 2013 the MDB issued its "new" Findings, which are, in substance, the same as the May 16, 2012 Findings. A Final Order on the MDB's "new" Findings was then, finally, signed by the Director on April 26, 2013.

77.     With the remand from the Circuit Court to the Department on October 7, 2011, it took some 18 months for the Director to issue his final order on the fourth remand on April 26, 2013. This unconscionable delay by the Department in entering the final order also constituted a violation of Dr. Wilson's due process rights.

78.     In addition, in Stewart's final order in connection with the fourth remand dated April 26, 2013, Stewart contends that his final order was delayed "[d]ue to a number of uncontrollable issues, including the retirement of the lead prosecutor, shortages in staffing, and misplaced records . . .." (Px 35 p. 2) Stewart did not, however attach any documents to support his purported excuses, and Dr. Wilson was denied the opportunity of a hearing and the right of cross-examination to contest these *ex parte* findings, which constitute another violation of Dr. Wilson's due process rights. Indeed, it is not proper for Stewart to support the Department's decision in its license revocation proceedings against Dr. Wilson by reference to alleged "facts" that were not introduced on the record during the course of a hearing, with no notice to Dr. Wilson and no opportunity for cross examination or to put on rebuttal evidence. Again, this constituted a violation of Dr. Wilson's due process rights.

79.     Finally, in connection with Dr. Wilson's Fourth Complaint on Administrative Review, on May 21, 2014 Judge Martin ruled that the Department's Finding that the potassium chloride injection administered by Dr. Wilson to Taylor resulted in Taylor's death "is against the

manifest weight of the evidence and is reversed." (Px 2 p. 8) In reversing the decision of the Department to revoke Dr. Wilson's medical license, Judge Martin ruled that the Department offered "multiple explanations for the unreasonable delays and the court construes this to be an acknowledgement that it took far too long to enter a final decision. The decision [of the Department to revoke Dr. Wilson's medical license] is reversed in its entirety because the Department failed to render its decision promptly." (*Id.* p. 12)

80.     All conditions precedent to recovery by Plaintiff have been performed or have occurred.

81.     Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following Counts.

### Count One
**(§1983 Claims Against Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Doe Defendants 1-5 And Doe Defendants 21-30)**

82.     Dr. Wilson had a property interest in his medical license which was protected against unreasonable seizure by the Fourth Amendment of the United States Constitution. Further, Dr. Wilson had a liberty interest in continuing with his chosen profession as a practicing cardiologist protected under the Fifth and Fourteenth Amendments of the United States Constitution.

83.     Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Doe Defendants 1-5 and Doe Defendants 21-30 each participated, individually, jointly, and severally, in the decision to seek the summary suspension of Dr. Wilson's medical license without conducting an adequate investigation as to the circumstances surrounding Taylor's death and why Dr. Wilson utilized the particular palliative care approach that he did. By November 18, 1986, it was a clearly established federal constitutional principle that a police officer, and thus a

-42-

coroner/medical examiner and an investigator for the Department, had to conduct a reasonable investigation of all surrounding facts and circumstances, including an interview of immediately available witnesses, before charging a citizen with a crime involving the element of intent, especially when there is no realistic likelihood that the citizen is a flight risk or likely to cause immediate harm to others. *See BeVier v. Hucal*, 806 F.2d 123, 127-28 (7th Cir. 1986).

84.    The course of conduct set forth above by Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Doe Defendants 1-5 and Doe Defendants 21-30 constitutes violations of Dr. Wilson's Fourth Amendment rights against unreasonable seizure, and Fifth and Fourteenth Amendment rights to due process of law, which are redressable herein under 42 U.S.C. §1983.

85.    The willful, intentional and reckless conduct of Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Doe Defendants 1-5 and Doe Defendants 21-30 as set forth above constitutes continuing violations of Dr. Wilson's constitutional rights.

86.    Dr. Wilson does not have an adequate remedy under Illinois law for the claims set forth herein.

**Count Two**
**(§1983 Claims Against Defendants Gorchynsky, Glasgow,**
**Sherman, Doe Defendants 6-10 And Doe Defendants 21-30)**

87.    Dr. Wilson had a liberty interest in continuing with his chosen profession as a practicing cardiologist protected under the Fifth and Fourteenth Amendments of the United States Constitution.

88.    Defendants Gorchynsky, Glasgow, Sherman, Doe Defendants 6-10 and Doe Defendants 21-30 each participated, individually, jointly, and severally, in the decision to continue the summary suspension of Dr. Wilson's medical license and continue the prosecution

of the Department's baseless claims against Dr. Wilson, from and after the time these Defendants learned, or should have learned, that (a) Taylor died from natural causes, and the particular palliative care approach that Dr. Wilson utilized toward Taylor did not, in fact, cause Taylor's death; and/or (b) the particular palliative care approach utilized by Dr. Wilson toward Taylor was in compliance with Rule 2.20 of the American Medical Association's Code of Medical Ethics.

89.     The course of conduct set forth above by Defendants Gorchynsky, Glasgow, Sherman, Doe Defendants 6-10 and Doe Defendants 21-30 constitutes violations of Dr. Wilson's Fifth and Fourteenth Amendment rights to due process of law, which are redressable herein under 42 U.S.C. §1983.

90.     The willful, intentional and reckless conduct of Defendants Gorchynsky, Glasgow, Sherman, Doe Defendants 6-10 and Doe Defendants 21-30 as set forth above constitutes continuing violations of Dr. Wilson's constitutional rights.

91.     Dr. Wilson does not have an adequate remedy under Illinois law for the claims set forth herein.

### Count Three
### (§1983 Claims Against Defendants Gorchynsky, Glasgow, Stewart, Doe Defendants 11-20 And Doe Defendants 21-30)

92.     Dr. Wilson had a liberty interest in continuing with his chosen profession as a practicing cardiologist protected under the Fifth and Fourteenth Amendments of the United States Constitution.

93.     Defendants Gorchynsky, Glasgow, Stewart, Doe Defendants 11-20 and Doe Defendants 21-30 each knew, must have known, or should have known, that the Department's prosecution of its claims against Dr. Wilson from and after the first remand to the Department on October 5, 2014 was not proceeding in an expeditious manner, and thus knew, must have known,

or should have known that the delay in prosecuting the Department's claims against Dr. Wilson constituted a violation of Dr. Wilson's due process rights.

94.     The course of conduct set forth above by Defendants Gorchynsky, Glasgow, Stewart, Doe Defendants 11-20 and Doe Defendants 21-30 constitutes violations of Dr. Wilson's Fifth and Fourteenth Amendment rights to due process of law, which are redressable herein under 42 U.S.C. §1983.

95.     The willful, intentional and reckless conduct of Defendants Gorchynsky, Glasgow, Stewart, Doe Defendants 11-20 and Doe Defendants 21-30 as set forth above constitutes continuing violations of Dr. Wilson's constitutional rights.

96.     Dr. Wilson does not have an adequate remedy under Illinois law for the claims set forth herein.

### Count Four
**(§1983 Conspiracy Claim Against Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman, Stewart, Doe Defendants 1-5, Doe Defendants 6-10, Doe Defendants 11-20 And Doe Defendants 21-30 For Conspiring To Violate Dr. Wilson's Constitutional Rights)**

97.     Dr. Wilson had a property interest in his medical license which was protected against unreasonable seizure by the Fourth Amendment of the United States Constitution. Further, Dr. Wilson had a liberty interest in continuing with his chosen profession as a practicing cardiologist protected under the Fifth and Fourteenth Amendments of the United States Constitution.

98.     Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman, Stewart, Doe Defendants 1-5, Doe Defendants 6-10, Doe Defendants 11-20 and Doe Defendants 21-30 each participated, individually, jointly, and severally, in the violations of Dr. Wilson's constitutional rights set forth above. This conspiracy began on or about October 1, 1998, and

continued through April 26, 2013, and was designed for the purpose of violating Dr. Wilson's constitutional rights. Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman, Stewart, Doe Defendants 1-5, Doe Defendants 6-10, Doe Defendants 11-20 and Doe Defendants 21-30 are jointly and severally liable for the full amount of damages caused to Dr. Wilson because each engaged in the affirmative conduct described herein in furtherance of the goals of the conspiracy. Upon joining the conspiracy, each such Defendant became liable for the prior conduct of the earlier co-conspirators, and remains liable for the subsequent conduct of the other co-conspirators until such time as there is a clear and unequivocal renouncement of any further participation in the conspiracy. To date, none of the above named co-conspirators has renounced his, her or its further participation in the above conspiracy to violate the constitutional rights of Dr. Wilson.

99.     The course of conduct set forth above by Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman, Stewart, Doe Defendants 1-5, Doe Defendants 6-10, Doe Defendants 11-20 and Doe Defendants 21-30 constitutes a conspiracy to violate Dr. Wilson's Fourth Amendment rights against unreasonable seizure, and Fifth and Fourteenth Amendment rights to due process of law, which are redressable herein under 42 U.S.C. §1983.

100.     The willful, intentional and reckless conduct of Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman, Stewart, Doe Defendants 1-5, Doe Defendants 6-10, Doe Defendants 11-20 and Doe Defendants 21-30 as set forth above constitutes continuing violations of Dr. Wilson's constitutional rights.

101.     Dr. Wilson does not have an adequate remedy under Illinois law for the claims set forth herein.

## Count Five
### (State Law Malicious Prosecution Claim Against Defendants
### Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman,
### Doe Defendants 1-5, Doe Defendants 6-10 And Doe Defendants 21-30)

102.    The course of conduct set forth above constitutes the tort of malicious prosecution against Dr. Wilson under Illinois State Law in that (a) Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman, Doe Defendants 1-5, Doe Defendants 6-10 and Doe Defendants 21-30 commenced or continued the license revocation proceeding by the Department against Dr. Wilson; (b) the Department's license revocation proceeding against Dr. Wilson terminated in favor of Dr. Wilson; (c) there was an absence of probable cause for such proceedings; (d) Defendants Gorchynsky, Glasgow, Kalelkar, Donoghue, CCME, Sherman, Doe Defendants 1-5, Doe Defendants 6-10 and Doe Defendants 21-30 exhibited malice toward Dr. Wilson; and (e) damages thereby resulted to Dr. Wilson.

## Count Six
### (State Law Claim Under 225 ILCS 60/46 Against
### Defendants Department And The State Of Illinois)

103.    Pursuant to 225 ILCS 60/46:

> In the event that the Department's order of revocation, suspension . . . or other order of formal disciplinary action is without any reasonable basis  in fact of any kind, then the State of Illinois shall be liable to the injured physician for those special damages [the physician] ha[s] suffered as a direct result of such order.

104.    There was no reasonable basis in fact of any kind for the Department's summary suspension of Dr. Wilson's medical license, there was no reasonable basis in fact of any kind for the Department's revocation of Dr. Wilson's medical license.

### Count Seven
### (State Law Declaratory Judgment Of Indemnification
### As To The Duty Of Illinois To Indemnify The
### Individual State Actor Employees Named Herein)

105.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which state employees are individually liable within the course and scope of their employment services.

106.    Defendants Glasgow, Gorchynsky, Sherman and Stewart are or were officers, employees and/or agents of Defendant, who acted within the course and scope of their employment in committing the tortious conduct set forth herein.

### Damages

107.    As a direct, proximate and consequential result of the Defendants' wrongful conduct as set forth above, Dr. Wilson lost his license to practice medicine for over 15 ½ years, and thereby lost his house, his car and most of his personal possessions, and also suffered damage to his reputation and standing within the community. In addition to losing his ability to continue his practice of medicine as a cardiologist, Dr. Wilson lost staff privileges at Olympia Fields Hospital, and, because of the Defendants' wrongful conduct as set forth herein, Dr. Wilson has not only lost past income, but future income because it is highly unlikely that he will be able to again be employed as a cardiologist. In terms of past loss of revenue, Dr. Wilson has lost at least $7,500,000, with an approximate amount of $7,500,000 in loss of future earnings. In addition to Dr. Wilson's out-of-pocket losses and damage to his reputation, he has suffered personal humiliation and mental anguish, as well as physical suffering.

108.    Further, because the wrongful conduct of the Defendants as described above was willful, intentional, and malicious, and with such a high degree of recklessness that the Defendants knew, must have known, or should have known, that harm would likely result to Dr.

Wilson, Dr. Wilson seeks an assessment of punitive damages against the Defendants in an amount not less than three time Plaintiff's actual damages. Plaintiff hereby stipulates, however, that every penny of any punitive damages awarded will be donated to the General Research Fund of the American Heart Association.

## PRAYER

Plaintiff Dr. Robert Lance Wilson, D.O. respectfully requests:

(1)     That Plaintiff have judgment against the Defendants, jointly and severally for (a) compensatory damages in an amount to be determined by the jury; (b) punitive damages in an amount to be determined by the jury; (c) reasonable attorneys' fees and expenses for the defense of Dr. Wilson in connection with the Department's efforts to revoke Dr. Wilson's medical license, including attorneys' fees and expenses on appeal; and (d) reasonable attorney and expert fees herein pursuant to 42 U.S.C. §1988.

(2)     Further, Plaintiff respectfully requests that the Court enter the declaratory relief as requested herein.

(3)     Finally, Plaintiff requests that the Court grant Plaintiff court costs and such further relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff requests a trial by jury.

### NOTICE TO DEFENDANTS TO PRESERVE ALL
### DOCUMENTS AND ELECTRONIC STORAGE OF INFORMATION

You are hereby put on notice that you should preserve and not destroy, or allow the destruction of or removal from your files, any documents or electronic storage of information which may, directly or indirectly, have any relevance or bearing on any of the facts, matters or

issues set forth in the above Complaint, or may reasonably lead to discovery of the facts, matters

or issues which may be relevant to the facts, matters or issues set forth in the above Complaint.

Respectfully submitted,

ARMSTRONG LAW FIRM, P.C.


DATED: December 31, 2014.     By____*F. Dean Armstrong*_____
     F. Dean Armstrong
     ARDC #6199894
     1324 Dartmouth Road
     Flossmoor, IL 60422
     708/798-1599
     Fax: 708/798-1599
     armstronglaw@sbcglobal.net

**Attorneys for Plaintiff**
**Dr. Robert Lance Wilson, D.O.**