**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DR. ROBERT LANCE WILSON, D.O., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14 CV 10521 |
| ) | |
| ILLINOIS DEPARTMENT OF ) | |
| FINANCIAL AND PROFESSIONAL ) | Judge Rebecca R. Pallmeyer |
| REGULATION; ANDREW GORCHYNSKY; ) | |
| THOMAS GLASGOW; LEONARD A. ) | |
| SHERMAN; OFFICE OF THE COOK ) | |
| COUNTY MEDICAL EXAMINER; MITRA B. ) | |
| KALELKAR; EDMUND R. DONAGHUE; ) | |
| THE STATE OF ILLINOIS; DOE ) | |
| DEFENDANTS 1-5; DO DEFENDANTS 6-10; ) | |
| DOE DEFENDANTS 11-20; and DOE ) | |
| DEFENDANTS 21-30, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

The State of Illinois suspended the medical license of Doctor Robert Wilson in October 1998 based on the circumstances surrounding the death of one of his patients. The patient, Henry Taylor, had been admitted to Wilson's hospital with two life-threatening maladies: end-stage renal disease and superior vena cava (SVC) syndrome, a blockage of a major vein that can lead to upper-body swelling and, eventually, suffocation. As Taylor's condition deteriorated and his death appeared imminent, Wilson readied an injection of morphine and potassium chloride intended to ease Taylor's suffering in his final moments. Taylor died before Wilson could fully administer the palliative dose on September 30, 1998. In the days that followed, the Cook County Medical Examiner's (CCME) office performed an autopsy and ruled Taylor's death a homicide by potassium chloride intoxication. No criminal charges were ever filed against Wilson, but the Illinois Department of Financial and Professional Responsibility (IDFPR)—the

state agency charged with regulating medical licenses—temporarily suspended Wilson's license ex parte on October 9, 1998. Wilson's license was not reinstated until April 2014, when the Circuit Court of Cook County issued a final order reversing the determination of the IDFPR. Over the intervening 15.5 years, Wilson and the IDFPR were embroiled in constant litigation, with Wilson disputing both the autopsy's conclusion and the propriety of his suspension. The Circuit Court's 2014 order marked the fourth time that court had reversed Wilson's suspension. On remand from the first three of those rulings, the IDFPR reinstated its own initial ruling. It did not appeal the Circuit Court's fourth reversal.

Wilson has filed suit against thirty-nine[1] defendants, including the State of Illinois and Cook County. All of the individual defendants are current or former employees of the County or State. Wilson raises five claims under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights to due process, his property interest in his license, and his liberty interest in pursuing his chosen career. He also raises state-law claims for indemnification of the individual defendants by their employers (i.e., the State and County), malicious prosecution, and unreasonable suspension of a medical license, in violation of 225 ILCS 60/46.

The nine named defendants have all moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). In doing so, they have separated into three groups: (1) the "County Defendants" [26], consisting of the CCME; Dr. Mitra Kalelkar, the CCME's former Deputy Chief Medical Examiner; and Dr. Edmund Donoghue, the CCME's former Chief Medical Examiner; (2) the "State Defendants" [19], which include the State of Illinois, the IDFPR, its Director Jay Stewart, its former Director Leonard Sherman, and its former Chief Prosecutor Thomas Glasgow; and (3) Dr. Andrew Gorchynsky [22], the former Chief Medical Coordinator for the IDFPR. The defendants' motions rely on, among other things, a statute-of-limitations argument and defenses based on common-law and statutory immunity. For the reasons stated below,

---

[1] Thirty of the defendants are "Doe" defendants, pending Wilson's expected discovery of their identities in this litigation. All thirty are IDFPR employees.

the Defendants' motions [19, 22, 26] are granted, and Wilson's second amended complaint [18] is dismissed without prejudice.

## **BACKGROUND**

The following facts are taken from the plaintiff's second amended complaint [18]. Henry Taylor was admitted to Olympia Fields Hospital in Olympia Fields, Illinois, in September 1998. (Second Am. Compl. at 9.) At that time, Wilson, a cardiologist, had staff privileges at the hospital. (*Id.* at 9.) Taylor was in dire straits, suffering from end-state renal disease and severe swelling in his right arm. (*Id.* at 10.) Tests determined that Taylor's swelling was the result of SVC syndrome, a potentially fatal condition blocking the flow of blood from the upper body to the heart. (*Id.* at 10.) The condition eventually results in swelling of tissue in the neck, which, in turn, compresses the trachea. This is referred to as "airway collapse," and it leads to suffocation, cardiac arrest, and death. (*Id.*) Doctors relayed this prognosis to Taylor and advised that his SVC syndrome could be treated with artificial ventilation, but Taylor rejected a breathing tube on the morning of September 30, 1998. (*Id.*) Taylor's doctors recognized that at this stage of SVC syndrome, no medication could reverse the swelling or ease the pressure on Taylor's windpipe. (*Id.*) As Taylor had refused a breathing tube and previously signed two "do not resuscitate" orders (DNRs), death from suffocation was inevitable. (*Id.* at 11.) Believing that Taylor would die "within minutes," the doctor treating him paged Wilson, who had treated Taylor in the past. (*Id.*) Plaintiff arrived at Taylor's bedside at 8:10 a.m. and found him "suffocating to death as his trachea collapsed." (*Id.*) He explained to Taylor that, without intubation, he would die, but Taylor refused Wilson's repeated requests to insert a breathing tube. (*Id.*) Within minutes, Taylor's airway completely collapsed and he began "uncontrollably gasping for air." (*Id.*) Based on Taylor's DNRs, there was nothing Wilson could do to save Taylor's life. He administered morphine, but the 10mg dose did nothing to relieve Taylor's obvious, extreme pain.

3

Under the American Medical Association's guidelines, Wilson knew that he had "an obligation to relieve pain and suffering . . . , includ[ing by] providing effective palliative treatment even thought it may foreseeably hasten death." (*Id.* at 13 (quoting Am. Med. Assoc. Rule 2.20).) But Wilson recognized that morphine was insufficient to relieve Taylor's suffering. So, he administered a dosage of potassium chloride "for the purpose of rendering Taylor unconscious as Taylor spiraled through the terrifying process of suffocating to death." (*Id.* at 15-16.) Potassium chloride has the potential to be lethal, but Wilson deemed that risk necessary in light of Taylor's suffering. He administered 40 millequivalents (m/eq) of the drug rather than the standard dose of 30 m/eq, because Taylor had developed a tolerance for potassium during years of kidney dialysis. (*Id.* at 16.) Though larger than standard, this dose was still one-sixth the lethal dose of 240 m/eq. (*Id.*)

As Wilson began to administer the injection, however, Taylor's heart stopped from lack of oxygen. He died at 8:25 a.m. on September 30, 1998. (*Id.*) Recognizing that, because Taylor died as potassium chloride was being administered, there might be suspicion that that the drug had killed him, Wilson promptly took a voluntary leave of absence so that the IDFPR and the Cook County State's Attorney could conduct a thorough investigation into Taylor's death. (*Id.* at 17.) Wilson himself called the CCME to request that the office perform an autopsy. (*Id.*)

The next day, October 1, 1998, Taylor's body was transported to the CCME where Deputy Chief Medical Examiner Mitra Kalelkar performed an autopsy. (*Id.* at 20.) At first, Kalelkar could not determine the cause of Taylor's death. She listed the result as uncertain pending the return of a toxicology report on Taylor's blood. While waiting for the blood test, Kalelkar spoke to an unidentified "third party"[2] about the events leading to Taylor's demise. Based on that conversation, she changed the autopsy result to "homicide" resulting from

---

[2] Wilson does not clarify whether he knows the identity of the third party, nor does he explain how he learned of the third party's involvement.

4

"Potassium Chloride Intoxication." (*Id.*) Kalelkar's change of heart could not have been based on the blood test results, which were not completed by a third party until the following day. (Blood Test Results, Ex. 12 to Second Am. Compl.) According to an affidavit from Wilson's expert, Dr. James Bryant, those results, which were apparently never analyzed by the CCME or the IDFPR, actually confirmed that Taylor's potassium levels were normal at the time of his death (i.e., the injection had not reached his heart when he died). (*Id.* at 20-21.)

Immediately after modifying the autopsy results on October 1, 1998, Kalelkar notified the Olympia Fields Police Department that Taylor's death was a homicide. (*Id.* at 21.) Several days later, without notifying Wilson, Kalelkar released Taylor's body for cremation, foreclosing any opportunity for a second autopsy. (*Id.*) Kalelkar and her boss, Edmund Donoghue, met with IDFPR employees Dr. Andrew Gorchynsky and attorney Thomas Glasgow at the CCME office in Chicago on October 7. Kalelkar told the others that she had been unable to determine the cause of Taylor's death based on medical testing alone, but that she'd concluded his death had been a homicide after hearing a story from a third party about Wilson injecting Taylor with potassium chloride. (*Id.*)

Based on this meeting, Gorchynsky and Glasgow concluded that Wilson had injected Taylor in an effort to kill him, an effort that proved successful. Their conclusion relied, in part, on the belief that potassium chloride was capable of immediately causing Taylor's heart to stop. Wilson, alleges, however, that it would actually take "much longer" for the drug to have had any adverse effect on Taylor. (*Id.* at 24.) After the meeting with Kalelkar, Donoghue told the local Olympia Fields newspaper that the amount of potassium chloride administered by Wilson "is always fatal," and that the injection was "given to euthanize [and t]hat's exactly what happened." (*Id.* at 26.) Without interviewing Wilson or any other witnesses, Gorchynsky and Glasgow concluded their investigation and, at their urging, the IDFPR suspended Wilson's license without a hearing on October 9, 1998. (*Id.* at 30.) They also initiated revocation proceedings against Wilson. A formal hearing was eventually scheduled for November 1999. (*Id.* at 37.)

5

The next day, October 10, 1998, an IDFPR spokesman told the *Chicago Tribune* that "[i]t is rare for a physician to be suspended without first receiving a hearing . . . , because it eliminates the due process usually provided to a professional. But when we feel there is clear and convincing evidence of wrongdoing, we can take this action." (*Id.* at 31-32.) Over time, however, the IDFPR softened its position slightly. One of its prosecutors, William McLaughlin, Esq., told the IDFPR that it could not prove that Wilson had intended to kill Taylor. (*Id.* at 32.) On November 17, 1998, the IDFPR changed the charge against Wilson from an allegation that he had administered potassium chloride "for the purpose of causing Henry Taylor's death," to a charge that Wilson had administered the injection "which resulted in Henry Taylor's death." (*Id.* at 32-33.) At this point, Wilson claims, Gorchynsky, Glasgow, and others "must have known, or should have known, that . . . there was no basis to summarily suspend Dr. Wilson's medical license without a contested evidentiary hearing." (*Id.* at 33.) Nonetheless, Wilson's license remained suspended and the revocation proceedings continued apace.

On April 7, 1999, Wilson and his attorneys met with Glasgow and McLaughlin to discuss the progress of revocation proceedings. The meeting did not go well, and Glasgow told Wilson that "he did not care about Dr. Wilson's 5th Amendment rights [to due process]." (*Id.* at 34 (alteration in original).) Glasgow made clear that he would not lift Wilson's suspension because he considered Wilson "a danger to society." (*Id.*) Months later, in September 1999, Wilson received two pieces of good news: the Cook County State's Attorney's Office announced that it would not file any criminal charges against Wilson, and Taylor's family dismissed a wrongful death suit it had filed against Wilson without receiving any payment from the doctor or his malpractice insurance carrier. (*Id.* at 36.)

With a month left until his formal hearing before the IDFPR, Wilson filed suit in federal court against Kalelkar, Donoghue, the CCME, Gorchynsky, Glasgow, the IDFPR, and its former director Leonard Sherman in October 1999. (*Id.* at 36.) That suit, filed pursuant to 42 U.S.C. § 1983, alleged that the defendants had violated Wilson's constitutional rights by suspending his

6

license ex parte. He sought damages and also asked the court to enjoin the continued prosecution of the IDFPR's charges against him. (*Id.* at 36-37.) On the eve of Wilson's hearing, Judge Ruben Castillo of this court denied Wilson's request for a temporary restraining order that would have halted the IDFPR's allegedly biased revocation proceedings against him. The district judge ruled that "if the doctor is correct in his allegations as to what's about to occur; that is, a kangaroo-type proceeding, I think the monetary damages that will be available under Section 1983 will be more than sufficient . . . to take care of this . . . allegation." (*Id.* at 38.) Wilson's suit was later dismissed by Judge George Lindberg without prejudice under the *Younger* abstention doctrine, which requires federal courts to abstain from interfering in ongoing state proceedings. (*Id.*) Wilson appealed that ruling, but later voluntarily dismissed his appeal before the Seventh Circuit could rule on its merits. The record does not contain any information about Wilson's appeal.

A formal hearing on the IDFPR's revocation charges against Wilson was held before an administrative law judge (ALJ) in March 2000. Following the hearing, which Wilson characterizes as a "sham," the ALJ recommended that Wilson's license be suspended for "a minimum of five years." (*Id.* at 39.) The IDFPR adopted the ALJ's findings, issuing a five-year suspension, backdated to the start of Wilson's temporary suspension on October 9, 1998. Soon after that decision, Wilson ran into McLaughlin at a restaurant in Frankfort, Illinois.[3] According to Wilson, McLaughlin approached him and "with an obvious and understandable sense of guilt and remorse," informed Plaintiff that the IDFPR had "blackballed" Wilson because Wilson had "talk[ed] back" to Glasgow and didn't cut a deal with the IDFPR. (*Id.* at 39-40.)

The conversation with McLaughlin "stiffened Dr. Wilson's resolve to seek relief in a real Court before a real Judge." (*Id.* at 40.) He filed his first of four complaints for administrative review in April 2002. The Circuit Court of Cook County reversed the IDFPR's decision on two

---

[3] The complaint does not identify the date of the chance meeting between McLaughlin and Wilson.

7

grounds: the IDFPR had violated Wilson's due process rights by (1) failing to grant Wilson a continuance in order to present additional evidence; and (2) not granting Wilson's motion *in limine* to bar any evidence from the result of the autopsy, because Wilson had not been afforded the opportunity to conduct an independent autopsy. (*Id.* at 40.)

The IDFPR appealed the decision. On appeal, the Illinois Appellate Court affirmed the Circuit Court's decision with regard to the witness issue, but reversed on the autopsy issue because Wilson had not challenged the results of the autopsy during the initial evidentiary hearing. The matter was remanded to the IDFPR in October 2004. Wilson sought to substitute a new expert witness in November 2005, but that request was denied by the ALJ in March 2006. New findings were issued to the IDFPR in November 2006, and without notice to Wilson, the IDFPR affirmed its suspension order in July 2007. (*Id.* at 41-42.) Wilson again sought administrative review of this decision in August 2007, and again the Circuit Court reversed the IDFPR in May 2008. On remand this time, an evidentiary hearing was held before a new ALJ in October 2008, who agreed with the first ALJ's recommendation of a five-year suspension. (*Id.* at 42-43.) The IDFPR adopted this recommendation in July 2009. (*Id.* at 43.)

Wilson's third complaint for administrative review followed a familiar pattern. The Circuit Court reversed the IDFPR's decision a third time in July 2011, only to have Wilson's suspension reinstated on remand in June 2012. (*Id.*) Although the IDFPR issued its "initial findings" affirming the suspension in June 2012, it did not issue its final order until April 2013. (*Id.* at 44.) The IDFPR did not explain the cause of this delay. Wilson filed his fourth complaint for administrative review in May 2013. For a fourth time, the Circuit Court reversed the suspension, this time on the merits: the Circuit Court held that the IDFPR's conclusion that the potassium chloride injection had killed Taylor "is against the manifest weight of the evidence." That court also held that reversal was alternatively warranted on the basis of the IDFPR's due process delays. (*Id.* at 44-45.) The IDFPR did not appeal this decision.

8

On December 31, 2014, Wilson filed this suit bringing federal claims pursuant to § 1983 and several state causes of action [1]. He has since amended his complaint twice, most recently in April 2015 [18]. The Defendants have filed three separate motions to dismiss [19, 22, 26] Wilson's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). They argue that Wilson's suit is barred by the applicable statute of limitations and that they are immune from liability.

## **DISCUSSION**

**I.     Counts One Through Five: § 1983 claims**

The first five counts of Wilson's complaint raise claims under 42 U.S.C. § 1983, alleging that state and county employees violated his constitutional rights: Count One is based on the Defendants'[4] "unreasonable seizure" of Wilson's medical license without a hearing. (Second Am. Compl. at 46-47.) Count Two alleges that Defendants violated Wilson's constitutional rights to property (the medical license) and liberty (the opportunity to pursue his chosen career) by continuing to pursue revocation proceedings after they knew or should have known that the charges against Wilson were false. (*Id.* at 47-48.) Count Three alleges the same constitutional violations as Count Two, but it is predicated on the delays in the administrative proceedings following the first remand in October 2004. (*Id.* at 48-49.) Count Four is a *Monell* claim based on the CCME's "practice of allowing inappropriate hearsay autopsies[,] which contributed to the deprivation of Dr. Wilson's constitutional rights." (*Id.* at 49-50.) Finally, Count Five alleges that all Defendants conspired together to commit the constitutional violations cited in Counts One through Four. (*Id.* at 50-51.)

---

[4]     Counts One through Five each name different combinations of state and county Defendants. For the sake of simplicity, the court does not list each set of defendants in summarizing Wilson's claims, as those distinctions are immaterial to the court's statute-of-limitations analysis.

9

The Defendants[5] argue that all of Wilson's § 1983 claims are barred by the two-year limitations period applicable to any such claim filed in Illinois. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (explaining that the applicable statute of limitations "is that which the State provides for personal-injury torts"); 735 ILCS 5/13-202 (two-year statute of limitations for personal injury claims in Illinois). "Section 1983 claims accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." *Kelly v. City of* Chicago, 4 F.3d 509, 511 (7th Cir. 1993). And the Defendants contend that Wilson knew about all of the constitutional violations alleged in his complaint long before December 31, 2012 (i.e., two years before Wilson filed this suit). (County Defs.' Mot. to Dismiss at 6-9.)

Wilson counters that his § 1983 claims are timely because they did not accrue until his suspension was overturned by a final order of the Circuit Court of Cook County in April 2014. (Pl.'s Resp. to County Defs.' Mot. to Dismiss at 2.) For support, he cites, without elaboration, to *Heck v. Humphrey*, 512 U.S. 477, 487-87 (1984), and *Tillman v. Burge*, 813 F.Supp. 2d 946, 969–71 (N.D. Ill. 2011). Upon closer inspection, however, neither case supports Wilson's position.

The plaintiff in *Heck* was convicted of murder. With his criminal appeal pending, Heck filed suit under § 1983, alleging that police officers and prosecutors had, among other things, "knowingly destroy[ed]" evidence. The Court affirmed the district court's dismissal of Heck's suit, because

---

[5] Only the County Defendants raised a statute-of-limitations defense in their motion to dismiss. Although Gorchynsky and the rest of the State Defendants did not argue that Wilson's § 1983 claims are time-barred, they are free to raise such a defense in a subsequent answer. *See Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000) ("Rule 8(c) requires a defendant to plead a statute of limitations defense and any other affirmative defense in his answer to the complaint.") (internal quotation marks omitted). Because the County Defendants' statute-of-limitations arguments apply with equal force to Counts One through Five—even though Counts Two and Three name only State Defendants—the court will consider those arguments as they relate to all of Wilson's § 1983 claims. To do otherwise would require unnecessary briefing from the State and would run counter to the notion of judicial economy.

> in order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck*, 512 U.S. at 486. Although the complaint in *Heck* sought monetary damages only, the Court ruled that the plaintiff could not proceed under § 1983, because any award in his favor would "necessarily imply" the invalidity of his conviction. (*Id.* at 487.)

*Tillman* also involved civil claims arising out of a criminal prosecution. The plaintiff there filed multiple § 1983 claims against various state and municipal employees in 2010, based on the circumstances surrounding his wrongful conviction for rape in 1986. Tillman's conviction had been vacated just months before he filed the civil suit. The defendants argued that Tillman's claims were time-barred, and the district court granted their motion as it related to certain counts, but denied it as to others. The *Tillman* court's reasoning relied on *Heck*. It found that any claims that would "impugn[] the validity of the conviction" did not accrue until the conviction was vacated, but those claims that did *not* rely on the invalidity of his conviction accrued at the time the constitutional violation occurred. Based on that conclusion, the court dismissed Tillman's false-arrest claim as untimely. *Tillman*, 813 F.Supp. 2d at 968-69. It did not dismiss certain other counts, however, such as a coercive-confession claim, because "had [Tillman] brought this claim earlier, it would have impugned the validity of his conviction." *Id.* at 971.

The County Defendants urge that *Heck* and *Tillman* do not address the circumstances of Wilson's case, because "the underlying administrative and civil proceedings in this case . . . do not deal with allegations of criminal conduct." (County Defs.' Reply at 3.) Wilson does not cite to any case applying *Heck* to § 1983 claims unrelated to a criminal conviction or sentence, nor could the court find any. The lack of support for Wilson's position is perhaps unsurprising, given

that *Heck* and its progeny are singularly concerned with the prospect of a civil action undermining an outstanding *criminal* conviction or sentence. The *Younger* abstention doctrine—which demands that federal courts, absent extraordinary circumstances, abstain from enjoining state proceedings, *Younger v. Harris*, 401 U.S. 37 (1971)—is more relevant here. Although *Younger* itself demands that federal courts abstain from *enjoining* state proceedings, the plurality of circuit courts—including the Seventh Circuit—have concluded that the *Younger* doctrine dictates federal abstention in at least certain damages suits where an award "would be akin to a declaratory judgment." *Am. Fed'n of State, Cty. & Mun. Emps. v. Tristano*, 898 F.2d 1302, 1304 (7th Cir. 1990). In fact, that is exactly what happened here, as Judge Lindberg of this court dismissed Wilson's 1999 suit—which sought both injunctive relief and monetary damages—without prejudice, citing *Younger*.[6] But the fact that *Younger* required federal abstention does not have the same impact on the accrual of Wilson's claims as *Heck* would have. Although claims barred by *Heck* do not accrue until the reversal of the underlying conviction, the *Younger* doctrine has no bearing on a claim's accrual. This is why the Supreme Court has advised district courts to stay rather than dismiss without prejudice those claims it abstains from reaching based on the *Younger* doctrine: failure to do say may result in the plaintiff's claims being barred by the statute of limitations. *See Deakins v. Monaghan*, 484 U.S. 193, 203 n.7 (1988) (holding that where federal courts abstain under *Younger*, they should stay rather than dismiss those claims, otherwise "a plaintiff could be barred permanently from asserting his claims . . . by the running of the applicable statute of limitations.").

---

[6] The district judge should have stayed rather than dismissed Wilson's damages claims. *See Lee v. Bernard*, 62 F. App'x 670, 672 (7th Cir. 2003) ("When a court abstains under *Younger*, it must stay, rather than dismiss, § 1983 claims for money damages that cannot be redressed in the state proceeding; otherwise, the plaintiff's claims may be time-barred by the time the state case is resolved.") (citing *Deakins*, 484 U.S. at 202-03). But Wilson did not appeal that issue and cannot raise it now. *See United States v. Husband*, 312 F.3d 247, 250 (7th Cir. 2002) ("[A]ny issue that could have been but was not raised on appeal is waived . . . .").

Because *Heck* does not apply here to suspend the statute of limitations, the only question that remains is whether any of Wilson's claims accrued after December 31, 2012.[7] Wilson does not refer to specific dates in each count, but a close reading of the second amended complaint reveals that all of the § 1983 claims involve alleged constitutional violations of which Wilson was aware prior to that date: Count One is based on the ex parte suspension of Wilson's license, which occurred on October 9, 1998. (Second Am. Compl. at 29, 46-47.) Count Two charges that Defendants continued revocation proceedings after they knew or should have known that the IDFPR's claims were "baseless." (*Id.* at 47-48.) Wilson does not allege exactly when or how the Defendants should have recognized the inaccuracy of their claims, but other portions of the complaint confirm that this claim relies on Taylor's medical records and the autopsy blood test, which the Defendants would have had access to as part of their initial investigation in 1998. (*See id.* at 18-19 (referring to "the undisputed medical evidence" in Taylor's medical charts).) Count Three attacks the lengthy delays in the IDFPR's "prosecution of its claims against Dr. Wilson from and after the first remand to the Department in October 2004." (*Id.* at 48.) That remand concluded on July 17, 2007 when the director of the IDFPR affirmed Wilson's suspension. (*Id.* at 42.) Count Four is a *Monell* claim predicated on the CCME's autopsy practices. (*Id.* at 49-50.) The CCME released the results of its autopsy of Taylor on October 1, 1998. (Ex. 15 to Compl. [1].) Finally, Count Five alleges that Defendants conspired to produce the constitutional violations alleged in the first four counts of the complaint.

---

[7] Although *Heck* is inapplicable, the court notes that, even if the opposite were true, it is not clear that Wilson's claims would be preserved by its holding. Under Wilson's apparent understanding of *Heck*, any claims that impugn the validity of his suspension did not accrue until that suspension was overturned in April 2014. But which of Wilson's claims actually rely on the invalidity of his suspension? For instance, Count One, which alleges due process violations based on the IDFPR's ex parte suspension of Wilson's license, would not require proof that his license was improperly suspended. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions . . . .")

13

(Second Am. Compl. at 50-51.) Wilson alleges that the conspiracy "began on or about October 1, 1998, and continued through June 2, 2014." (*Id.*)

None of the five counts accrued within the two-year statute of limitations. Although the alleged conspiracy continued through June 2014, civil conspiracy claims accrue "when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992). As the underlying constitutional violations spelled out in Counts One through Four all accrued long before December 31, 2012, a conspiracy to commit those violations likewise accrued prior to that date.

All of Wilson's § 1983 claims appear to be time-barred. Counts One through Five are dismissed without prejudice. If Plaintiff believes that his claims are in fact timely under the reasoning of this opinion, he may file an amended complaint, specifying how and when he believes any alleged constitutional violations accrued after December 31, 2012.

## II. Counts Six Through Eight: State-Law Claims

The remaining three counts of Wilson's second amended complaint raise state-law claims against Defendants. Count Six alleges that Wilson was maliciously prosecuted. (Second Am. Compl. at 52.) Count Seven raises a claim under 225 ILCS 60/46, which establishes a cause of action for physicians whose licenses are revoked or suspended by the state "without any reasonable basis in fact." (*Id.* at 52-53.) And Count Eight seeks a "declaratory judgment of indemnification as to the duty of the [IDFPR], the State of Illinois, and Cook County to indemnify the individual [Defendants]." (*Id.* at 53-54.)

Having dismissed Wilson's federal claims, the court declines to exercise supplemental jurisdiction over the remaining state-law claims. 28 U.S.C. §§ 1367(c)(1), (3). This course of action is particularly prudent given that Illinois courts have, as yet, offered little guidance in applying 225 ILCS 60/46, the statutory claim that appears to have the most direct application here. Novel issues of state law are better left to the state courts. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000) ("Federal courts are loathe to fiddle around with state law.

Though district courts may try to determine how the state courts would rule on an unclear area of state law, district courts are encouraged to dismiss actions based on novel state law claims.") The court notes that Wilson's claim under 225 ILCS 60/46 may also have a significant impact his federal-law claims, as § 1983 claims are "not actionable if there is an adequate state-law remedy." *Howlett v. Hack*, 794 F3.d 721, 727 (7th Cir. 2015). Counts Five through Eight are dismissed without prejudice to their being re-filed in state court.

## **CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss [11, 19, 22, 26] are granted and Plaintiff's second amended complaint [18] is dismissed without prejudice. Plaintiff's third amended complaint, if any, shall be filed within 21 days.

ENTER:

Dated: March 18, 2016

_____
REBECCA R. PALLMEYER
United States District Judge