# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DR. ROBERT LANCE WILSON, D.O., )
)
Plaintiff, )
)
v. ) No. 14 C 10521
)
ILLINOIS DEPARTMENT OF FINANCIAL ) Judge Rebecca R. Pallmeyer
AND PROFESSIONAL REGULATION; )
ANDREW GORCHYNSKY; THOMAS )
GLASGOW; LEONARD A. SHERMAN; )
JAY STEWART; THE STATE OF )
ILLINOIS; DOE DEFENDANTS 1-5; )
DOE DEFENDANTS 6-10; DOE )
DEFENDANTS 11-20; and DOE )
DEFENDANTS 21-30, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Wilson, a cardiologist, has been embroiled in litigation ever since his medical license was suspended in 1998. In 2014, he filed this lawsuit, following the Circuit Court of Cook County's fourth reversal of an Illinois agency decision upholding the suspension. This court dismissed the case on statute of limitations grounds, *Wilson v. Ill. Dep't of Fin. and Prof'l Regulation*, No. 14 CV 10521, 2016 WL 1073072 (N.D. Ill. Mar. 18, 2016), but the Seventh Circuit reversed and remanded, concluding that the suit was timely filed. *Wilson v. Ill. Dep't of Fin. and Prof'l Regulation*, 871 F.3d 509, 513 (7th Cir. 2017). Now, Defendants Illinois Department of Financial and Professional Regulation ("IDFPR"), Andrew Gorchynsky, Thomas Glasgow, Leonard Sherman, and Jay Stewart move to dismiss Plaintiff's Fourth Amended Complaint [90] for failure to state a claim, FED. R. CIV. P. 12(b)(6), and for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). For the reasons explained here, the motion is granted in part and denied in part without prejudice.

## BACKGROUND

When reviewing a 12(b)(6) motion to dismiss, the court "must take the truth of the allegations in [the] complaint at face value." *Simpson v. Brown Cty.*, 860 F.3d 1001, 1009 (7th Cir. 2017). The underlying facts of this case have remained largely unchanged since the court issued its first opinion dismissing Dr. Wilson's Second Amended Complaint.[1] *Wilson*, 2016 WL 1073072, *vacated*, *Wilson*, 871 F.3d.

In mid-September 1998, Henry Taylor was admitted to Olympia Fields Hospital at the age of 69. (Fourth Am. Compl. [90] ¶ 11.) Mr. Taylor suffered from superior vena cava ("SVC") syndrome and end-stage renal disease. His condition was deteriorating, and he signed two "do not resuscitate" orders while under the care of another doctor who is not party to this suit. At approximately 8:10 on the morning of September 30, Plaintiff Dr. Wilson was called to care for Mr. Taylor. As a complication of Mr. Taylor's SVC, his windpipe was collapsing, and he had refused a breathing tube. His death was imminent; he was struggling to breathe, gasping for air, and "flailing about" when Dr. Wilson arrived. (*Id.* at ¶¶ 15, 16.) At 8:16, Mr. Taylor's windpipe fully collapsed, "cutting off all oxygen." (*Id.* at ¶ 19.) He was, however, still fully conscious. With the do-not-resuscitate orders in place, Dr. Wilson "believed he was morally and professionally obligated . . . to do everything within his power to relieve Taylor's conscious suffering as Taylor slowly went through the agonizing process of suffocating to death." (*Id.* at ¶ 21.) Dr. Wilson twice administered morphine. (*Id.* at ¶¶ 16, 20.) He then began to inject Mr. Taylor with 40 milliequivalents (m/eq) of potassium chloride, a drug that is lethal in a dose of 240 m/eq.[2] (*Id.* at

---

[1]     Mr. Wilson has settled, however, with the parties from Cook County (Dr. Mitra Kalelkar, Edmund Donoghue, and the Cook County Medical Examiner) and dropped them from his Fourth Amended Complaint. (Pl.'s Notice of Filing and Explanation of Changes to Third Am. Compl. [86-5] ¶ 3(a).)

[2]     A news article about the Taylor incident, quoted in Plaintiff's Fourth Amended Complaint, suggests that "Kidney disease patients are limited to a dose of 50 [m/eq] of potassium [chloride] a day." (Fourth Am. Compl. [90] ¶ 46 (quoting Ex. 7 to *id.*).)

¶ 28.)  Dr. Wilson intended the selected dose to render Mr. Taylor "unconscious during the final stages of [his] process of death." (*Id.*)  "As Dr. Wilson began the injection, however, Taylor's heart stopped from lack of oxygen due to the natural progression of his underlying disease," and Taylor was pronounced dead at 8:25AM.  (*Id.* at ¶ 29.)  At least two other doctors were present at the time of Mr. Taylor's death.  (*Id.* at ¶¶ 43, 45.3.)

Deputy Chief Medical Examiner Mitra Kalelkar at the Cook County Medical Examiner ("CCME") conducted an autopsy on October 1, 1998.  (*Id.* at ¶ 38.)  The autopsy was not conclusive, and Dr. Kalelkar "listed the cause of Taylor's death as uncertain 'pending' the return of the lab/toxicology results on Taylor's blood." (*Id.*)  Later that same day, before receiving the results, but after having a conversation with an unidentified person who told Dr. Kalelkar a "story" about Dr. Wilson using potassium chloride, Dr. Kalelkar determined that Taylor's death was a homicide from potassium chloride intoxication.  (*Id.* at ¶¶ 39, 42.)  The lab results that came back on October 2 were inconsistent with that determination; the report found "that Taylor had a normal potassium level at the time of his death, which meant that the potassium chloride injection had not reached [his] heart by the time of [his] death." (*Id* at ¶ 39.)  Dr. Kalelkar never reviewed those lab results, however, and did not change the homicide determination.  (*Id.*)

Following the autopsy, Dr. Kalelkar notified the Olympia Fields Police Department that Mr. Taylor's death was a homicide, and CCME released Mr. Taylor's body for cremation on October 6, foreclosing the possibility of a second-opinion autopsy.  (*Id.* at ¶ 41.)  On October 7, Dr. Kalelkar and her boss met with Dr. Andrew Gorchynsky and Thomas Glasgow of the IDFPR Department of Professional Regulation ("DPR").  Dr. Gorchynsky was the Chief Medical Coordinator for the DPR, "responsible for reviewing complaints against Illinois doctors, and for making recommendations regarding the investigation and disposition of those complaints." (*Id.* at ¶ 42.)

Glasgow was the Chief of Medical Prosecutions at DPR.[3] (*Id.* at ¶ 9.3.) "At this meeting, Kalelkar informed Gorchynsky and Glasgow that her conclusion as to the cause of death (potassium chloride intoxication) and the manner of death (homicide) was not based on any scientific or medical testing on the body of Taylor, or the analysis of any lab results on Taylor's blood." (*Id.* at ¶ 42.) After a "cursory" review of some of Mr. Taylor's medical records, but without interviewing any witnesses, reviewing any "chart notes prepared by the other doctors who were present at the time of Taylor's death," or consulting any expert materials, Gorchynsky and Glasgow determined that they agreed with Dr. Kalelkar's homicide determination. (*Id.* at ¶ 43.) Dr. Wilson alleges that this is because "Gorchynsky, Glasgow, and Doe Defendants 1-5,[4] were of the [incorrect] belief the potassium chloride, upon injection, would immediately cause Taylor's heart to stop." (*Id.* at ¶ 45.2.) Had they conducted an adequate investigation, Gorchynsky and Glasgow would have learned, among other things, that Mr. Taylor's heart stopped just "as the [potassium chloride injection] was being given" (*id.* at ¶ 45.3); that the 40 m/eq dose was non-fatal (*id.* at ¶ 45.1); and that Mr. Taylor's potassium level was normal at the time he died. (*Id.* at ¶ 45.5.)

Based on their conclusion that Dr. Wilson intended to kill Mr. Taylor, Gorchynsky, Glasgow, and Doe Defendants 1-5 "decided that the [DPR] should file a Complaint against Dr. Wilson seeking the revocation of [his] medical license" on October 9, 1998 "for his alleged intent to kill his patient." (*Id.* at ¶¶ 48, 49.) They also sought "an *ex parte* summary suspension of Dr.

---

[3]     The allegations against Glasgow involve his actions in the initial summary suspension of Dr. Wilson's medical license, and Glasgow's interactions with Wilson, his counsel, and others leading up to the first hearing described below. He is not mentioned as having a continuing role in the proceedings against Dr. Wilson after that point.

[4]     Doe Defendants 1-5 are "the employees of the Department and/or members of the MDB [Medical Disciplinary Board] who participated in the decision to seek the summary suspension of Dr. Wilson's medical license without doing an adequate investigation." (Fourth Am. Compl. [90] ¶ 9.7.)

Wilson's medical license," filing a Petition for Temporary Suspension[5] with the Director of the IDFPR, Nikki Zollar.  (*Id.* at ¶¶ 49, 50.)  Attached to the petition was an affidavit from Dr. Gorchynsky representing that he had "reviewed medical records and other documents" pertaining to Mr. Taylor's treatment, and that the "above records document" that Dr. Wilson "injected Henry Taylor with Potassium Chloride for the purpose of causing Henry Taylor's death."  (*Id.* at ¶ 50 (quoting Ex. 21 to *id.*).)  The Director entered an order suspending Dr. Wilson's medical license on October 9, 1998.  (*Id.* at ¶ 51.)  Mr. Wilson never had an opportunity to be heard prior to the suspension.  (*Id.*)

After the suspension, Plaintiff alleges, "certain members of the Department discovered that the Department's charges against Dr. Wilson were totally without merit."  (*Id.* at ¶ 54.)  "[T]he Department was specifically told by one of its prosecutors . . . that it couldn't prove the charges against Dr. Wilson . . . [and prosecutor William McLaughlin] (whose job it was to stay in contact with the Cook County State's Attorney's Office on its investigation of Taylor's death) [informed the Department] that Taylor didn't have a chance to live."  (*Id.* at ¶ 55.)  In November 1998, the Medical Disciplinary Board ("MDB") of the IDFPR did withdraw the charge that Dr. Wilson had injected

---

[5]     *See* 225 ILL. COMP. STAT. ANN. 60/37(d) ("The Secretary, after consultation with the Chief Medical Coordinator or Deputy Medical Coordinator, may temporarily suspend the license of a physician without a hearing, simultaneously with the institution of proceedings for a hearing provided under this Section if the Secretary finds that evidence in his or her possession indicates that a physician's continuation in practice would constitute an immediate danger to the public.  In the event that the Secretary suspends, temporarily, the license of a physician without a hearing, a hearing by the Disciplinary Board shall be held within 15 days after such suspension has occurred and shall be concluded without appreciable delay.").  *See also id.* at 60/25 ("The Secretary of the Department may, upon receipt of a written communication from the Secretary of Human Services, the Director of Healthcare and Family Services (formerly Director of Public Aid), or the Director of Public Health that continuation of practice of a person licensed under this Act constitutes an immediate danger to the public, and after consultation with the Chief Medical Coordinator or Deputy Medical Coordinator, immediately suspend the license of such person without a hearing.").  This statutory language suggests an *ex parte* suspension will ordinarily last no more than 15 days before a Disciplinary Board hearing.  In Dr. Wilson's case, as described in the text, the suspension lasted a good deal longer.

Mr. Taylor "for the purpose of causing" his death from its complaint, but it continued with Dr. Wilson's prosecution, and it left the summary suspension order in place. (*Id.* at ¶ 56.)

In April 1999, Dr. Wilson and his attorneys met with Glasgow and an assistant prosecutor from the Department "to discuss the progress of the license revocation proceedings." (*Id.* at ¶ 58.) At that meeting, Glasgow allegedly "told Dr. Wilson that he did not care about Dr. Wilson's 5th Amendment rights [to due process], that [the Department] would revoke his license to practice medicine, and . . . that if [Glasgow] were the prosecuting States [sic] Attorney[,] he would have Dr. Wilson locked up and tried for murder because Dr. Wilson murdered Mr. Taylor." (*Id.* (modifications in original) (quoting Attorney Edward Nielsen's Affidavit, Ex. 26 to *id.*).) Glasgow also allegedly stated that "he would not consider lifting the suspension on Dr. Wilson's license because Dr. Wilson is a danger to society." (Fourth Am. Compl. [90] ¶ 58 (quoting Attorney Denise Nalley's Affidavit, Ex. 27 to *id.*).) By the end of September 1999, the Cook County State's Attorney's Office had determined that it would not press charges against Dr. Wilson.[6] (Fourth Am. Compl. [90] ¶ 59.) At that time, Dr. Wilson's medical license remained suspended under the summary suspension order, and he had not yet had a hearing with the IDFPR.

Around the same time, several other events occurred. Then-director of the DPR[7] Leonard Sherman stated in a televised interview: "I think he [Dr. Wilson] is always within his rights to come in and say that the danger to the public no longer exists and make his argument." (*Id.* at ¶ 60.) Glasgow allegedly informed Dr. Wilson's attorney that "unless Dr. Wilson admitted his wrongdoing by use of potassium chloride, and further agreed to a sentence of discipline . . . , the MDB 'w[ould]

---

[6]     It appears that, at some point, the Taylor family had filed a wrongful death action against Dr. Wilson, as he alleges that the family dismissed that case in September 2002, without any payment from Dr. Wilson or his medical malpractice carrier. (Fourth Am. Compl. [90] ¶ 61.)

[7]     Defendants' Memorandum in Support of its Motion to Dismiss [95] refers to Sherman as a Director of the IDFPR, not the director of the DPR. (Dfs.' Memo. in Support of MTD [95], at 1.)

find against Dr. Wilson' at the [upcoming] formal hearing . . . ." (*Id.* at ¶ 63.) "Glasgow made it clear to Dr. Wilson's attorney . . . that regardless as to what the facts or evidence at the upcoming hearing turned out to be, Dr. Wilson 'would lose before the [Disciplinary] Board.'" (*Id.*)

Mr. Wilson's IDFPR revocation hearing finally took place before a hearing officer in November 1999.[8] (Memorandum Opinion and Order, Ex. 30 to Fourth. Am. Compl. [90-2], at 2.) Illinois law establishes the procedures for such hearings. The IDFPR Secretary (in this action, also referred to as the Director[9]) has "the authority to appoint an attorney duly licensed to practice law in the State of Illinois to serve as the hearing officer in any action to suspend, revoke . . . or take any other disciplinary action with regard to a [medical] license." 225 ILL. COMP. STAT. 60/35. After conducting a hearing, during which "the accused person shall be accorded ample opportunity to present in person, or by counsel, such statements, testimony, evidence and argument as may be pertinent," that hearing officer "shall report his findings and recommendations to the . . . [MDB] within 30 days of the receipt of the record." *Id.* at 60/35, 60/37(a). The MDB then has "60 days from the receipt of the [hearing officer's] report to review the report . . . and present their findings of fact, conclusions of law and recommendations to the [IDFPR] Secretary." *Id.* at 60/35. Once the MDB has made its recommendation, the Secretary "may take the action recommended by the [MDB]," *id.* at 60/40(b), or the Secretary may

---

[8] In October 1999, Dr. Wilson filed a § 1983 suit in federal court over the suspension of his license. He moved for a temporary restraining order to stay the IDFPR proceedings against him, but the court denied his motion on November 15, 1999. *Wilson v. Kalelkar*, No. 99 C 6590, Dkt. No. 13 (N.D. Ill. Nov. 15, 1999) (Castillo, J. (sitting as emergency judge)). The court reasoned that monetary damages would be sufficient. (Fourth Am. Compl. [90] ¶ 64.) Wilson continued to seek a stay of the IDFPR proceedings and injunctive relief prohibiting his continued suspension. The court ultimately ruled that the *Younger* doctrine required the court to abstain, and it dismissed the case without prejudice. *Wilson v. Kalelkar*, No. 99 C 6590, 1999 WL 1101211, at *5 (N.D. Ill. Dec. 1, 1999) (Lindberg, J.).

[9] *See* Regulation—Medical Practice Act—Sunset Extension, 2011 Ill. Legis. Serv. P.A. 97-622 (S.B. 664) (replacing "Director" with "Secretary" throughout the Medical Practice Act, 225 ILL. COMP. STAT. 60/1 et seq.).

"disagree[ ] with or take[ ] action contrary of the recommendation, . . . fil[ing] with the [MDB] his or her specific written reasons of disagreement." *Id.* at 60/44.[10]

Plaintiff alleges that his first hearing was a "sham." (Fourth Am. Compl. [90] ¶ 67.) The hearing officer ultimately "recommended that Dr. Wilson's medical license be suspended for a minimum of five years"; the MDB issued its findings to the IDFPR Director, and the Director adopted that recommendation, suspending Dr. Wilson's license through October 9, 2003.[11] (*Id.* at ¶ 66.) Following the hearing, Prosecutor McLaughlin ran into Dr. Wilson in a restaurant. McLaughlin allegedly told Dr. Wilson, among other things, that the IDFPR "had 'blackballed' Dr. Wilson from the start," that "the [MDB] Board had it out for" him, that the hearing officer "had 'his strings . . . pulled [from above],'" and that Glasgow "had it out for" Dr. Wilson. (*Id.* at ¶ 67.)

Dr. Wilson subsequently sought review of the administrative decision by the Circuit Court of Cook County. In April 2002, that court reversed the Department's decision on grounds discussed in this court's prior opinion. *Wilson*, 2016 WL 1073072, at *4 (detailing IDFPR's subsequent appeal). The case was eventually remanded to the IDFPR in October 2004. This next round of IDFPR proceedings was not an improvement over the first: Plaintiff alleges that the hearing officer "refused to allow Dr. Wilson to substitute his rebuttal expert witness." (*Id.* at ¶ 72.) "[I]t took over 10-1/2 months for [the hearing officer] to rule on Dr. Wilson's Motion for Substitution

---

[10]    The Fourth Amended Complaint does not clearly describe this process for the court. In one location, Plaintiff explains that the "Department's Director adopted the MDB's findings." (Fourth Am. Compl. [90] ¶ 66). The Complaint defines the "Department" as the IDFPR, and 225 ILL. COMP. STAT. 60/44's statutory history notes that the term Director was replaced by the term Secretary. (*Id.* at ¶ 1.) *See* Regulation—Medical Practice Act—Sunset Extension, 2011 ILL. LEGIS. SERV. P.A. 97-622 (S.B. 664). Thus, this description by the Plaintiff conforms with the court's understanding of the medical disciplinary procedure. In another paragraph, however, the complaint notes that Director Stewart "signed the Department's Final Order for the five-year revocation of Dr. Wilson's medical license." (*Id.* at ¶ 70.) Stewart is described as the Director of the DPR, which the court understands to be a sub-group within the IDFPR. (*Id.* at ¶ 9.5.)

[11]    The department backdated Dr. Wilson's suspension to the October 9, 1998 temporary suspension.

of Expert Witness." (*Id.* at ¶ 73.) Subsequently, the MDB issued further findings to the Director on November 1, 2006 without notice to Dr. Wilson,[12] and the Director again affirmed Dr. Wilson's suspension. (*Id.* at ¶ 72.) "[I]t took an additional 8-1/2 months before the Director entered a final order." (*Id.* at ¶ 73.) Ultimately, it took the Department "just under 20 months to enter a final decision" on remand. (*Id.*) Dr. Wilson again appealed to the Circuit Court in August 2007, and that court again reversed the hearing officer's determination, remanding to the agency on May 9, 2008. (*Id.* at ¶ 74.)

Dr. Wilson's re-hearing before a hearing officer took place on October 29, 2008. (*Id.* at 75.) The hearing officer issued his recommendation of a five-year suspension on March 11, 2009, and the recommendation was adopted by the Director[13] on July 21, 2009. The Department's decision to suspend Dr. Wilson's medical license was again reversed and remanded by the Circuit Court of Cook County on July 25, 2011. (*Id.* at ¶ 77.)

It is unclear when the fourth and final round of agency proceedings occurred. The hearing officer issued his report and recommendation on April 15, 2012; that recommendation was ultimately accepted by the MDB on May 16 and adopted by Director Stewart,[14] but Stewart apparently never entered the recommendation as a final order. (*Id.* at ¶ 78.) In March 2013, the MDB issued "new" findings, mirroring the May 16 findings from the prior year. (*Id.*) Director

---

[12]    It is unclear from the Fourth Amended Complaint if or when a re-hearing was held before these findings were issued.

[13]    Again, the Fourth Amended Complaint fails to specify to which Director it refers.

[14]    While Plaintiff calls Stewart the Director of the DPR, Defendants' Memorandum in Support of its Motion to Dismiss [95] refers to Stewart as the Director of the IDFPR. (Dfs.' Memo. in Support of MTD [95], at 1.) Defendants' statement is consistent with Plaintiff's assertion that Stewart entered a final order, as this is a power statutorily granted to the Director of the IDFPR. *See* 225 ILL. COMP. STAT. 60/40(b) (providing the Secretary with the authority to "take the action recommended by the [MDB]"); § 1:23 Rehearing and Final Order, 21 ILL. PRAC.,THE LAW OF MEDICAL PRACTICE IN ILLINOIS § 1:23 (3d ed.) ("[T]he Secretary may take the action recommended by the Board. As appropriate, the Secretary may issue an order of revocation, suspension, or other disciplinary action containing a brief, concise statement of the grounds upon which the Department's action is based and the specific terms and conditions for such action.").

Stewart then entered a final order on April 26, 2013. Dr. Wilson contends that "it was not proper for Stewart to support the Department's decision in its license revocation proceedings against Dr. Wilson by reference to [these] alleged 'facts' that were not introduced on the record during the course of a hearing, with no notice to Dr. Wilson and no opportunity for cross examination or to put on rebuttal evidence." (Fourth Am. Compl. [90] ¶ 80.) Dr. Wilson again appealed in the Circuit Court. On May 21, 2014, the Circuit Court of Cook County again reversed the Department's suspension of Dr. Wilson's license, this time on the merits. (Order, Ex. 2 to Third Am. Compl. [86-1].) Pursuant to that court's final judgment order, Dr. Wilson agreed to

> hold his license to practice medicine in abeyance pending (a) completion of all reasonable, necessary, and appropriate continuing medical education courses as reasonably required by the [IDFPR] . . . (b) successful completion of all reasonable, necessary and appropriate competency testing as reasonably required by the [IDFPR] for the practice of medicine in the State of Illinois; and (c) all other reasonable, necessary and appropriate requirements for the practice of medicine in the State of Illinois as the [IDFPR] may reasonably require, consistent with the Court's May, 21 2014 order.

(*Id.*) The IDFPR did not appeal, and the Cook County Circuit Court's decision stands. (Fourth Am. Compl. [90] ¶ 81.) To the court's knowledge, Dr. Wilson has not completed the steps outlined in that final judgment and has not returned to medical practice.

Dr. Wilson filed this lawsuit on December 31, 2014. The court granted Defendants' motion to dismiss on statute of limitations grounds on March 18, 2016. *Wilson*, 2016 WL 1073072. The Seventh Circuit reversed and remanded that ruling, however, *Wilson*, 871 F.3d 509, and on remand Plaintiff filed his Third [36] and then Fourth Amended Complaints [90]. Count I of the Fourth Amended Complaint alleges that Defendants Gorchynsky, Glasgow, Doe Defendants 1-5, and Doe Defendants 21-30 violated Dr. Wilson's Fourth Amendment rights by unreasonably seizing his medical license. Count I also alleges that Defendants violated Plaintiff's Fourteenth Amendment due process rights by interfering with Dr. Wilson's property interest in his license and his liberty interest in continuing with his chosen profession. Count II alleges that Defendants Gorchynsky, Sherman, Stewart, Doe Defendants 6-10, and Doe Defendants 21-30 are liable for

the violations of Dr. Wilson's Fourth Amendment and due process rights under a supervisory responsibility theory. Count III similarly alleges that Defendants Stewart, Doe Defendants 11-20, and Doe Defendants 21-30 "failed to act in reckless disregard of Dr. Wilson's constitutional rights." Count IV levies a "stigma-plus" due process claim against Defendant Sherman for statements Sherman made in a televised interview. Count V alleges that all Defendants conspired to violate Dr. Wilson's constitutional rights. Count VI charges Gorchynsky, Glasgow, Sherman, Stewart, Doe Defendants 1-5, Doe Defendants 6-10, and Doe Defendants 21-30 with malicious prosecution under Illinois law. Count VII claims that the IDFPR and the State of Illinois are liable to Dr. Wilson for the *ex parte* summary suspension of his medical license pursuant to 225 ILL. COMP. STAT. 60/46. Finally, Count VIII requests that the court enter a declaratory judgment that all individual defendants are indemnified by the State of Illinois. Defendants now move, together, to dismiss the Fourth Amended Complaint.

**DISCUSSION**

## I.    Legal Standard

A motion to dismiss under Rule 12(b)(6) "tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff,* 696 F.3d 635, 637 (7th Cir. 2012). *See also* FED. R. CIV. P. 8(a)(2) (requiring a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). To survive a 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S at 678. Still, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

## II.     Section 1983 Claims

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996). Defendants here argue that Dr. Wilson has failed to sufficiently state a claim for any Constitutional violations. They also argue that all individual Defendants enjoy absolute immunity from any suit for damages under various doctrines. The court addresses the immunities first.

### A.     Prosecutorial Immunity

Defendants Glasgow and Gorchynsky claim that they are absolutely immune from any damages suit because they were acting as prosecutors in Dr. Wilson's license revocation proceedings. "Prosecutors are absolutely immune from suits for monetary damages under § 1983 for conduct that is 'intimately associated with the judicial phase of the criminal process.' " *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "[A]gency officials performing certain functions analogous to those of a prosecutor" are also protected by prosecutorial immunity. *Butz v. Economou*, 438 U.S. 478, 515 (1978).

Courts take a functional approach when analyzing the availability of prosecutorial immunity; whether an official is immune depends on "the nature of the function performed." *Kalina v. Fletcher*, 522 U.S. 188, 127 (1997) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Protected conduct includes, but is not limited to, a prosecutor's acting as "an advocate for the State," *Smith*, 346 F.3d at 742; "prepar[ing] to initiate a judicial proceeding," *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (citations omitted); "appear[ing] in court to present evidence," *id.*; and "determin[ing] that [ ] evidence [is] sufficiently strong to justify a probable-cause finding." *Kalina*, 522 U.S. at 130. Not every step taken by a prosecutor is shielded from challenge, however; activity carried out in an investigative role and conduct "unrelated to the preparation and initiation of judicial proceedings" are not protected. *Smith*, 346 F.3d at 742. For example, prosecutors do not enjoy absolute immunity when they make statements to the press

or when they "act[ ] as a complaining witness in support of a warrant application." *Van de Kamp*, 555 U.S. at 343 (citations omitted). *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.").

Glasgow, a prosecutor by title, is protected by prosecutorial immunity for his evaluation of the evidence against Dr. Wilson and for presenting the IDFPR's case in front of the hearing officer. *See Davis v. Zirkelbach*, 149 F.3d 614, 617 (7th Cir. 1998) (affirming the district court's finding that two prosecutors were absolutely immune from claims arising "from their decisions to commence and continue prosecuting" plaintiff). Similarly, Glasgow's decision to seek an *ex parte* summary suspension of Dr. Wilson's medical license was part of Glasgow's advocacy on behalf of the State; there is no allegation that Glasgow had actual knowledge of the exculpatory lab results at the time he helped petition for the *ex parte* summary suspension charge against Dr. Wilson.[15] This renders Glasgow immune from Count I of the Fourth Amended Complaint, which deals only with the issuance of the summary suspension; he is not named in Counts II through IV. Glasgow is also immune from the § 1983 conspiracy allegations in Count V. Section 1983 requires "an actual denial of a civil right is necessary before a cause of action arises." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). *See also House v. Belford*, 956 F.2d 711, 720 (7th Cir. 1992) ("A person may not be prosecuted for conspiring to commit an act that

---

[15] Dr. Wilson challenges the claim of absolute immunity by claiming that Glasgow engaged in investigative activities, but his Complaint does allege that Glasgow actually engaged in any investigative activities. True, Glasgow spoke with Kalelkar and Donoghue of the CCME, but interviewing witnesses in preparation for trial and "evaluating evidence" are prosecutorial activities, not investigative activities. *Kalina*, 522 U.S. at 507. *Cf. id.* at 508 (citing, as an example of an investigative role, one where a prosecutor were to "plan[ ] and execute[ ] a raid on a suspected weapons cache").

he may perform with impunity. Thus, we fail to understand how a witness can be held liable under § 1983 for conspiring to commit an act for which he is protected from § 1983 liability by absolute immunity.")  Because Glasgow is immune from the only Constitutional allegation against him, he is dismissed from the § 1983 conspiracy claim as well.[16]

Gorchynsky, as the Chief Medical Coordinator of the DPR, is partially cloaked with prosecutorial immunity.  (Fourth Am. Compl. [90] ¶ 9.2.)  *See* 225 ILL. COMP. STAT. 60/7 (providing that the "Chief Medical Coordinator shall be the chief enforcement officer" of the Medical Practice Act of 1987, 225 ILL. COMP. STAT. 60/1 et seq.).  Gorchynsky's initial evaluation of the evidence against Dr. Wilson, his decision to request an *ex parte* summary suspension, and his decision to recommend that the IDFPR file a Complaint against Dr. Wilson are, like Glasgow's activities, all protected prosecutorial conduct.  Later, however, after meeting with Kalelkar and Donoghue, Gorchynsky submitted an affidavit in support of the summary suspension of Dr. Wilson's medical license to the Director of the IDFPR.  That affidavit represented that Gorchynsky had "reviewed medical records and other documents regarding the treatment of [ ] Henry Taylor," and that the records "document[ed] that . . . Dr. Robert Wilson . . . injected Henry Taylor with Potassium Chloride for the purpose of causing Henry Taylor's death."  (Fourth Am. Compl. [90] ¶ 50 (citing Ex. 21 to *id.*).)  Wilson contends that the medical records documented quite the opposite, and that Gorchynsky's "lack of an adequate investigation" resulted in his affidavit containing a false representation.  (*Id.*)  The submission of an affidavit is not protected by prosecutorial immunity:

_____

[16]     The court notes, as well, that Dr. Wilson has not alleged facts suggesting an unlawful agreement between Glasgow and any other Defendants.  Glasgow met with Gorchynsky and CCME officials before filing the IDFPR complaint against Dr. Wilson (Fourth. Am. Compl. [90] ¶ 45), but that activity is protected by prosecutorial immunity.  *Van de Kamp*, 555 U.S. at 343 ("[W]e have held that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding.") (citation omitted).  Glasgow also conferred with Gorchynsky when the IDFPR was deciding whether to file for an *ex parte* summary suspension of Wilson's license.  (Fourth. Am. Compl. [90] ¶ 50.)  That, again, is activity for which Glasgow is absolutely immune.  And Glasgow's warnings that Wilson "would lose before the Board" provide insufficient notice to any other Defendants about the grounds on which Wilson's conspiracy claim rests.  FED. R. CIV. P. 8.

"when prosecutors are engaged in the sensitive tasks of . . . swearing out an information to support a prosecution, the Court has held that they are entitled only to qualified immunity from suit." *Davis v. Zirkelbach*, 149 F.3d 614, 617 (7th Cir. 1998) (citing *Kalina*, 522 U.S. at 510). *Kalina* involved an affidavit submitted by a prosecutor in support of "an application for an arrest warrant." *Kalina*, 522 U.S. at 505. The affidavit came as part of a "certification for determination of probable cause," in which the prosecutor "personally attest[ed] to the truth of the averments in the certification. *Id.* at 509. The Supreme Court found that the submission of that affidavit was not protected by prosecutorial immunity because "[t]estifying about facts is the function of the witness, not of the lawyer." *Id.* at 510. Similarly, Gorchynsky's affidavit here was not the work of an advocate, but the work of a witness stating facts in support of the State's case. Thus, Gorchynsky is immune from suit for his evaluation of evidence and decision to seek a suspension of Dr. Wilson's license, but not for the filing of an affidavit in support of *ex parte* summary suspension.

### B.    Quasi-judicial Immunity

Defendants Sherman and Stewart claim quasi-judicial immunity. Quasi-judicial immunity is a type of "[a]bsolute immunity [that] protects members of quasi-judicial adjudicatory bodies when their duties are functionally equivalent to those of a judge or prosecutor." *Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011) (citing *Butz*, 428 U.S. at 512–13). The Seventh Circuit has interpreted the Supreme Court's decision in *Butz* as identifying "several characteristics of quasi-judicial functions that courts should consider when determining whether a public official is entitled to absolute immunity":

> (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for damages actions as a means for controlling unconstitutional conduct; (3) the insulation from political influence; (4) the importance of precedent; (5) the adversarial nature of the process; and (6) the correctability of error on appeal.

Heyde, 633 F.3d at 517 (citing *Butz*, 438 U.S. at 512). The Seventh Circuit has broadly considered these factors, without treating them as a test. *See Heyde*, 633 F.3d at 517–19

(affirming the district court's holding that the members of a county's tax assessment Board of Review were protected by quasi-judicial immunity, when the Board was empowered by Illinois law to act as "the fact-finder and decision-maker for disputed property assessments," and could only increase assessments "if it provide[d] notice and a hearing" to the taxpayer); *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 522 (7th Cir. 2001) (describing the statutory scheme authorizing the Illinois State Board of Elections ("ISBE") to "hear and pass upon objections to the nominations of candidates for State offices" and granting it the power to examine witnesses and issue subpoenas, in a case affirming the district court's finding that members of the ISBE are entitled to absolute immunity) (citations omitted). *Heyde* clarified that "absolute immunity [ ] applies only to judicial acts and does not protect the official from acts that are ministerial or administrative in nature." *Heyde*, 633 F.3d at 517.

No alleged facts connect Sherman to any judicial or prosecutorial functions; the primary mentions of Sherman in the Fourth Amended Complaint deal with a television interview he gave in 1999 to a local news station, and with his supervisory role at the DPR, neither of which shroud him in quasi-judicial immunity. (Fourth Am. Compl. [90] ¶¶ 60, 92.) During the television interview, Defendant Sherman stated, "I think he [Dr. Wilson] is always within his rights to come in and say that the danger to the public no longer exists and make his argument." None of the six factors laid out in *Heyde* suggest that Sherman's interview was quasi-judicial in nature. (*Id.* at ¶ 60 (modification in original).) Further, in *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993), the Supreme Court denied the Du Page County State's Attorney Fitzsimmons absolute immunity for making allegedly false statements about evidence during the public announcement of the indictment of his political rival, Buckley. The Court determined that Fitzsimmons received only qualified immunity for his press statement, explaining that "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." *Id.* at 277. Similarly, Sherman's statement to the news press has no functional tie to IDFPR's adjudication of Dr. Wilson.

Nor does Sherman's supervisory role support a quasi-judicial immunity defense. As Director, Plaintiff alleges that Sherman was "in charge of setting policy and overseeing the overall conduct of the employees of the [DPR]," and was tasked with "ensuring that a doctor who was charged with disciplinary action . . . is accorded all requisite due process rights, including the fair and timely prosecution of claims asserted against that doctor." (Fourth Am. Compl. [90] ¶ 92.) Plaintiff makes the same allegations with respect to Stewart. These are administrative functions, not judicial functions. Thus, neither Sherman nor Stewart is protected by quasi-judicial immunity for their administrative roles. The viability of any claims against them are discussed later in this opinion.

Finally, Dr. Wilson alleges that Stewart violated his Constitutional rights when he signed the delayed fourth IDFPR order suspending Dr. Wilson's medical license. (*Id.* at ¶ 78.) Issuing orders is fundamentally judicial in nature, and Dr. Wilson does not contend that Stewart was acting outside of the scope of his authority by exercising his discretion in signing the order. *See* 225 ILL. COMP. STAT. 60/40(b), 60/44 (granting the Secretary of the IDFPR discretion to agree or disagree with the MDB's recommendations). *Cf. Lowe v. Letsinger*, 772 F.2d 308, 313 (7th Cir. 1985) (explaining that a clerk of court's "duty to type and send notice after entry of judgment is a non-discretionary, ministerial task" that does not receive absolute immunity).

Dr. Wilson's argument, however, is more nuanced: he argues that Stewart "failed to issue, 'without appreciable delay' a Final Order on the MDB's May 16, 2012 Findings (Fourth Am. Compl. [90] ¶ 78); that Stewart improperly issued his April 2013 final order based on an MDB report that contained "'facts' that were not introduced on the record during the course of a hearing, with no notice to Dr. Wilson and no opportunity for cross examination or to put on rebuttal evidence" (*id.* at ¶ 80); and that Stewart's order explained the reasons for the delayed order without "attach[ing] any documents to support his purported excuses." (*Id.*) The Supreme Court has recognized that "[a] judge is absolutely immune from liability for his judicial acts[,] even if his exercise of authority is flawed by the commission of grave procedural errors." *Stump v. Sparkman*, 435 U.S. 349, 359

(1978). In *Stump*, an Indiana judge sitting in a court of general jurisdiction granted a mother's petition to have her daughter sterilized without the daughter's knowledge. The Seventh Circuit found Judge Stump liable for damages to the daughter, but the Supreme Court reversed on grounds of judicial immunity. The Supreme Court explained that the "erroneous manner in which [the court's] jurisdiction was exercised . . . may have affected the validity of [the court's] act, [but it] did not make the act any less a judicial act." *Id.* (quoting *Bradley v. Fisher*, 80 U.S. 335, 357 (1871)). In this case, Dr. Wilson has made a colorable argument that Stewart made serious procedural errors in issuing his April 2013 suspension order. That is not enough, however, to defeat Stewart's claim of quasi-judicial immunity for his signing of the April 2013 suspension order.

### C. Fourth Amendment Claims

Count I alleges that Defendants Gorchynsky, Glasgow, Does 1-5, and Does 21-30 violated Wilson's Fourth Amendment rights when they participated in the unreasonable *ex parte* summary suspension of his medical license. As explained above, Gorchynsky and Glasgow are both absolutely immune from any damages claims brought as a result of their evaluation of the evidence against Dr. Wilson and their decision to seek the *ex parte* suspension of his medical license. Thus, the Fourth Amendment claim set forth in Count I is dismissed.

Counts II through V also reference the Fourth Amendment, albeit in a cursory and repetitive manner. To the extent that those counts may be construed as asserting Fourth Amendment claims, it is unclear whether such claims fit these facts at all. The Fourth Amendment grants people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Neither Plaintiff nor Defendants have established whether Dr. Wilson's medical license is a "paper" or "effect" subject to seizure within the meaning of the Fourth Amendment. Dr. Wilson's attempt to establish that the medical license does fall within the Amendment's protections is not convincing. He argues in his brief that he has a "constitutionally protected property interest in his license"—but a protected property

interest is a requirement for a due process claim, not a Fourth Amendment claim.[17]  His citation

to *Oliver v. United States*, 466 U.S. 170, 177 (1984) (establishing that "open fields are not 'effects'

within the meaning of the Fourth Amendment) is too broad to be helpful.  *Id.* at 176.  *See id.* at

177 n.7 ("The Framers would have understood the term 'effects' to be limited to personal, rather

than real, property.").  Finally, Dr. Wilson tries to argue that his "liberty interest in continuing with

the practice of medicine" falls within the Fourth Amendment.  (Pl.'s Resp. to Dfs.' Motion to

Dismiss [98], at 4.)  But that, too, is a due process argument.  Defendants, for their part, only

make the blanket statement that "a professional license [is not a] tangible 'effect'" under the Fourth

Amendment, and they cite only unpublished district court opinions from other districts in support

of that statement.  (Dfs.' Memo. in Support of Motion to Dismiss [95], at 3.)  The court is unwilling

to hold forth on this issue without additional guidance and therefore directs the parties to submit

further briefing on whether Dr. Wilson's medical license constitutes a paper or effect within the

meaning of the Fourth Amendment.

## D.    Procedural Due Process

Counts I through IV of the Complaint allege that varying combinations of Defendants

violated Dr. Wilson's right to procedural due process.  "Procedural due process in constitutional

law generally involves a familiar line of inquiry: (1) is there a property or liberty interest protected

by due process; and (2) if so, what process is due, and when must that process be made

---

[17]    To the extent that cases like *Baca v. City of Albuquerque*, No. CV 11-0122 KBM/ACT, 2011 WL 13285716, at *4 (D.N.M. May 10, 2011) frame a Fourth Amendment claim in terms of a "property interest," the court does not find such district court precedent persuasive. Plaintiff also cites *Soldal v. Cook County*, 506 U.S. 56, 61, 113 S. Ct. 538, 543, 121 L. Ed. 2d 450 (1992), but that case is unhelpful to his position here.  There, the Supreme Court found that the plaintiffs had suffered a Fourth Amendment seizure when their mobile home was hauled away from a mobile home park by two park employees accompanied by a Sheriff Deputy.  The court explained that "our cases unmistakably hold that the Amendment protects property as well as privacy," *id.* at 62, but clarified in a footnote: "In holding that the Fourth Amendment's reach extends to property as such, we are mindful that the Amendment does not protect possessory interests in all kinds of property . . . . This case, however, concerns a house, which the Amendment's language explicitly includes, as it does a person's effects."  *Id.* at 62 n.7.

available?" *Simpson v. Brown County*, 860 F.3d 1001, 1006 (7th Cir. 2017). Defendants assert that Dr. Wilson has failed to state a claim upon which relief can be granted, and they argue that the Defendants' immunities warrant dismissal of Plaintiff's due process claims.

### 1. *Ex Parte* Summary Suspension

Count I alleges that Gorchynsky and Glasgow initiated a summary suspension without an "adequate investigation," without notice, and without a hearing, violating Wilson's Due Process rights. (Fourth Am. Compl. [90] ¶¶ 86, 87.) As explained above, Glasgow and Dr. Gorchynsky are absolutely immune from § 1983 claims for their evaluation of the evidence against Dr. Wilson and for their role in initiating the license revocation proceedings. Thus, Count I's due process claim is dismissed.

### 2. License Revocation Proceedings

Count II alleges that Gorchynsky, Sherman, and Stewart violated Dr. Wilson's procedural due process rights over the course of the license revocation hearings. "The Department" allegedly "blackballed" Wilson "from the start," (Fourth Am. Compl. [90] ¶ 91), and Wilson argues that Sherman and Stewart both "knew, must have known, or should have known" that his prosecution was in violation of his Fourth and Fourteenth Amendment rights. (*Id.* at ¶¶ 92, 93–95.) Count III similarly alleges that Stewart "failed to act[,] in reckless disregard of Dr. Wilson's constitutional rights," even though he "knew, must have known, or should have known, that the Department's prosecution of its claims . . . was not proceeding in an expeditious manner." (*Id.* at ¶ 101.)

The court cannot determine that Gorchynsky is immune from liability for his continued role in Dr. Wilson's license revocation proceedings because the complaint lacks any detail about Gorchynsky's actions after the filing of the initial department complaint. Dr. Wilson's Fourth Amended Complaint contains only one allegation of any additional involvement in Dr. Wilson's prosecution on Gorchynsky's part, beyond the *ex parte* summary suspension stage: he alleges that Gorchynsky participated "individually, jointly, and in conspiracy [with Sherman, Stewart, Does 6-10, and Does 21-30] in the decision not to withdraw the summary suspension of Dr. Wilson's

medical license and to continue the prosecution of [the IDFPR's] baseless claims." (*Id.* at ¶ 95.) The court is unable, from that allegation, to determine whether Gorchynsky's activity may have been prosecutorial in nature. More importantly, this allegation against Gorchynsky is not sufficient to state a claim; it does not give Gorchynsky "notice of . . . the grounds upon which [this due process claim against him] rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).[18] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). No other factual matter suggests that Gorchynsky had any involvement in the hearing process, nor that he took any additional actions with respect to Dr. Wilson's case. *Id.* at 556. To the extent that Dr. Wilson argues that discovery is necessary to learn more about Gorchynsky's involvement in the license suspension proceedings, the court notes that this is Plaintiff's Fourth Amended Complaint, that Defendants noted Plaintiff's failure to state a claim against Gorchynsky in a motion to dismiss filed three years ago (*see* Df. Gorchynsky's Motion to Dismiss Second Am. Compl. [22], at 6), and that Dr. Wilson has been engaged in a dispute with the IDFPR for twenty years, including four trips through the Illinois state courts and two federal lawsuits. The court is not inclined to await further investigation. Wilson's due process claim for the license revocation proceedings is dismissed as against Gorchynsky.

The allegations against Sherman and Stewart are more complex. Sherman and Stewart were both Directors of the DPR for unspecified periods of time. (Fourth Am. Compl. [90] ¶¶ 9.4–9.5.) In Count II, Plaintiff alleges that both Sherman and Stewart, as Directors of the DPR, "were in charge of setting policy and overseeing all conduct of the employees of the DPR, including investigators and prosecutors, and ensuring that a . . . [charged doctor] is accorded all requisite due process rights." (Fourth Am. Compl. [90] ¶ 92.) Dr. Wilson alleges that both Directors "knew,

---

[18]     Just as this blanket allegation against Gorchynsky is insufficient to state a claim for relief, it similarly fails against Sherman and Stewart.

must have known, or should have known, that the manner that the Department was prosecuting its claims against Dr. Wilson was part of the Department's vendetta against Dr. Wilson, and part of a cover-up because of the Department's initial failure to adequately investigate Dr. Wilson's conduct in connection with the death of Taylor." (*Id.*) Dr. Wilson also alleges that Sherman and Stewart, too, "participated in the decision not to withdraw the summary suspension . . . and to continue the prosecution of" Dr. Wilson. (*Id.* at ¶ 95.)

As Sherman and Stewart note, supervisory liability is unavailable under § 1983. Dr. Wilson "may not rely on the doctrine of *respondeat superior* to hold supervisory officials liable for the misconduct of their subordinates. . . . Rather, the supervisory officials also must have had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614–15 (7th Cir. 2002) (citation omitted). Direct personal involvement may not be required if a plaintiff claims that a supervisor failed to intervene in the deprivation of plaintiff's constitutional rights: "An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985).

Dr. Wilson has not alleged that Sherman ever "directed or consented" to Dr. Wilson's continued prosecution, *id.*, nor does he "contend that [Sherman] ever made or ratified [any] decision about" the proceedings. *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011). Wilson does allege that Sherman participated in a decision not to withdraw the proceedings against him; as described above, that statement is insufficient alone to state a claim. Further, the factual allegations in the complaint do not support a reasonable inference that Sherman failed to act with a deliberate or reckless disregard of Dr. Wilson's due process rights. The Complaint alleges that Sherman was in charge of the DPR at some point, and, as noted, alleges that he "knew, must have known, or should have known" about the "vendetta against Dr. Wilson," and that "the

Department was specifically informed" that its "charges against Dr. Wilson were without merit." (Fourth Am. Compl. [90] ¶ 92.) Assuming these facts are true, they still require a chain of inferences that is too attenuated; they do not suggest that Sherman deliberately turned a blind eye to evidence he was aware of, nor that he acted with reckless disregard, nor that he himself was specifically informed of the merits of Wilson's case. *Cf. Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) (concluding that the Director of the Department of Corrections failed to intervene in the violation of a prisoner's constitutional rights, when multiple people had written letters to the Director about the prisoner's situation and the Director had responded to those letters). Defendants' motion to dismiss Count II is granted as to Defendant Sherman.

Wilson does assert that Stewart had some personal involvement in the prosecution. Stewart signed the April 2013 order suspending Dr. Wilson's medical license, but as described above, Stewart has quasi-judicial immunity for the issuing of the final order. Still, the April 2013 order came after months of inaction from the DPR and IDFPR—inaction of which Stewart was aware. Stewart acknowledged and justified the delays in his April Order by blaming them on "a number of uncontrollable issues, including the retirement of the lead prosecutor, shortages in staffing, and misplaced records." (*Id.* at 2.) This is a department in which he held a supervisory role. These facts are sufficient to provide an "affirmative link between the action complained about and the official sued." *Gentry v. Duckworth*, 65 F.3d 555, 561 (1995) (citation omitted). As explained above, Stewart is not absolutely immune from suit for his role as an administrator. Defendants' motion to dismiss Counts II and III is denied as to Defendant Stewart.

### 3. "Stigma-Plus"

Dr. Wilson alleges a "stigma-plus" due process claim against Defendant Sherman for the television interview Sherman gave in October 1999. In that interview, Sherman allegedly stated: "I think he [Dr. Wilson] is always within his rights to come in and say that the danger to the public no longer exists and make his argument." (*Id.* at ¶ 60 (modifications in original).) Sherman gave this interview before Dr. Wilson's first hearing. (*Id.*)

In this Circuit, "[a] plaintiff may prove a deprivation of a protected liberty interest by showing damage to his "good name, reputation, honor, or integrity. . . . This stigmatic harm, however, must take concrete forms and extend beyond mere reputational interests." *Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 753 (7th Cir. 2012) (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Osmosegbon v. Wells*, 335 F.3d 668, 675 (7th Cir. 2003) (internal quotation marks omitted).   "This two-pronged framework is known as the 'stigma plus' test." *Hannemann*, 673 F.3d at 753. *See id.* at 754 (explaining that there is a "stigma" prong to the test—requiring that the defendant make a defamatory statement—and a "plus" prong—requiring the plaintiff to "establish[ ] that any defamatory statements have caused an alteration in his legal status."). *See also Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013) (laying out the two parts of the "stigma-plus" test).  The "safeguards" of due process "come into play only when the 'alteration of legal status,' such as the governmental deprivation of a securely held right, is 'combined with the injury resulting from the defamation.'" *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 708–09 (1976)). Both Plaintiff and Defendant have offered an analysis of Plaintiff's "stigma-plus" due process claim; regrettably, the court concludes that neither side proceeds under the correct legal framework.  Defendants refer to legal frameworks identified by the Second and Tenth Circuits (Dfs.' Memo. in Support of Motion to Dismiss [95], at 7–8 (citing *DiBlasio v. Novello*, 413 F. App'x 352, 356 (2d Cir. 2011); *Kennedy v. Smith*, 259 F. App'x 150, 155 (10th Cir. 2007)), while Plaintiffs respond by also citing *DiBlasio*, and adding a reference to a 1952 Illinois Supreme Court case. (Pl.'s Resp. to Dfs.' Motion to Dismiss [98], at 8 (citing *Smith v. Dep't of Registration & Ed.*, 412 Ill. 332, 344, 106 N.E.2d 722, 728 (1952)).  Out-of-Circuit and state court precedent can, of course, be persuasive, when the law is unsettled.  But this court does not need to be persuaded when the Seventh Circuit has already established a legal framework that the parties simply overlook.

Still, the court finds that Dr. Wilson's claim fails.  Regardless of whether the alleged interview statement was defamatory, Dr. Wilson has not alleged facts that would establish that Sherman's statement altered his legal status.  *See Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir.

2005) ("[A]n individual has no cognizable liberty interest in his reputation.") (quoting *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 617 (2002)). Dr. Wilson's legal status was altered by IDFPR proceedings, which were already under way when Sherman spoke to the press. *See Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015). In *Hinkle*, Wayne County Sherriff Jimmy Hinkle was accused of sexually abusing his step-daughter. The step-daughter later admitted that she had falsified the accusations, but not until an Illinois State Police investigation was opened by investigator Rick White. During the course of the investigation, "the accusations [against Hinkle] became well-known in the community because White talked to a lot of people with whom he had no business sharing details of the investigation." *Id.* at 765. This included "word . . . [being] leaked [by an associate of White's] to the local paper . . . at White's instigation." *Id.* at 766. The prosecutor ultimately "declined to press charges," and Hinkle sued White and his supervisor, alleging that by spreading rumors about him, they deprived him of his liberty interest in his employment as law enforcement management. He did not directly challenge the investigation, itself, as violating his due process rights. The Seventh Circuit affirmed the lower court's grant of summary judgment for Defendants, finding under the stigma-plus test that "the defendants did nothing to alter Hinkle's legal status. Rather, reading the facts in the light most favorable to Hinkle, the defendants defamed him. Even if that defamation seriously impaired his future employment prospects, the state did not alter his legal status."[19] Like *Hinkle*, Sherman's statement to the press here did not alter Dr. Wilson's legal status—the license revocation proceedings may have, but

---

[19]     *See also Paul v. Davis*, 424 U.S. 693 (1976). In *Paul*, local police chiefs distributed a flier announcing "Active Shoplifters" to a group of Kentucky merchants. That flier contained Plaintiff Davis' picture and name; though Davis had been charged with shoplifting, his case had never been resolved. *Id.* at 696. Davis' supervisor at work leaned of the flier, and though Davis was not fired, his supervisor told him "he had best not find himself in a similar situation in the future." *Id.* (internal quotation marks omitted). The Court found that the defendants had not deprived Davis of "any right vouchsafed to him by the State and thereby protected under the Fourteenth Amendment. That being the case, petitioners' defamatory publications, however seriously they may have harmed respondent's situation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause." *Id.* at 712.

Wilson has challenged those proceedings under a stigma-plus theory. Defendants' motion to dismiss Count IV is granted.

### E.   Conspiracy Claim

Finally, in Count V, Dr. Wilson asserts that all Defendants participated in a conspiracy to violate his constitutional rights. The parties' briefing on the conspiracy claim is again lacking. As discussed above, Glasgow is immune from the only Constitutional claim levied against him. With respect to the other Defendants, none of whom have full immunity, Defendants assert that no claim for conspiracy can stand when there are no underlying constitutional violations. (Df. Gorchynsky's Motion to Dismiss Second Am. Compl. [22], at 7.) But Plaintiff's Fourth Amendment claims and a procedural due process claim against Stewart have survived this motion. Plaintiff, for his part, does not address the conspiracy claim at all in his response to Defendants' motion to dismiss. The court denies Defendants' motion on the conspiracy count without prejudice to reconsideration of this issue at a later stage should it be necessary.

## III.   State Law Claims

This court retains supplemental jurisdiction over Defendants' state law claims.

### A.   Malicious Prosecution

Dr. Wilson levies a state law malicious prosecution charge against all Defendants. In Illinois, "[t]he elements of a malicious-prosecution claim . . . are well established": "(1) the commencement of judicial proceedings by the defendant, (2) a lack of probable cause for the proceedings, (3) malice in instituting the proceedings, (4) termination of the prosecution in the plaintiff's favor, and (5) damage or injury to the plaintiff." *St. Paul Fire & Marine Ins. Co. v. City of Zion*, 2014 IL App (2d) 131312, ¶ 15, 18 N.E. 3d 193, 197. "The absence of any of these elements bars a plaintiff's malicious prosecution claim." *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 26. Defendants argue that prosecutorial and sovereign immunity defeat a malicious prosecution claim against Gorchynsky, Sherman, and Glasgow, and that Dr. Wilson fails to adequately allege the malice element of the malicious prosecution claim.

### 1. Prosecutorial Immunity

Illinois law tracks federal prosecutorial immunity law. *Frank v. Garnati*, 2013 IL App (5th) 120321, ¶¶ 16–17, 989 N.E.2d 319, 322. "Specifically, Illinois courts adopt and apply the United States Supreme Court's line of cases on prosecutorial immunity and its contours." *Simpson v. Meijer, Inc.*, No. 12 C 6217, 2013 WL 3834641, at *8 (N.D. Ill. July 24, 2013) (collecting cases). Thus, Glasgow and Gorchynsky enjoy the same prosecutorial immunity here as outlined above, but Sherman and Stewart do not share that immunity.

### 2. Sovereign Immunity

Defendants argue that Sovereign Immunity bars the state law malicious prosecution claim against all Defendants. The Illinois State Lawsuit Immunity Act, 745 ILL. COMP. STAT. 5/1 generally provides that "the State of Illinois shall not be made a defendant or party in any court." *See* 705 ILL. COMP. STAT 505.8(d) (Court of Claims Act); *Fritz v. Johnston*, 209 Ill. 2d 302, 310, 807 N.E. 2d 461, 466 (2004) (explaining that "all claims against the state for damages sounding in tort must be brought in the Court of Claims—no other tribunal, including our circuit courts, has jurisdiction of any such claim"). Although a lawsuit may be filed against individual state employees for actions carried out while acting within the scope of their duties, the claim may still be considered a suit against the State for purposes of sovereign immunity. "The determination of whether an action is in fact a suit against the State turns upon an analysis of the issues involved and the relief sought, rather than the formal designation of the parties." *Id.* at 310, 807 N.E.2d at 466 (quoting *Currie v. Lao*, 148 Ill. 2d 151, 158, 592 N.E.2d 977, 980 (1992)).

The court must go beyond the simple inquiry of "whether the employee was acting within the scope of his employment when he committed the act in question," and instead look to "the *source of the duty* with the breach of which the employee is charged." *Fritz*, 209 Ill. 2d at 310, 807 N. E. 2d at 466 (emphasis in original) (citing *Currie*, 148 Ill. 2d at 159, 592 N.E. 2d at 980). "Where the duty is imposed solely by virtue of the individual's employment with the state, sovereign immunity attaches . . . . Otherwise—that is, if the duty exists independent of state

employment—the individual is subject to suit in circuit court."[20] *Fritz*, 209 Ill. 2d at 310–11, 807 N.E. 2d at 466–67 (citing *Currie*, 148 Ill. 2d at 159, 592 N. E. 2d at 980). *See also Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) ("An employee's conduct can be imputed to the State if 'it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority.' ") (quoting *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001)).

Plaintiff here has not alleged hat Sherman and Stewart acted outside of the scope of their state employment. In fact, Dr. Wilson explicitly argues the opposite. (*See* Fourth Am. Compl. [90] ¶¶ 9.4, 9.5 (stating that Sherman and Stewart are "sued herein solely in [their] individual capacity for actions that [they] engaged in as a state actor within the course and scope of [their] employment with the Department.").) Nor does Plaintiff's Fourth Amended Complaint allege the breach of any "duty independent of state employment" that could render Sherman or Stewart liable for a state law malicious prosecution action. Thus, sovereign immunity applies here, and Count VI is dismissed in its entirety.

### B. 225 Ill. Comp. Stat. 60/46

Count VII seeks money damages from the State for the suspension of Dr. Wilson's medical license, pursuant to 225 ILL. COMP. STAT. 60/46. That statute provides that "the State of Illinois shall be liable to [an] injured physician" if a DPR "order of revocation, suspension, placing the licensee on probationary status, or other order of formal disciplinary action is without any reasonable basis in fact of any kind." *Id.* Dr. Wilson maintains that the Department's suspension of his license lacked any reasonable basis in fact. The court must disagree. The court could locate only one case interpreting § 60/46. *See Blumstein v. State*, 47 Ill. Ct. Cl. 186 (1995). *Blumenstein* interpreted § 60/46 narrowly, finding that the statute requires a court to look only to

---

[20] Defendants cite a three-step test for sovereign immunity taken from *Richman v. Sheahan*, 270 F.3d 430 (7th Cir. 2001). However, the Supreme Court of Illinois has since formulated its statement of the sovereign immunity doctrine, *see Fritz*, 209 Ill. 2d at 310–11, 807 N.E. 2d at 466–67, and declined to articulate the doctrine in those three clear steps. Therefore, the court here relies on *Fritz*.

the IDFPR's "factual basis for its order at the time that it entered its order." *Id.* at 195. That case includes no facts about the incident that resulted in suspension of the plaintiff physician's license; it simply notes that the IDFPR suspended his medical license for 90 days. Without offering details, the Court of Claims found that the IDFPR had "ample" reasonable basis to suspend the license after it heard "the testimony of several of the [physician's] patients" and an expert. *Id.* at 195. Focusing on the information available to the IDFPR at the time it issued the suspension order, and finding that the available facts formed a "reasonable basis" for the order, the court entered judgment for the defendant State and against the plaintiff. *Id.* at 196. *See id.* at 194 (explaining that the issue under § 60/46 is "not whether the Department was right" nor whether there was a "factual basis that supported or failed to support the Department's initial charges," but rather whether there was a "factual basis for the Department's order").

In this case, the final opinion of the Circuit Court of Cook County held that certain findings of the hearing officer—such as the finding that Dr. Wilson caused Mr. Taylor's death—were "against the manifest weight of the evidence." (Order, Ex. 2 to Third Am. Compl. [86-1], at 8.) It also found that the DPR's "endless administrative proceedings" and "unconstitutional delays" process violated Dr. Wilson's rights to due process. (*Id.* at 9–14.) The court also, found, however, that there *was* "sufficient evidence in the record to support the administrative decision" that Dr. Wilson had breached the applicable standard of care for cardiologists. (*Id.* at 9.) Specifically, the court noted the hearing officer's finding that "administering undiluted potassium chloride was not an appropriate approach to palliative care." This finding indicates that the DPR was not "without *any* reasonable basis in fact of *any* kind" for suspending Dr. Wilson's medical license and requires the court to dismiss Count VII. 225 Ill. Comp. Stat. 60/46 (emphasis added).

### C. Prayer for Declaratory Judgment of Indemnification

Finally, Defendants argue that Count VIII of Plaintiff's Fourth Amended Complaint should be dismissed pursuant to Eleventh Amendment sovereign immunity. The court will address indemnification if a judgment is issued in this case.

## CONCLUSION

Dr. Wilson has not sought specific injunctive relief. Instead he seeks damages pursuant to § 1983 for Defendants' alleged constitutional violations. Defendants' motion to dismiss [94] is granted in part and denied in part. The court directs additional briefing on certain issues as identified above. Such additional briefs shall be filed on or before April 23, 2019, but only after the parties meet and engage in good-faith settlement negotiations. Status conference is set for Thursday, May 2, 2019. at 9:30 a.m. Finally: none of the 30 John Doe Defendants has been identified or served with process, and any effort to move forward against a John Doe at this point is untimely. John Does 1 through 30 are dismissed.

ENTER:

REBECCA R. PALLMEYER
United States District Judge

Dated: March 25, 2019