**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DR. ROBERT LANCE WILSON, D.O.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 10521** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **JAY STEWART,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

In 1998, the Illinois Division of Professional Regulation (DPR) initiated proceedings to suspend Dr. Robert Lance Wilson's medical license because of a controversial treatment decision he made at a Chicago-area hospital. Dr. Wilson insists that this discipline was unjustified, and he has been in conflict with the agency ever since. Over several years, as the DPR attempted to finalize the suspension of his license, Dr. Wilson obtained four favorable state-court decisions— each one reversing the agency's latest suspension order. In the final decision of that series, the state court determined that although there was sufficient evidence to conclude that Dr. Wilson had breached the applicable standard of care in 1998, the DPR had violated his state law rights during the lengthy proceedings. The apparent expectation was that Dr. Wilson would undergo some retraining and then be able to return to practice.

After that last court decision, in 2014, Dr. Wilson filed this lawsuit alleging various constitutional and state-law violations by a slew of named and unnamed state officials. This court has already dismissed large portions of the operative complaint.[1] Dr. Wilson's only remaining claim is that Jay Stewart, the Director of the DPR between 2011 and 2016, violated his constitutional due process rights by failing to promptly conclude the administrative proceedings.

---

[1] *See Wilson v. Ill. Dep't of Fin. & Pro. Regul.*, 376 F. Supp. 3d 849, 872 (N.D. Ill. 2019) (dismissing claims against several defendants on immunity and other grounds) [100]; *Wilson v. Ill. Dep't of Fin. & Pro. Regul.*, No. 14 C 10521, 2021 WL 1784818 (N.D. Ill. May 5, 2021) (dismissing Dr. Wilson's Fourth Amendment and conspiracy claims) [114].

Because the court finds that Stewart is immune from damages liability, it grants his motion for summary judgment [132].

## BACKGROUND[2]

### I.    The Parties

Plaintiff Robert Lance Wilson is a doctor of osteopathy who specializes in cardiology. (DSOF ¶ 1.)  He was first licensed to practice in Illinois in 1988.  (PSOAF ¶ 1.)  As a practicing physician, Dr. Wilson was regulated by the DPR, an Illinois state agency.[3]  (*See* DSOF ¶ 5.)

As of 1998 (the inception of the parties' dispute), the agency was known as the "Department of Professional Regulation."  (*Id.*)  In 2004, it was renamed the "Division of Professional Regulation" when it was absorbed by a new, larger agency called the Illinois Department of Financial and Professional Regulation (IDFPR).  (*Id.*)  IDFPR is led by a "Secretary," while each division is led by a "Director."  (*Id.* ¶ 6.)

Defendant Jay Stewart was the Director of the DPR from April 2011 to August 2016.  (*Id.* ¶ 2.)  As the Director, Stewart oversaw the agency's discipline of physicians, which included "signing the final orders," "setting general policies and goals and objectives," and "trying to make

---

[2]    The following facts come mainly from the parties' Local Rule 56.1 statements and related exhibits.  (*See* Def.'s L.R. 56.1 Joint Statement of Material Facts in Supp. of Summ. J. [134] (hereinafter "DSOF"); Pl.'s Statement of Additional Facts in Opp. to Def.'s Mot. for Summ. J. [147] (hereinafter "PSOAF").)   The court has also accounted for each party's responsive statements.  (*See* Pl.'s Resp. to DSOF [146]; Def.'s Resp. to PSOAF [151].)

Further below, the court discusses the rules that govern such factual filings.  Here, the court notes that to the extent Dr. Wilson's submissions do not comply with those rules, the court has ignored his statements and responses.  (*See* Def.'s Reply in Supp. of His Mot. for Summ. J. [150] (hereinafter "Def.'s Reply") at 4–9 (summarizing various deficiencies in Dr. Wilsons' filings, such as assertions not based on personal knowledge, assertions that are legally conclusory, and assertions based on hearsay).)

[3]    The DPR "licenses and regulates over 1 million professionals and firms in Illinois[,] including a variety of healthcare related professions such as doctors, nurses, and veterinarian[s], as well as a variety of occupational professions such as CPAs, barbers, engineers, and detectives."  *See About IDFPR*, ILL. DEP'T OF FIN. & PRO. REGUL. (last visited Aug. 16, 2022), https://idfpr.illinois.gov/About/About.asp.

sure . . . staffing and budget issues were addressed to help support the operations."[4]  (*See id.* ¶ 7; PSOAF ¶ 20; Dep. of Jay E. Stewart, Ex. 3 to DSOF [134-3] (hereinafter "Stewart Dep.") at 47:5–10.)

In his oversight role, Stewart was not involved in the day-to-day management of the DPR's individual cases.  (*See* DSOF ¶ 66.)  There was a multistep chain of command:  Cases brought against physicians like Dr. Wilson were managed by prosecutors in the agency's Medical Prosecutions Unit, who reported to the Chief of Prosecutions, who reported to the Deputy Director of Statewide Enforcement, who in turn reported to Stewart.  (*Id.* ¶ 7.)  And Stewart exercised no control over the agency's Administrative Law Judges (ALJs).  As members of the Formal Hearings Unit, ALJs reported directly to the General Counsel of the IDFPR (the DPR's parent agency), who in turn reported to the IDFPR's Secretary.  (*Id.* ¶ 8; Stewart Dep. 104:17–21 ("[T]he director has no control over the administrative law judges.  They don't report to the director.  They're not subject to the director's control . . . .  That's the office of the secretary.").)[5]

The DPR tracked its disciplinary cases using a computer database called the Illinois Licensing and Enforcement System (ILES).  (PSOAF ¶ 26.)  ILES contained a record for every individual licensed by the agency.  (Decl. of Mark Thompson, Ex. 24 to DSOF [152-1] (hereinafter

---

[4]     Dr. Wilson asks the court to deny Stewart's motion on the ground that Stewart's testimony about his job responsibilities, and about his recollection of Dr. Wilson's case, was "evasive" and "put[] his credibility into question."  (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J. [145] (hereinafter "Pl.'s Resp.") at 22–23.)  The court disagrees for the reasons aptly stated in Stewart's reply brief.  (*See* Def.'s Reply at 2–3 ("The fact that Stewart did not answer questions the way Plaintiff's counsel wanted him to does not make him evasive . . . .").)  Although Dr. Wilson claims that Stewart "repeatedly refused to give a straight-forward answer to . . . straightforward question[s]" (Pl.'s Resp. at 22), it appears to the court that it was Dr. Wilson's attorney who became combative and repeated his questions when Stewart did not provide the answer that, in counsel's view, would confirm that Stewart was personally responsible for violations of state law governing the disciplinary proceedings.  (*See, e.g.*, Stewart Dep. 49:9–53:7.)

[5]     Cecilia Abundis, who became the DPR's Director in 2019, described this arrangement in similar terms:  "Directors do not manage the day-to-day.  That's why there's a firewall between the Director and investigations and prosecution.  There's a firewall between Directors and the Administrative Law Judge.  It's the duty of the Director to review the order once he or she receives it and to make a decision."  (Dep. of Cecilia Abundis, Pl.'s Ex. C [145-1] (hereinafter "Abundis Dep.") at 13:5–8, 25:11–18.)

"Thompson Decl.") ¶ 2.) Each ILES record would note, among other things, whether any disciplinary actions had been brought against the individual. (*Id.* ¶ 3.) If such an action had been brought, the record would note each filing in the case, such as pleadings, motions, orders, and complaints for administrative review. (*Id.*)[6]

Although Stewart did not become the DPR's Director until 2011, the parties have provided a factual chronology that begins in 1998, when Dr. Wilson's dispute with the agency first erupted. In his reply, Stewart insists that many of these earlier facts are irrelevant now that Dr. Wilson has waived his wrongful-continuation claim and proceeds solely on his delay-related claim.[7] (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J. [145] (hereinafter "Pl.'s Resp.") at 1–2 (waiving wrongful-continuation claim); Def.'s Reply in Supp. of His Mot. for Summ. J. [150] (hereinafter "Def.'s Reply") at 1 (arguing that "much of Plaintiff's factual discussion . . . [is] irrelevant" to the delay claim).) Dr. Wilson has nevertheless addressed facts from the beginning to the end of the long-running dispute, and in the interest of putting this case to bed, the court covers the full timeline as well.

## II.    Death of Henry Taylor

In September 1998, at a hospital in south suburban Chicago, a 69-year-old patient named Henry Taylor was suffering from end-stage renal disease and superior vena cava syndrome. (DSOF ¶ 9; PSOAF ¶ 2.) Blood was not properly draining away from Mr. Taylor's upper body, which

---

[6]    The filings themselves, however, typically would not be available through ILES. (Thompson Decl. ¶ 3.) Though the parties have not explained this, the court presumes that the full record was retained in paper or electronic form in some other location.

[7]    In his (now-withdrawn) wrongful-continuation claim, Dr. Wilson alleged that Stewart "knew, must have known, or should have known, that the manner that the Department was prosecuting its claims against Dr. Wilson was part of the Department's vendetta against Dr. Wilson, and part of a cover-up because of the Department's initial failure to adequately investigate Dr. Wilson's conduct in connection with the death of Taylor." (*See* Fourth Am. Compl. [90] ¶ 92 (Count II).)

In his delay claim, Dr. Wilson alleges that Stewart violated his constitutional due process rights by "fail[ing] to bring the license revocation proceedings against Dr. Wilson to closure without appreciable delay." (Pl.'s Resp. at 25; *see also* Fourth Am. Compl. ¶¶ 99–104 (Count III).)

caused severe swelling and threatened his ability to breathe.[8]  (DSOF ¶ 9.)  The condition was serious, and he signed two "Do Not Resuscitate" orders (DNRs).[9]  (PSOAF ¶ 2.)

By the morning of September 30, Mr. Taylor's condition had worsened to the point where he was effectively suffocating to death in his hospital bed.  (DSOF ¶ 10; PSOAF ¶ 3.)  Dr. Wilson, who had staff privileges at the hospital, was called in to treat him.  (PSOAF ¶¶ 2–3.)  Dr. Wilson began by injecting Mr. Taylor with morphine, but Mr. Taylor continued to flail and gasp for breath. (DSOF ¶ 11; PSOAF ¶¶ 3, 5.)  Dr. Wilson then made the decision that soon attracted the DPR's attention:  He injected Mr. Taylor with 40 milliequivalents of undiluted potassium chloride.  (DSOF ¶ 11; PSOAF ¶¶ 6–7.)

Mr. Taylor was pronounced dead less than one minute later—or about 15 minutes after Dr. Wilson had arrived to treat him.  (DSOF ¶ 11; PSOAF ¶ 7.)  More than two decades later, Dr. Wilson still maintains that Mr. Taylor's death was inevitable and that, as a doctor, he was professionally obligated to ease Mr. Taylor's suffering.[10]  (*See* PSOAF ¶¶ 3–7.)  To that end, Dr. Wilson says, the injection of potassium chloride was a proper palliative measure intended to render Mr. Taylor unconscious and reduce his pain.  (DSOF ¶¶ 11–12; PSOAF ¶¶ 3–7.)  Dr. Wilson also contends that the potassium chloride itself could not have killed Mr. Taylor, who died too quickly for the chemical to have circulated through his body.  (DSOF ¶ 12; PSOAF ¶ 7.)

---

[8]     "Superior vena cava syndrome . . . is a group of problems caused when blood flow through the superior vena cava (SVC) is slowed down.  The SVC is a large vein that drains blood away from the head, neck, arms, and upper chest and into the heart."  *Superior Vena Cava Syndrome*, CEDARS-SINAI (last visited Aug. 16, 2022), https://www.cedars-sinai.org/health-library/ diseases-and-conditions/s/superior-vena-cava-syndrome.html.

[9]     Mr. Taylor signed the DNRs while in the care of a doctor who is not a party to this case.  (PSOAF ¶ 2.)

[10]     Dr. Wilson cites language from an American Medical Association ethics opinion on end-of-life care:  "Physicians have an obligation to relieve pain and suffering and to promote the dignity and autonomy of dying patients in their care.  This includes providing effective palliative treatment even though it may foreseeably hasten death."  (PSOAF ¶ 4 (quoting AMA Council on Ethical and Judicial Affairs, Code of Medical Ethics, Opinion 2.20: Withholding or Withdrawing Life-Sustaining Medical Treatment (1998–1999), Pl.'s Ex. 3 [145-1]).)

At this stage, the truth of these assertions is immaterial. It is enough to say that several DPR officials disagreed with Dr. Wilson about the prudence of his treatment decision.

### III. Commencement of Administrative Proceedings Against Dr. Wilson

At Dr. Wilson's request, Mr. Taylor's body was transported to Cook County Medical Center for an autopsy.[11] (DSOF ¶ 13; PSOAF ¶¶ 8–9.) The examiner initially reported that the cause of Mr. Taylor's death was indeterminate, but she soon changed her conclusion, identifying the cause of death as homicide by potassium chloride intoxication.[12] (DSOF ¶ 13; PSOAF ¶ 10.) The examiner's conclusion prompted a homicide investigation by the Cook County State's Attorney; that office eventually announced that it would not file charges. (DSOF ¶¶ 14, 18; PSOAF ¶ 12; Press Release, Ill. State's Att'y, No Charges in Death of Patient at Olympia Fields Osteopathic Hospital (Sept. 28, 1999), Pl.'s Ex. 28 [145-2].)

In the meantime, the DPR had opened its own investigation into Mr. Taylor's medical treatment. On October 9, 1998, nine days after Mr. Taylor's death (and after Dr. Wilson had announced his plan to take a voluntary leave), the DPR's Medical Director and Chief of Medical Prosecutions (Andrew Gorchynsky and Thomas Glasgow, respectively) filed an *ex parte* petition for the temporary suspension of Dr. Wilson's license.[13] (DSOF ¶ 16; PSOAF ¶ 11.) On the basis of that petition, which was supported by Gorchynsky's affidavit, the DPR's then-Director, Nikki Zollar, entered an order summarily suspending Dr. Wilson's license (the "October 1998 Summary Suspension Order"). (DSOF ¶¶ 16–17; PSOAF ¶ 11.)

---

[11] On the day of Mr. Taylor's death, Dr. Wilson also announced a voluntary leave of absence from his hospital duties. (PSOAF ¶ 8.)

[12] The medical examiner, Mitra Kalelkar, was previously a defendant in this case, but she entered into a settlement agreement with Dr. Wilson before he filed his third amended complaint. *See Wilson*, 376 F. Supp. 3d at 855 n.1.

[13] Gorchynsky and Glasgow were previously defendants in this case, but the court already dismissed the claims against them. (*See Wilson*, 376 F. Supp. 3d 849; *Wilson*, 2021 WL 1784818.)

On the same day the October 1998 Summary Suspension Order was issued, the DPR also filed a formal administrative complaint seeking the suspension or revocation of Dr. Wilson's license. (DSOF ¶ 15; PSOAF ¶ 11.) In an amended complaint, dated November 17, 1998, the DPR's Chief of Medical Prosecutions, Thomas Glasgow, alleged that by injecting Mr. Taylor with potassium chloride, Dr. Wilson had been grossly negligent and breached the standard of care. (DSOF ¶ 19; *see also* First Am. Compl., *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. *Regul*. Nov. 17, 1998), Ex. 6 to DSOF [134-6] (alleging that Dr. Wilson had acted with gross negligence (Count I) and engaged in "dishonorable, unethical, and unprofessional conduct" (Count II)).)

## IV. November 1999 Hearing and First Administrative Decision

A formal hearing took place over multiple days in November 1999, a little over one year after Mr. Taylor's death.[14] (DSOF ¶¶ 20–40; *see also* Hr'g Tr., *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. *Regul*. Nov. 16–18, 1999), Exs. 7–12 to DSOF [134-7 to 134-12].) Several individuals testified at the hearing, which took place before ALJ Philip Howe. (DSOF ¶ 20.) Dr. Wilson's own expert, Dr. Bruce Waller, said, among other things, that he was unaware of any literature supporting or recommending the use of potassium chloride as a palliative treatment. (*Id.* ¶¶ 24–26.) Dr. Wilson himself testified that he had never before injected a patient with 40 milliequivalents of undiluted potassium chloride, had never seen it done, had not researched the uses of potassium chloride before the day of Mr. Taylor's death, and was unaware of any articles or literature supporting or recommending the use of potassium chloride as a palliative treatment. (*Id.* ¶¶ 27–28.) Evidently, Dr. Wilson nevertheless stood by the decision he made in Mr. Taylor's case.

The proceeding went awry during the testimony of Dr. Michael Settecase, the medical director at the hospital where Dr. Wilson had treated Mr. Taylor. (*See id.* ¶¶ 29–31.) When an

---

[14] Dr. Wilson had requested several continuances of this hearing date, in part because of the State's Attorney's homicide investigation. (DSOF ¶ 18.)

agency official asked Dr. Settecase whether the Illinois Department of Corrections used potassium chloride for lethal injections, Dr. Wilson's attorney objected. (*Id.* ¶ 29.) ALJ Howe overruled the objection, and Dr. Settecase answered, "I think so." (*Id.*) After an angry outburst, Dr. Wilson stormed out of the hearing room, not returning even after a recess. (*Id.* ¶¶ 30–31.)

The DPR then elicited further testimony from Dr. Mark Seigler, an internist and an expert in end-of-life medical ethics. (*Id.* ¶¶ 32–37.) According to Dr. Seigler, undiluted potassium chloride is an "extraordinarily dangerous and caustic drug" that could cause heart stoppage even at doses of 10 or 20 milliequivalents. (*Id.* ¶ 33.) Dr. Siegler testified that he was unaware of any literature supporting or recommending the use of potassium chloride as a palliative treatment. (*Id.* ¶ 35.) The only instances in which he could recall living things being injected with undiluted potassium chloride were (1) lethal injections, (2) euthanasia of dogs after medical experiments, and (3) assisted suicides, which he had learned about through a *60 Minutes* episode on Dr. Kevorkian. (*Id.* ¶ 34.)

On March 2, 2000, ALJ Howe issued a report and recommendation to the agency's Medical Disciplinary Board (MDB). (*Id.* ¶ 41; *see also* ALJ's Report and Recommendation, *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. *Regul.* Mar. 2, 2000), Ex. 13 to DSOF [134-13].) ALJ Howe found that the Department had proven both counts of the amended complaint by clear and convincing evidence, and he recommended that Dr. Wilson's medical license be suspended for at least five years.[15] (DSOF ¶ 41; PSOAF ¶ 13.)

---

[15] The court notes a small point of confusion: Throughout their summary judgment filings, the parties seem to use the words "suspend" and "revoke" interchangeably. Although there may be a meaningful distinction between these two actions within the Illinois medical-licensing regime, the distinction has not been explained clearly in the record. For the purpose of readability, the court uses the term "suspend" (or "suspension"). This term seems more appropriate than "revoke" (or "revocation") because the DPR orders relevant to this case typically lifted Dr. Wilson's license for a limited period of time, such as five years.

The next month, on April 5, 2000, the MDB issued findings to the DPR's then-Director, and, on June 26, 2000, the Director issued an order suspending Dr. Wilson's license for five years (the "June 2000 Suspension Order").[16]  (DSOF ¶ 42; PSOAF ¶ 13.)

## V.    Dr. Wilson's First Three Actions for Administrative Review

Dr. Wilson challenged this ruling in state court by filing a complaint for administrative review.  In April 2002, an Illinois circuit court reversed and vacated the June 2000 Suspension Order, but that decision was overturned in part on appeal, and Dr. Wilson's case was remanded to the agency for further proceedings.  (DSOF ¶ 42; PSOAF ¶¶ 15–16; *see also Wilson v. Dep't of Pro. Regul.*, 344 Ill. App. 3d 897, 801 N.E.2d 36 (1st Dist. 2003).)  Although Dr. Wilson had effectively prevailed before the trial court, both sides appealed, arguing that the ALJ had abused his discretion in various ways.  The appellate court found that "the ALJ's decision to allow the autopsy into evidence was not an abuse of discretion."  *Wilson*, 344 Ill. App. 3d at 909, 801 N.E.2d at 45.  But the court held that "it was an abuse of discretion [for the ALJ] to deny Dr. Wilson's motion to reopen the proceedings in order to recall his expert," Dr. Waller.  *Id.* at 911, 801 N.E.2d at 47.

Unsatisfied, Dr. Wilson filed a petition for a writ of certiorari, but the U.S. Supreme Court denied that petition in October 2004.  (DSOF ¶ 48; PSOAF ¶¶ 16–17; *see also Wilson v. Dep't of Pro. Regul.*, 543 U.S. 869 (2004) (mem.).)  The case was then remanded to the DPR, and the administrative proceeding reopened.  The next year, Dr. Wilson sought to substitute an expert witness for the purpose of offering rebuttal testimony, but the hearing officer, ALJ James Jeffrey Canavan, denied the request in March 2006.  (DSOF ¶ 48; PSOAF ¶ 17.)  On November 1, 2006, the MDB issued findings that adopted ALJ Canavan's report, and, on July 17, 2007, the DPR's

---

[16]    The parties have done a poor job of explaining the procedures that govern DPR's enforcement actions, especially with respect to the MDB.  In a prior opinion, this court briefly summarized the statutory scheme.  *See Wilson*, 376 F. Supp. 3d at 859.

then-Director entered a final decision reaffirming the June 2000 Suspension Order. (DSOF ¶ 48; PSOAF ¶ 17.)

For a second time, Dr. Wilson sought administrative review in state court. Again, he prevailed: On May 9, 2008, an Illinois circuit court vacated the DPR's July 2007 order reaffirming the June 2000 Suspension Order. (DSOF ¶ 49; PSOAF ¶ 18; *see also* Agreed Order for Remand, *Wilson v. Dep't of Pro. Regul.*, No. 07 CH 22754 (Ill. Cir. Ct. Cook Cnty. May 9, 2008), Ex. 15 to DSOF [134-15].)

On remand to the DPR, Susan Link, a longtime agency prosecutor, was assigned to Dr. Wilson's case.[17] (DSOF ¶ 50.) The Chief of Medical Prosecutions asked Link, as a matter of routine, to review the record, evaluate the case, and provide an independent assessment about whether the prosecution should continue. (*Id.* ¶ 51.) Link concluded that there was sufficient evidence to prove the DPR's charges against Dr. Wilson (i.e., gross negligence and "dishonorable, unethical, and unprofessional conduct"). (DSOF ¶ 52; First Am. Compl., *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. *Regul.* Nov. 17, 1998).) In a declaration submitted in this case, Link stated that she "believed then, and still believe[s], that continuing the prosecution against Dr. Wilson was right and necessary to protect the people of Illinois," and confirmed that "[n]o one at the IDFPR ever pressured [her], attempted to influence [her] decision, or told [her] that [she] had to continue the prosecution against Dr. Wilson." (Decl. of Susan Link ¶¶ 6–7 [134-5]; *see also* DSOF ¶ 53.)

The DPR continued the administrative proceeding after Link concluded that it was prudent to do so. (DSOF ¶ 54.) In October 2008, ALJ John Lagattuta heard testimony from Dr. Wilson's new expert, Dr. James Bryant, who testified that he had no opinion on whether potassium chloride was appropriate palliative care. (*Id.*; PSOAF ¶ 19; *see also* Hr'g Tr., *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. Regul. Oct. 29, 2008), Ex. 16 to DSOF [134-16].) On

---

[17]     Link handled Dr. Wilson's administrative prosecution from the time of the May 2008 remand to her retirement from the DPR in June 2012. (DSOF ¶ 50.)

March 11, 2009, ALJ Lagattuta issued a report and recommendation that again recommended the suspension of Dr. Wilson's license for five years. (DSOF ¶ 55; PSOAF ¶ 19.) After the MDB accepted the ALJ's recommendation on April 15, 2009, the DPR's then-Director adopted it on July 21, 2009. (DSOF ¶ 55; PSOAF ¶ 19.)

For a third time, Dr. Wilson sought administrative review in state court, and for a third time, succeeded. An Illinois circuit court reversed the agency's decision on July 25, 2011. (DSOF ¶ 56; PSOAF ¶ 22; *see also* Order, *Wilson v. Dep't of Pro. Regul.*, No. 09 CH 29811 (Ill. Cir. Ct. Cook Cnty. July 25, 2011), Pl.'s Ex. 34 [145-2].) The court held that ALJ Lagattuta had improperly excluded testimony from one of Dr. Wilson's experts, Dr. Waller, and failed to explain whether he considered Mr. Taylor's DNR orders (or, if not, why he did not consider them). (PSOAF ¶ 22; *see also* Hr'g Tr., *Wilson v. Dep't of Pro. Regul.*, No. 09 CH 29811 (Ill. Cir. Ct. Cook Cnty. July 25, 2011), Pl.'s Ex. 34 [145-2].) The DPR did not appeal this third reversal, and the case was remanded on October 7, 2011 (the "October 2011 Remand"). (DSOF ¶ 56.)

## VI.    Arrival of Defendant Stewart as Director of the DPR

By the time of the third reversal and the October 2011 Remand, Defendant Jay Stewart had finally entered the picture. He became the DPR's Director in April 2011. (DSOF ¶ 2; PSOAF ¶ 20.)

The prosecution of Dr. Wilson continued, with Stewart now at the DPR's helm.[18] Several months after the October 2011 Remand, ALJ Lagattuta issued a report and recommendation,

---

[18]    On November 23, 2011, a few weeks after the October 2011 Remand, Dr. Wilson sent DPR a "Motion for Judgment of Acquittal and to Dissolve October 9, 1998 Summary Suspension Order." (PSOAF ¶ 25; *see also* Resp't's Mot. for Judgment of Acquittal & to Dissolve October 9, 1998 Summ. Suspension Order, *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. Regul. Nov. 23, 2011), Pl.'s Ex. 61 [145-2].)

Neither Stewart nor any other DPR official ever "ruled" on this motion. (See PSOAF ¶ 41.) Dr. Wilson cites no source establishing that his request was legally cognizable, however. According to Cecilia Abundis, who became the DPR's Director in 2019, there is "no such thing" as a motion to dissolve a summary suspension order, as "that mechanism does not exist under the Medical Practice Act." (Abundis Dep. 13:5–8, 62:19–63:1.) Abundis testified that a licensee in Dr. Wilson's position has two available remedies: a "full formal hearing" (as Dr. Wilson was

concluding once again that the DPR had proven both counts against Dr. Wilson—gross negligence and "dishonorable, unethical, and unprofessional conduct"—by clear and convincing evidence. (DSOF ¶ 57; *see also* ALJ's Report and Recommendation, *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. Regul. Apr. 25, 2012), Ex. 17 to DSOF [134-17].) The MDB then issued findings of fact and conclusions of law, adopting ALJ Lagattuta's recommendation that Dr. Wilson's license be suspended for at least five years. (DSOF ¶ 59.)

Approximately one year later, in April 2013, Stewart issued a final order suspending Dr. Wilson's license for a "minimum period of five (5) years."[19] (DSOF ¶¶ 57–58; Order, *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. Regul. Apr. 26, 2013), Ex. 19 to DSOF [134-19] (hereinafter "April 2013 Suspension Order".)

Stewart's order included an explanation for the long delay that directly preceded it. Approximately two weeks after the MDB had issued its recommendation in May 2012, the DPR prosecutor assigned to Dr. Wilson's case, Susan Link, had retired, and her caseload was distributed among to other attorneys. (April 2013 Suspension Order at 2; *see also* DSOF ¶¶ 50, 59.) The DPR was also suffering from staffing shortages, and "the case did not progress."[20]

---

given) or judicial relief from an Illinois court (as Dr. Wilson sought and obtained several times). (*See id.* at 63:1–5.) Dr. Wilson has cited no contrary authority.

[19]    Stewart's order stated that "[t]his revocation is retroactive and has an effective date of April 5, 2000." (April 2013 Suspension Order at 4.) The court understands that April 5, 2000, is the date on which the MDB first submitted findings of fact, conclusions of law, and recommendations in Dr. Wilson's case. (*See* ALJ's Report and Recommendation at 22, *Dep't of Pro. Regul. v. Wilson*, No. 1998-16588 (Ill. Dep't of Pro. Regul. Apr. 25, 2012), Ex. 17 to DSOF [134-17] (noting that the MDB issued its findings on April 5, 2000).)

The parties have not explained the ramifications of the April 2013 Suspension Order being made *retroactive* as of this date. Presumably, such a suspension would be deemed to have expired long before 2013.

[20]    Dr. Wilson purports to dispute this fact, but he provides no citation or explanation. (*See* Pl.'s Resp. to DSOF ¶¶ 59–60.) Under this district's Local Rule 56.1, a party seeking to dispute an asserted fact "must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e)(3). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.*

12

(April 2013 Suspension Order at 2; *see also* DSOF ¶ 59.)  A few months later, the DPR learned that a final order had never been entered, but the case stalled further when an agency lawyer discovered that the MDB's most recent findings had been misplaced.[21]  (April 2013 Suspension Order at 2; *see also* DSOF ¶ 60.)  Once these issues had been addressed—which required the MDB to redeliberate and issue new findings in March 2013—Stewart issued the order on April 26, 2013, just two days after receiving the proposed version.  (April 2013 Suspension Order at 2; *see also* DSOF ¶¶ 58, 60.)

**VII.    Dr. Wilson's Fourth Action for Administrative Review**

For the fourth and final time, Dr. Wilson sought administrative review in state court.  On May 21, 2014, an Illinois circuit court reversed the April 2013 Suspension Order.  (DSOF ¶ 61; PSOAF ¶ 36; *see also* Order, *Wilson v. Dep't of Fin. & Pro. Regul.*, No. 13 CH 13507 (Ill. Cir. Ct. Cook Cnty. May 21, 2014), Ex. 20 to DSOF [134-20] (hereinafter "May 2014 State Court Order").)

The circuit court made three significant rulings.  First, it held that the DPR's "decision that the combination of drugs administered to Mr. Taylor by Dr. Wilson resulted in Mr. Taylor's death" was "against the manifest weight of the evidence."  (May 2014 State Court Order at 4–8; DSOF ¶ 62.)  The court concluded, second, that there was sufficient evidence in the record to support the administrative decision that Dr. Wilson had breached the applicable standard of care for cardiologists by administering undiluted potassium chloride for palliative purposes.  (May 2014 State Court Order at 8–9; DSOF ¶ 63.)  Third, the court held that the lengthy delay between the October 2011 Remand and the April 2013 Suspension Order violated Dr. Wilson's due process rights under the Illinois Administrative Procedure Act.  (May 2014 State Court Order at 9–12; DSOF ¶ 64.)

In its final judgment, dated June 2, 2014, the circuit court reversed and vacated the DPR's (1) October 1998 Summary Suspension Order, (2) June 2000 Suspension Order, and (3) April

---

[21]    Again, Dr. Wilson purports to dispute this fact, but he provides no citation or explanation.  (*See* Pl.'s Resp. to DSOF ¶¶ 59–60.)

2013 Suspension Order. (*See* Final Judgment, *Wilson v. Dep't of Fin. & Pro. Regul.*, No. 13 CH 13507 (Ill. Cir. Ct. Cook Cnty. June 2, 2014), Pl.'s Ex. 1 [145-2].) According to the judgment, Dr. Wilson had stipulated that he would "hold his license to practice medicine in abeyance pending (a) completion of all reasonable, necessary and appropriate continuing medical education courses as reasonably required by [IDFPR], (b) successful completion of all reasonable, necessary and appropriate competency testing as reasonably required by [IDFPR] for the practice of medicine in the State of Illinois, and (c) all other reasonable, necessary and appropriate requirements for the practice of medicine in the State of Illinois as [IDFPR] may reasonable require, consistent with the Court's May 21, 2014 Order." (*Id.*) Once those steps were taken, Dr. Wilson would be free to resume the practice of medicine.

## VIII. Developments After the Fourth Court Reversal

The DPR did not appeal the state court's fourth reversal of its administrative decision. Two days after the final judgment, Dr. Wilson filed a petition for the DPR to reinstate his medical license. (PSOAF ¶ 36; Petition for Reinstatement of Medical License and Right to Practice Medicine in the State of Illinois, *In re Robert Lance Wilson, D.O.*, No. 2015-8374 (Ill. Dep't of Fin. & Pro. Regul. June 4, 2014), Pl.'s Ex. 72 [145-2].)

On September 22, 2015, the DPR sent Dr. Wilson a letter acknowledging receipt of his application. (PSOAF ¶ 36; Letter from Todd Robertson, DPR Medical Licensing Board Liaison, to Robert L. Wilson (Sept. 22, 2015), Pl.'s Ex. 78 [145-2].) That letter promised Dr. Wilson that "[e]very effort will be made to expedite your application." (PSOAF ¶ 36; Letter from Todd Robertson, DPR Medical Licensing Board Liaison, to Robert L. Wilson (Sept. 22, 2015).) But seven weeks later, on November 10, the DPR followed up by filing a notice stating that the DPR intended to deny his application because he (1) was "not of good moral character required under Section 60/9(B)(1)" of the Illinois Medical Practice Act, 225 ILCS 60/1 *et seq.*, and (2) lacked "professional capacity" because he had not practiced medicine or "engaged in a formal program of medical education during the 3 years preceding his application." (PSOAF ¶ 36; Notice of Intent

14

to Deny Licensure, *In re Robert Lance Wilson, D.O.*, No. 2015-8374 (Ill. Dep't of Fin. & Pro. Regul. Nov. 10, 2015), Pl.'s Ex. 80 [145-2].)

Dr. Wilson filed a petition for a hearing on November 30, 2015. (PSOAF ¶ 36; Applicant's Pet. for Hr'g, *In re Robert Lance Wilson, D.O.*, No. 2015-8374 (Ill. Dep't of Fin. & Pro. Regul. Nov. 30, 2015), Pl.'s Ex. 82 [145-2].) On January 21, 2016, however, the DPR withdrew its notice of intent to deny his application. (PSOAF ¶ 36; *see* Order to Remove from the Call, *In re Robert Lance Wilson, D.O.*, No. 2015-8374 (Ill. Dep't of Fin. & Pro. Regul. Jan. 21, 2016), Pl.'s Ex. 86 [145-2].) Instead, the agency notified Dr. Wilson that to demonstrate his professional capacity, he should complete an "accredited graduate medical education program of at least 3 years." (DSOF ¶ 65; PSOAF ¶ 37; Letter from Todd Robertson to F. Dean Armstrong, Counsel for Dr. Wilson (Jan. 26, 2016), Pl.'s Ex. 36 [145-2].) Dr. Wilson later testified that given his "age (at that time, 60), and financial condition (practically broke)," satisfying this requirement was "a practical impossibility." (PSOAF ¶ 37.) He now claims that the license-reinstatement matter is "still languishing to this date." (*Id.*)

A few days later, while the petition for reinstatement was still pending, Dr. Wilson's lawyer sent IDFPR a letter to request that the agency issue Dr. Wilson a "temporary license." (PSOAF ¶ 38; Letter from F. Dean Armstrong to Daniel Kelber, Associate General Counsel, IDFPR (Jan. 29, 2016), Pl.'s Ex. 87 [145-2].) The letter explained that Dr. Wilson was pursuing a job opportunity in a university medical program, but the position required that the applicant be a licensed physician. (PSOAF ¶ 38.) A few days later, Kelber responded that the agency "need[ed] to have further discussions internally before [Stewart] makes a final decision." (PSOAF ¶ 39; Email from Daniel Kelber to F. Dean Armstrong (Feb. 1, 2016), Pl.'s Ex. 88 [145-2].) Dr. Wilson's lawyer then replied that although Dr. Wilson had an interview the following week, there was "no firm deadline as to when the limited & restricted 'license' has to be issued." (PSOAF ¶ 39; Email from Dean Armstrong to Daniel Kelber (Feb. 1, 2016), Pl.'s Ex. 89 [145-2].) No temporary license was ever issued. (PSOAF ¶ 40.) As part of this case, Dr. Wilson filed a declaration stating,

without other details, that "as a consequence" of that inaction, he was "not able to obtain the job." (PSOAF ¶ 40 (citing Decl. of Dr. Robert Lance Wilson, D.O., Pl.'s Ex. A [145-1] ¶ 25).)

## PROCEDURAL HISTORY

Wilson filed this case in December 2014, a few months after the fourth and final state-court reversal of the DPR's suspension order. (*See* Compl. [1] ¶ 3 (citing Final Judgment, *Wilson v. Dep't of Fin. & Pro. Regul.*, No. 13 CH 13507 (Ill. Cir. Ct. Cook Cnty. June 2, 2014), Pl.'s Ex. 1 [145-2]).) Three groups of defendants—comprising all the named defendants—soon moved to dismiss [19, 22, 26]. This court found that Wilson's federal claims were barred by the statute of limitations, and it declined to exercise supplemental jurisdiction over his state-law claims. *Wilson v. Ill. Dep't of Fin. & Pro. Regul.*, No. 14 C 10521, 2016 WL 1073072 (N.D. Ill. Mar. 18, 2016) [51]. But the Seventh Circuit reversed and remanded, concluding that Wilson's federal claims were timely. *Wilson v. Ill. Dep't of Fin. & Pro. Regul.*, 871 F.3d 509 (7th Cir. 2017).

In Wilson's operative fourth amended complaint [90], he once again asserted a variety of constitutional and state-law claims against named and unnamed defendants. The named defendants again moved to dismiss [90], and this court granted the motion in part and denied it in part. *Wilson v. Ill. Dep't of Fin. & Pro. Regul.*, 376 F. Supp. 3d 849, 872 (N.D. Ill. 2019) [100]. In that opinion, the court concluded, first, that Defendant Thomas Glasgow was fully shielded, and Defendant Andrew Gorchynsky was partially shielded, by absolute prosecutorial immunity. *Id.* at 862–64. Second, the court held that although Defendant Stewart was protected by absolute quasi-judicial immunity for issuing the April 2013 Suspension Order, neither he nor Defendant Leonard Sherman (another former Director of the DPR) was protected by such immunity for their administrative actions that affected the license-suspension proceeding. *Id.* at 864–66. Third, the court held that Dr. Wilson's due process allegations against Defendants Gorchynsky and Sherman did not satisfy Rule 12(b)(6), but that he successfully stated a due process claim against Defendant Stewart. *Id.* at 867–69. Fourth, the court rejected Dr. Wilson's "stigma-plus" claim against Defendant Sherman. *Id.* at 869–71. Fifth, the court also determined that Dr. Wilson's

malicious-prosecution claims were barred by either prosecutorial immunity (for Defendants Glasgow and Gorchynsky) or sovereign immunity (for Defendants Sherman and Stewart). *Id.* at 871–73. Sixth, the court dismissed Dr. Wilson's claim under 225 ILCS 60/46 against the State of Illinois. *Id.* at 873. Finally, the court reserved judgment on Dr. Wilson's Fourth Amendment and conspiracy claims pending additional briefing on "whether Dr. Wilson's medical license constitutes a paper or effect within the meaning of the Fourth Amendment." *Id.* at 866–67. After the parties submitted that briefing, the court issued another memorandum opinion, dismissing Dr. Wilson's Fourth Amendment and conspiracy claims. *Wilson v. Ill. Dep't of Fin. & Pro. Regul.*, No. 14 C 10521, 2021 WL 1784818 (N.D. Ill. May 5, 2021) [114].

Together, the 2019 and 2021 dismissals narrowed this case substantially. The only Defendant remaining now is Jay Stewart, who directed the agency from 2011 to 2016. Dr. Wilson contends that Stewart violated his constitutional due process rights by "fail[ing] to bring the license revocation proceedings against Dr. Wilson to closure without appreciable delay." (Pl.'s Resp. at 25; *see also* Fourth Am. Compl. [90] ¶¶ 99–104 (Count III).)[22] As explained below, the court concludes that Stewart is immune from liability on this claim.

## **LEGAL STANDARD**

The standards that govern a motion for summary judgment are familiar. The court should grant such a motion only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts should draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are

---

[22] Dr. Wilson arrived at summary judgment with a second remaining claim: that Defendant Stewart violated his due process rights by wrongfully continuing the prosecution against him. (*See* Fourth Am. Compl. ¶¶ 90–98 (Count II).) In his opposition brief, however, Dr. Wilson has explicitly waived this wrongful-continuation claim, conceding that Stewart is protected by absolute prosecutorial immunity. (*See* Pl.'s Resp. at 1–2.) Thus, in this opinion, the court addresses only Dr. Wilson's delay-related claim.

supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

This court's Local Rule 56.1 requires a party moving for summary judgment to file a statement of material facts, consisting of "concise numbered paragraphs" supported by citations to "specific evidentiary material."[23] L.R. 56.1(a)(2), (d). The nonmovant must file a responsive statement that admits or disputes each asserted fact. L.R. 56.1(b)(2), (e). "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also* L.R. 56.1(e)(3). "If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted." *TWD, LLC v. Grunt Style LLC*, __ F. Supp. 3d __, 2022 WL 1092184, at *3 (N.D. Ill. Apr. 12, 2022) (citing *Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005)). "Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded." *Id.* (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an

---

[23]    On summary judgment, statements made "on information and belief" are not admissible for their truth. *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 513 (7th Cir. 2022) (citing 10B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2738 (4th ed. 2021)). The court therefore ignores all facts that Dr. Wilson has offered on this basis. (*See, e.g.*, PSOAF ¶¶ 22, 24.)

organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

District courts have "considerable discretion in interpreting and applying their local rules." *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 549 (7th Cir. 2017) (quoting *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 858 (7th Cir. 2015)). Given "the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, [the Seventh Circuit has] repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011).

## DISCUSSION

In his sole remaining claim, Dr. Wilson contends that Defendant Stewart violated his constitutional due process rights by failing to push the license revocation proceedings to a conclusion without delay. (Pl.'s Resp. at 25; *see also* Fourth Am. Compl. ¶¶ 99–104 (Count III).) Dr. Wilson claims in his briefing, however, that "Stewart is not being sued simply for the delay in issuing the [April 2013 Suspension Order]." (Pl.'s Resp. at 25.) Rather, Dr. Wilson suggests his claim is a broader effort "to impose §1983 supervisory liability against Stewart for his failure to bring the license revocation proceedings against Dr. Wilson to closure without appreciable delay, which is something that Stewart, as the Director of the DPR, was obligated to do." (*Id.* (citing Stewart Dep. 48:3–15; 225 ILCS 60/37(d); 5 ILCS 100/10-65(d)).)

Stewart seeks summary judgment on three grounds. First, he argues that Dr. Wilson has not shown that Stewart was personally involved in any delays in the license-revocation proceeding, meaning that Stewart cannot be liable under § 1983. (Def.'s Mem. of Law in Supp. of His Mot. for Summ. J. [133] (hereinafter "Def.'s Mot.") at 37–39; Def.'s Reply at 12–20.) Second, Stewart argues that he is protected by absolute, quasi-judicial immunity for any delays in the proceeding. (Def.'s Mot. at 34–36; Def.'s Reply at 9–12.) And third, he argues that he is

protected by qualified immunity, if not absolute immunity.  (Def.'s Br. at 39–40; Def.'s Reply at 20–22.)

The court begins and ends with the second argument: quasi-judicial immunity.  It is well settled that judges are absolutely immune from damages for their judicial acts, *Stump v. Sparkman*, 435 U.S. 349, 355–56 (1978), and that prosecutors are absolutely immune when they act as "advocate[s] for the State," *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).  The same form of absolute immunity also extends to "members of quasi-judicial adjudicatory bodies when their duties are functionally equivalent to those of a judge or prosecutor."  *Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011) (citing *Butz v. Economou*, 438 U.S. 478, 512–13 (1978)); *see also, e.g.*, *Ditkowsky v. Stern*, 581 F. App'x 571, 573 (7th Cir. 2014) (members of state's attorney-discipline board); *Reed v. Village of Shorewood*, 704 F.2d 943, 951–52 (7th Cir. 1983) (members of local liquor-licensing commission); *Buckwalter v. State of Nev. Bd. of Med. Exam'rs*, 678 F.3d 737, 740 (9th Cir. 2012) (members of state's medical board).

To determine whether a defendant is shielded by quasi-judicial immunity, courts look to "the nature of the function performed, not the identity of the actor who performed it."  *Buckley*, 509 U.S. at 269.  "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."  *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 522 (7th Cir. 2001) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

In an earlier motion to dismiss, Stewart made essentially the same argument he makes now: that he is protected by absolute, quasi-judicial immunity to the full extent of his involvement in Dr. Wilson's license-revocation proceedings.  *See Wilson*, 376 F. Supp. 3d at 864–66.  The court's earlier ruling addressed that argument in two parts.  First, the court recognized that a state officer is "absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors."  *Id.* (alteration omitted) (quoting *Stump*, 435 U.S. at 359)).  Because "[i]ssuing orders is fundamentally judicial in nature," the court held

that Stewart was absolutely immune from liability for issuing the April 2013 Suspension Order, however delayed or flawed it may have been. *Id.* at 865–66. Second, however, the court recognized that absolute immunity "applies only to judicial acts and does not protect the official from acts that are ministerial or administrative in nature." *Id.* at 865 (quoting *Heyde*, 633 F.3d at 517). It therefore held that absolute immunity would not extend to Stewart's actions in "setting policy and overseeing the overall conduct of the employees of the [DPR]." *Id.* at 865, 869 ("These are administrative functions, not judicial functions."). As a result, Dr. Wilson's complaint survived the motion to the extent it alleged an unconstitutional delay caused by Stewart's administrative actions.

Now, on summary judgment, the entire case has been reduced to Dr. Wilson's claim that, as he puts it, Stewart "fail[ed] to bring the license revocation proceedings against Dr. Wilson to closure without appreciable delay." (Pl.'s Resp. at 25.) Dr. Wilson believes that this failure was administrative in nature, while Stewart believes that the failure, if any, was judicial.

No judge or decision-making body should be cavalier about delays. That said, "deciding when to decide a case, no less than deciding the case itself, is a judicial act for which a judge is absolutely immune." *Lowe v. Letsinger*, 772 F.2d 308, 313 (7th Cir. 1985) (finding a judge absolutely immune where he had taken four years to rule on the plaintiff's petition for post-conviction relief); *cf. Trotter v. Klincar*, 748 F.2d 1177, 1182 (7th Cir. 1984) (holding that "judicial functions" include not only rendering decisions but also undertaking "activities that are part and parcel of the decision process"). Dr. Wilson insists that his claim is not foreclosed by this straightforward principle. In his view, he is suing Stewart not merely for the delay in issuing particular orders (which he concedes would be a nonstarter), but instead for some broader "failure to bring the license revocation proceedings . . . to closure without appreciable delay." (Pl.'s Resp. at 25.) Stewart retorts that "these are just two ways to say the same thing, especially since, as a practical matter, the only way that a Director could 'bring . . . license revocation proceedings . . . to closure' is by entering an order of some kind." (Def.'s Reply at 10.)

Despite Dr. Wilson's attempt to dress up his claim in more complex terms, the court agrees with Stewart that this case boils down to Dr. Wilson's grievance about the sluggish pace of judicial action in his license-revocation proceeding. Dr. Wilson believes that Stewart, as the final adjudicator, did not resolve the case fast enough. However troubling the delays were in this case, "deciding when to decide a case, no less than deciding the case itself, is a judicial act." *Lowe*, 772 F.2d at 313. Stewart is thus absolutely immune from the claim.

In *Lowe*, where the defendant failed to rule on a state court post-conviction petition for four years, the Seventh Circuit set out three factors for determining whether an act is judicial rather than administrative:

> (1) whether the act or decision involves the exercise of discretion or judgment, or is rather a ministerial act which might as well have been committed to a private person as to a judge; (2) whether the act is normally performed by a judge; and (3) the expectations of the parties, i.e., whether the parties dealt with the judge as judge.

*Lowe*, 772 F.2d at 312 (citations omitted). The court concluded that "[a]ll three factors point[ed] to the judicial character of Judge Letsinger's decision not to issue a decision in the case for four years." *Id.* First, "[d]eciding when to issue a decision is part and parcel of a judge's docket management function over which he has broad and virtually unfettered discretion." *Id.* Second, "the timing of a decision is normally, if not always, a judicial decision." *Id.* And third, "Lowe dealt with the judge as a judge when he repeatedly requested the issuance of a decision." *Id.*

Stewart's role reflects these same hallmarks of judicial action. Stewart exercised significant discretion in the disciplinary process, as he was not mandated to make one decision or another. (*See, e.g.*, Stewart Dep. 210:9–10 (testifying that "I wouldn't have signed [an] order if I wasn't comfortable with it"); *id.* 212:15–16 (testifying that "a director is not compelled to sign or not sign specific orders"); *id.* at 213:12–13 (testifying that "a director can choose not to sign an order" recommended by the Medical Disciplinary Board).) And it goes without saying that signing orders in a disciplinary proceeding is a task one would expect to be performed by a judicial figure.

It makes no difference that Dr. Wilson has identified statutes that require certain aspects of the DPR's license-revocation proceedings to be conducted "promptly" or concluded "without appreciable delay." (Pl.'s Resp. at 25 (citing 225 ILCS 60/37(d); 5 ILCS 100/10-65(d)).)[24] Whether an adjudicator's actions are "based on statute, rule or inherent authority," they are absolutely protected from damages liability as long as they are carried out in a "judicial capacity." *Thompson v. Duke*, 882 F.2d 1180, 1184 (7th Cir. 1989). Even if Stewart did, through untimeliness, violate a procedural requirement in question, his acts and omissions were made in his judicial capacity as the decision-maker in Dr. Wilson's disciplinary proceeding.[25]

The Seventh Circuit's decision in *Dawson v. Newman* provides a helpful illustration of the principle that a statutory violation does not abrogate a judicial figure's absolute immunity. *See* 419 F.3d 656 (7th Cir. 2005). In that case, a state judge had ordered the plaintiff released from prison after correcting his sentence, but his office failed to properly transmit the order to the state's department of corrections. *Id.* at 658–59. As a result, the plaintiff remained in prison for fourteen months longer than he should have. *Id.* at 659. The plaintiff then sued the judge for damages under § 1983, citing a state statute that required "the court" to "immediately send" the sentence-correction order to the department of corrections. *Id.* at 661. Despite the plain violation of the statute, the Seventh Circuit found the judge absolutely immune from liability. *Id.* at 661–62. To

---

[24]    The first of these statutes provides that "[i]n the event that the [IDFPR] Secretary suspends, temporarily, the license of a physician without a hearing, a hearing by the Medical Board shall be held within 15 days after such suspension has occurred and *shall be concluded without appreciable delay*." 225 ILCS 60/37(d) (emphasis added). The second statute provides that "summary suspension of a license may be ordered pending proceedings for revocation or other action," but that "[t]hose proceedings shall be promptly instituted and determined." 5 ILCS 100/10-65(d).

[25]    Dr. Wilson has not meaningfully attempted to apply the language of these statutes to the facts of the case. He simply gestures at the statutory phrases "promptly" and "without appreciable delay," as if it is self-evident that Stewart violated those requirements. And even if Dr. Wilson had successfully established Stewart's violation of the statutes, he has not established a violation of his constitutional rights. *See Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004) ("[T]he mere fact that state rules or statutes are violated does not in and of itself amount to a constitutional violation or give rise to an actionable § 1983 claim.").

the extent that the statute imposed any duty directly on the judge (rather than on a staff member or on the court "as an institution"), this duty was "part of the judicial case processing function," which meant that it "implicate[d] the judge's role *as judge* rather than as an administrative or clerical officer." *Id.*

The same is true in this case. Assuming that the Illinois statutes imposed any duty on Stewart himself, they implicated his role as an adjudicator exercising a "docket management function" over the license-revocation proceeding. *See Lowe*, 772 F.2d at 312; *see also Trotter*, 748 F.2d at 1182 (granting absolute immunity to decision-maker's actions that were "analogous to judicial action relating to the conduct of trial proceedings and to rulings on motions of counsel"). Just as a judge's violation of a procedural rule does not strip her of absolute immunity, *see Stump*, 435 U.S. at 356, Stewart's ostensible violation of the Illinois statutes des not abrogate his quasi-judicial immunity in this case.

In *Butz v. Economou*, the Supreme Court identified "several characteristics of quasi-judicial functions that courts should consider when determining whether a public official is entitled to absolute immunity":

> (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for damages actions as a means for controlling unconstitutional conduct; (3) the insulation from political influence; (4) the importance of precedent; (5) the adversarial nature of the process; and (6) the correctability of error on appeal.

*Heyde*, 633 F.3d at 517 (citing *Butz*, 438 U.S. at 512). This court cited the *Butz* factors in its previous opinion. *See Wilson*, 376 F. Supp. 3d at 864. The parties have nevertheless not addressed those factors, but the court concludes that they support Stewart's defense of absolute immunity.

As Stewart points out, "[t]he State's interest in promoting the general welfare by licensing physicians is of great importance." *Rios v. Jones*, 63 Ill. 2d 488, 497, 348 N.E.2d 825, 830 (1976). It is vital that an adjudicator like Stewart, who signed the DPR's final orders disciplining physicians, "be free of 'the harassment and intimidation associated with litigation.'" *See Richman v. Sheahan*,

270 F.3d 430, 435 (7th Cir. 2001) (quoting *Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir.1992)); *cf.* *Kissell v. Breskow*, 579 F.2d 425, 430 (7th Cir. 1978) (granting absolute immunity to state officers who oversee attorney discipline so that the officers can be "free[] . . . to exercise their best judgment"). Dr. Wilson does not believe that the DPR (or Stewart) treated him fairly, but that treatment occurred in an adversarial setting where Dr. Wilson could seek judicial review of the agency's decisions. Indeed, Dr. Wilson successfully persuaded a court of what was essentially the same theory undergirding this § 1983 claim: that the DPR had violated Dr. Wilson's due process rights by making decisions too slowly. (*See* May 2014 State Court Order at 9–12.) On this very basis, the state court granted Dr. Wilson relief by vacating the DPR's suspension orders. These factors all establish that Stewart is protected by quasi-judicial immunity for his role.

As noted, the court's earlier left open the possibility for Dr. Wilson to show that it was Stewart's administrative actions, rather than judicial actions, that caused a constitutional deprivation. *See Wilson*, 376 F. Supp. 3d at 865, 869. In an effort to squeeze through this door, Dr. Wilson cites Stewart's testimony about the duties he had as the DPR's "leader," such as "setting the general policy goals and obligations of the DPR" and seeking to "ensure the department complies with the laws, rules and regulations that it operated under." (Pl.'s Resp. at 25–26.) But the mere fact that Stewart possessed administrative duties does not strip him of absolute immunity with respect to his adjudicatory role in Dr. Wilson's license-revocation proceeding. As Stewart points out, such a theory of liability would create an end-run around the absolute immunity doctrines by allowing a plaintiff to recast almost any claim against a decision-maker as a claim regarding the decision-maker's high-level duties like managing the conduct of employees or ensuring that the office follows the law. (*See* Def.'s Reply at 11.)

At one point in his brief, Dr. Wilson offhandedly suggests that quasi-judicial immunity cannot extend to delays that were not brought about by "the complexities of [the] case" or "the necessary deliberative process." (Pl.'s Resp. at 25.) Under this theory, immunity would be warranted only where the defendant's malfeasance (here, the delay) is deemed to have been

justified by the demands of the case.  Stewart correctly notes that a defendant's acts need not meet any standard of quality or rigor to be protected by absolute immunity.  (Def.'s Reply at 10 ("[T]he case law does not distinguish between difficult and easy judicial decisions.").)  *See also Thompson*, 882 F.2d at 1184 ("In the continuum of judicial proceedings some judicial acts require extensive exercise of a judge's decision-making skills and others do not—yet all such acts make up the judicial function regardless of their isolated importance.").  Indeed, judicial acts are protected "whether or not the judges erred in conducting the litigation."  *Myrick v. Greenwood*, 856 F.3d 487, 488 (7th Cir. 2017).

The upshot is that in holding Stewart to be absolutely immune, the court does not place any imprimatur on his actions.  The facts of this case reflect somewhat poorly on the agency (and perhaps on Stewart himself).  But if courts granted absolute immunity only after assessing quasi-judicial conduct on the merits, it would undermine the doctrine's prophylactic goal of protecting officials' "decision-making function from being impeded by fear of litigation or personal monetary liability."  *Crenshaw v. Baynerd*, 180 F.3d 866, 868 (7th Cir. 1999); *see also Lowe*, 772 F.2d at 313 ("The functioning of the system is more important than some particular and rare judicial misdeed which can be dealt with in other ways, by appellate processes, the ballot, or, in the federal system, by impeachment or other sanctions . . . .").  Because Dr. Wilson's claim targets Stewart's judicial acts, Stewart is absolutely immune.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Stewart's motion [132] is granted.  Judgment is entered in favor of Defendant and against Plaintiff.  This ruling is final and appealable.


ENTER:

Dated:  August 16, 2022

_____
REBECCA R. PALLMEYER
Unitetrd States District Judge